UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 00-6017-CIV-DIMITROULEAS/SELTZER

CHERL SEARS                          )
                                     )
            Plaintiff,               )
                                     )
v.                                   )
                                     )
THE SCHOOL BOARD OF BROWARD          )
COUNTY, FLORIDA,                     )
                                     )
            Defendant.               )
_____)

NIGHT BOX
FILED

DEC 2 1 2000

CLARENCE MAD~~
CLERK, USDC / SDFL / FTL

## DEFENDANT'S NOTICE OF FILING

Defendant, THE SCHOOL BOARD OF BROWARD COUNTY, FLORIDA, through its

counsel, Muller, Mintz, Kornreich, Caldwell, Casey, Crosland & Bramnick, P.A., hereby gives

notice of filing of the following deposition transcriptions and affidavit in support of Defendant's

Motion for Summary Judgment and in opposition to Plaintiff's Motion for Summary Judgment:

1.    Deposition Transcript of Cherl Sears;

2.    Deposition Transcript of Gracie Diaz; and

3.    Affidavit of Gracie Diaz.

Suite 3600
First Union Financial Center
200 South Biscayne Boulevard
Miami, Florida 33131-2338
(305) 358-5500 (Miami-Dade)
(954) 522-0393 (Broward)
(305) 379-3802 (Fax)

MULLER, MINTZ, KORNREICH, CALDWELL,
CASEY, CROSLAND & BRAMNICK, P.A.

By_____
Gordon D. Rogers
grogers@mullermintz.com
Florida Bar No. 210168

By_____
Debra M. Lubkin
dlubkin@mullermintz.com
Florida Bar No. 992161
Counsel for Defendant

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of this document has been furnished to Counsel for

Plaintiff, Mark J. Berkowitz, Esquire, Mark J. Berkowitz, P.A., Suite 200N, 524 South Andrews

Avenue, Fort Lauderdale, Florida 33301, by Certified Return Receipt Mail, Receipt No. 700 0520

0018 3409 1125, this **21**st day of December, 2000.

Debra M. Lubkin

```
 1                UNITED STATES DISTRICT COURT

 2           FOR THE SOUTHERN DISTRICT OF FLORIDA

 3
                        CASE NO. 00-6017-CIV-DIMITROULEAS
 4

 5   CHERL SEARS,                    )
                                     )
 6                    Plaintiff,     )
                                     )
 7        vs.                        )
                                     )
 8   THE SCHOOL BOARD OF BROWARD     )
     COUNTY, FLORIDA,                )
 9                                   )
                      Defendant.     )  ORIGINAL
10   - - - - - - - - - - - - - - - - x

11

12

13            DEPOSITION OF CHERYL SEARS

14

15          Taken before RICK LEVY, Registered

16   Professional Reporter and Notary Public in and for

17   the State of Florida at Large, pursuant to Notice

18   of Taking Deposition filed in the above cause.

19
     200 South Biscayne Boulevard
20   Suite 3600
     Miami, Florida
21   Wednesday, November 8, 2000
     10:21 a.m. - 2:55 p.m.
22

23

24

25
```

```
 1   APPEARANCES:

 2   On behalf of the Plaintiff:

 3          MARK J. BERKOWITZ, P.A.
            Suite 200N 524 South Andrews Avenue
 4          Ft. Lauderdale, Florida 33301
            BY:  MARK J. BERKOWITZ, ESQUIRE
 5
     On behalf of the Defendant:
 6
            MULLER, MINTZ, KORNREICH, CALDWELL et al.
 7          200 South Biscayne Boulevard
            First Union Financial Center  Suite 3600
 8          Miami, Florida 33131
            BY: GORDON ROGERS, ESQUIRE
 9
     Also Present: Kelly Sulzberger
10                          INDEX
11    Witness      Direct   Cross   Redirect   Recross
     CHERL SEARS
12    By Mr. Rogers    3              --
13                        EXHIBITS
14                     NUMBER        PAGE
15                     No. 1          10
                       No. 2          14
16                     No. 3          15
                       No. 4          22
17                     No. 5          24
                       No. 6          34
18                     No. 7          40
                       No. 8          58
19                     No. 9          61
                       No. 10         64
20                     No. 11         67
                       No. 12         73
21                     No. 13         74
                       No. 14         79
22                     No. 15         81
                       No. 16         86
23                     No. 17         90
                       No. 18         92
24                     No. 19        110
                       No. 20        112
25                     No. 21        121
```

```
 1    Thereupon --
 2                      CHERYL SEARS
 3    was called as a witness and, having been first duly
 4    sworn, was examined and testified as follows:
 5                    DIRECT EXAMINATION
 6    BY MR. ROGERS:
 7        Q    It's now about 10:21 a.m for the purposes
 8    of the rule.  Ms. Sears, my name is Gordon Rogers.
 9    We're here on the case of Cherl Sears vs. School
10    Board of Broward County Florida, case number
11    00-6017-CIV Dimitrouleas.
12              Again, the purpose of this deposition is
13    for me to ask you questions and find out what your
14    case is about.  If at any time you don't understand
15    my question, please let me know and I'll rephrase
16    it.
17              If at any time your lawyer objects to
18    something, bare in mind there are very few
19    objections except to form of the question in this
20    sort of thing, but if he does object and directs
21    you not to answer you naturally do what your lawyer
22    says.
23              What I anticipate is we should not have
24    that much to go through so I don't think we'll have
25    any problem with the six hour rule here today so
```

```
 1   we'll probably end up breaking for lunch and come
 2   back after lunch and finish it up.  Because of the
 3   nature of the way that some of the discovery was
 4   framed it may be pretty tedious for us to go
 5   through some things but the only big thing is on a
 6   deposition one, make sure you understand the
 7   question, two, make sure you tell the truth.
 8         If you don't understand the question
 9   again let me know and we'll rephrase it.  If you
10   need a break at any time let me know.  As long as
11   there's no question pending we can accommodate
12   whatever you need.  Other than that can you just
13   state your name for the record and spell it for the
14   court reporter?
15      A    My name is Cherl Sears.  Cherl is
16   C-h-e-r-l.  Sears is a S-e-a-r-s.
17      Q    Residence address?
18      A    4730 Northwest 11th Street, Lauderhill,
19   Florida, 33133.
20      Q    How long have you lived there?
21      A    Since 1994.  August of 1994.
22      Q    Where did you live prior to that?
23      A    Pompano Beach, Florida.
24      Q    Can you tell me something about your
25   educational background?
```

```
 1        A     I have a BA degree in criminal justice.
 2   You want to know where I worked or --
 3        Q     No, you finished high school obviously?
 4        A     Yes.
 5        Q     Where did you go to high school?
 6        A     Fort Myers High School in Fort Myers,
 7   Florida.
 8        Q     What year did you finish high school?
 9        A     1984.
10        Q     Where did you get your BA degree from?
11        A     Florida Memorial College in Miami,
12   Florida.
13        Q     I presume at some point you moved from
14   Fort Myers to Miami?
15        A     Yes.
16        Q     Can you tell me when that was?
17        A     1985.
18        Q     Maybe we can sort of speed things up with
19   some documents here.  Let me show you a document
20   and ask if you can identify it for me.  Each time
21   we do this I'm going to show it to your lawyer
22   first and he'll show it to you.
23              Can you tell me what the document I've
24   just shown you is?
25        A     It's a resume of my educational
```

1   background and my work experience.

2       Q    How did you come to prepare that?  Who
3   did you prepare it for?

4       A    I prepared it for a variety of jobs that
5   I was seeking employment, job employment so
6   whatever employment I was seeking it was for that
7   purpose.

8       Q    Did you submit that resume to the School
9   Board of Broward County?

10      A    Yes, I did.

11      Q    We're referring to bate stamped document
12  0026, 0027, 0028.  Drawing your attention to 0029
13  can you tell us what that document is?

14      A    0029?

15      Q    Yes.

16      A    It's an application for employment for
17  the Broward County School Board.

18      Q    You applied at the date and this appears
19  to be January 27th 1992 up at the top?

20      A    January 27th '92, yes.

21      Q    You applied for work as a substitute
22  teacher or coach?

23      A    Right, substitute teacher at the time.

24      Q    That is a document that you prepared?

25      A    Yes.

1        Q        And submitted to the School Board?

2        A        Yes.

3        Q        Now, if you turn to the next document

4    which is 0030 that shows your BA degree in criminal

5    justice from Florida Memorial College at the top

6    under education; is that correct?

7        A        That's correct.

8        Q        Then when you get down to section B about

9    a third of the way down the page it talks about

10    teaching experience. Can you tell me what teaching

11    experience you're referring to there?

12        A        This teaching experience here is only

13    substitute experience where I substituted in a

14    variety of subjects. All subjects.

15        Q        This was --

16        A        Middle school level.

17        Q        In Fort Myers?

18        A        Right.

19        Q        Was it all at the same school?

20        A        It was a variety of schools but this is

21    just only one school.

22        Q        So just so I understand, during 1991 you

23    substituted for Lee County School Board at a

24    variety of different schools?

25        A        Yes.

```
 1        Q      You say that you -- in the last column
 2    that you were a full-time sub.  What do you mean by
 3    that?
 4        A      I was at that school for several months
 5    at a time.
 6        Q      Were you assigned to the school and just
 7    subbed at any class that needed a teacher or did
 8    you have a specific class each day?
 9        A      I was in one class for several months and
10    after the teacher -- like an interim sub or
11    something like that.  I don't know the exact dates
12    but I was in one class for several months and when
13    the teacher came back I was released from that
14    class and I subbed all over, different classes.
15        Q      But at the same school?
16        A      At that same school.
17        Q      When you say 1991, that was during
18    calendar year 1991?
19        A      Yes.
20        Q      So it wasn't the whole school year 1991
21    it was just the year 1991?
22        A      Yes.
23        Q      Then down below that we have non-teaching
24    work experience and it shows 1991 to 1991 you
25    worked for Broward County Parks and Recreation?
```

```
 1        A     Yes.
 2        Q     That was what type of job?
 3        A     Summer employment.  Well, working with
 4   kids playing different sports activities.
 5        Q     Was that more or less a camp counselor
 6   job?
 7        A     Exactly.
 8        Q     Now, if you go on to the next page which
 9   is 0031 of the document this talks about whether or
10   not you had a Florida educator certificate.  What
11   sort of certificate did you have at that time?
12        A     Substitute certificate.
13        Q     Go ahead.
14        A     Which enabled me to substitute in areas K
15   through 12.
16        Q     That was with the Lee County School
17   Board?
18        A     At this time I'm not sure.  I had one
19   through Lee County School Board and I had one
20   through -- I had one for Lee County School Board
21   and before I was able to sub for Broward County I
22   had to get one for Broward County.
23        Q     But do you have a recollection of whether
24   you had a certificate for Broward County before you
25   made this application that's 0029 in that document?
```

```
 1        A     I can't remember whether I had it at the
 2   time or whether I got it after the time but it was
 3   required before you can sub in Broward County.  I
 4   can't remember.
 5        Q     Now, you've had a chance to look at the
 6   document we're just referring to which includes
 7   your resume and various bate stamped pages.  Do you
 8   see anything in there that's incorrect?
 9        A     On all pages?
10        Q     Just since you did the resume I presume
11   that's all correct but you tell me if it's not.
12        A     I don't know anything that's incorrect on
13   it.
14              MR. ROGERS:  We would like to have this
15         attached then as Defendant's Exhibit No. 1
16         composite.
17                   (Defendant's Exhibit No. 1 was
18                   marked for identification.)
19   BY MR. ROGERS:
20        Q     For the record let me show you another
21   document bate stamped 0039, 0040 and ask if you can
22   tell me what that is.
23        A     This is a substitute teacher's clearance
24   form.
25        Q     And the date on this is -- is that your
```

```
 1    signature at the bottom of the page?
 2         A     Yes.
 3         Q     That's dated January 28th 1992?
 4         A     Yes.
 5         Q     And then if I'm reading correctly and I
 6    apologize this is a poor copy but a lot of this
 7    stuff is on microfiche.  It appears to say you can
 8    begin as a substitute teacher on February 4th 1992
 9    all the way down at the bottom right above your
10    signature?
11         A     You're saying that's what it says?
12         Q     Yes.
13         A     Okay, yes, I see it.
14         Q     So you were cleared to begin work as a
15    substitute teacher based upon this clearance form
16    as of February 4th 1992; is that correct?
17         A     Yes.
18         Q     Now, look at the top of the page for me
19    because I'm trying to figure out were you
20    fingerprinted by Broward County School Board on
21    January 28th 1991 or did somebody write the wrong
22    year in there?
23         A     I'm not sure on the date.  I'm not sure
24    on the exact date that I was fingerprinted.
25         Q     Well, what were you doing in
```

1    January 1991?  Were you working somewhere else?

2        A    I think for Parks and Recreation in

3    Broward County.

4        Q    I thought that was a summer job?

5        A    That was a summer job but I don't know

6    the exact date that I was fingerprinted but that

7    was part of the requirement I had to be

8    fingerprinted before I was able to begin to sub but

9    I'm not sure.

10       Q    Tell me basically the process, you got

11   cleared to start working for Broward County as a

12   substitute?

13       A    As a substitute I had to be -- I think

14   they had to do a background check.  I had to be

15   fingerprinted.  I had to turn in my requirements

16   saying that I had a degree and I had to complete

17   substitute training course.  I had to be -- in

18   order to sub so I'm just not -- I don't know the

19   exact date that I was fingerprinted but I had to be

20   cleared through fingerprints before I could even

21   start subbing.

22       Q    This is your signature that appears on

23   the bottom of 0039?

24       A    Yes.

25       Q    What was explained to you as to what the

06017-WPD    Document 34    Entered on FLSD Docket 12/22/2000    Pa

```
1    frequency of your employment would be if you were
2    accepted as a substitute teacher?
3         A      You're talking about the requirements
4    or --
5         Q      Just basically I'm talking about the
6    fifth paragraph down on this document.
7         A      Actually this wasn't explained to me.  I
8    just read it and completed everything I had to
9    complete and I guess this was done by the school
10   board.  This was their clearance sheet.  They
11   checked off what I completed.  I had no one sit
12   down with me and explain to me what was expected.
13        Q      Did you read this before you signed it?
14        A      Yes, I read it.
15        Q      So the paragraph that I'm speaking of
16   says that and I quote "I understand that there are
17   currently over 3,000 substitutes on the board
18   approved substitute list and that steady employment
19   is not guaranteed?"
20        A      Yes, I know that.  I'm familiar with
21   that.
22        Q      You understood that part.  But when
23   you're speaking about the checkoff sheet and
24   whatnot you think -- you're talking about the top
25   of this page?
```

ESQUIRE DEPOSITION SERVICES (954) 331-4400

```
 1        A     Yes, that's what I was talking about.
 2        Q     Somebody at the school board completed
 3   that part?
 4        A     Yes.
 5        Q     Then turn for me if you would to the next
 6   page of that document which is 0040.
 7        A     Okay.
 8        Q     Is that your signature that appears on
 9   the bottom of that page?
10        A     Yes.
11        Q     Were you aware of the statement that
12   there were now 3,300 substitutes available and that
13   regular employment should not be expected or
14   guaranteed?
15        A     At the time I was aware of it.
16             MR. ROGERS:  This will be Defendant's
17        Exhibit No. 2.
18                  (Defendant's Exhibit No. 2 was
19                  marked for identification.)
20   BY MR. ROGERS:
21        Q     Now, let me show you the next document
22   which is bate stamped 0050 and ask if you can
23   identify that for me (Indicating).
24        A     Okay, yes.
25        Q     Tell me what this is.
```

```
 1        A      This is saying that I moved from Pompano
 2   Beach which I needed to put in a change address and
 3   I gave them the new address which is 4730 Northwest
 4   11th Street.
 5        Q      Is that still your current address?
 6        A      Yes.
 7        Q      Now, do you own that or rent?
 8        A      Own.
 9               MR. ROGERS:   This will be Defendant's
10          Exhibit No. 3.
11                    (Defendant's Exhibit No. 3 was
12                    marked for identification.)
13   BY MR. ROGERS:
14        Q      Now, prior to that date how frequently
15   had you been working with the school board as a
16   substitute teacher?
17        A      Before this date?
18        Q      Before that date.
19        A      At least four or five times a week.
20        Q      So four to five times a week?
21        A      Yes.
22        Q      Every week?
23        A      Every week.
24        Q      So how would you find out that you had a
25   particular assignment?
```

```
 1        A    On call.  They have a substitute system
 2   to where they call you out on the phone but I had
 3   built a rapport with schools to where I didn't even
 4   have to get called out by telephone.  The principal
 5   or whoever was in charge of calling the subs I
 6   would have assignments that was booked up weeks
 7   ahead of time whenever they knew that a teacher was
 8   going to be absent they plug you in.  So they
 9   reserve you in advance.
10        Q    What schools in particular did you have
11   that kind of arrangements with?
12        A    Ely High School, Castle Hill Elementary.
13   Basically I had to only go to one or two schools
14   and I was -- I kept work that way because I had a
15   rapport with the schools.
16        Q    When you had a rapport with the schools
17   who at the schools do you recall?
18        A    Shirley Larken was at Ely High School and
19   I can't remember the lady that was over subs at
20   Castle Hill.  It was a while back.
21        Q    Shirley Lerken, do you know what her
22   position was?
23        A    No.
24        Q    But she was in charge of subs?
25        A    Right, she was in charge of subs.
```

```
 1        Q     When you were working those four or five
 2   days a week at Ely and Castle Hill I believe you
 3   said?
 4        A     Yes.
 5        Q     Do you know how much you were getting
 6   paid a day?
 7        A     I don't know the exact amount because it
 8   went up.  I don't know the exact figure.
 9        Q     But this was you mentioned interim sub
10   that you were sort of like an interim sub in Lee
11   County?
12        A     No, Broward County.
13        Q     But you said sort of like an interim sub
14   in Dade County?
15        A     Yes, I was just getting substitute pay.
16   In Broward County when you're in the classroom the
17   reason I say interim is because I was in there a
18   certain amount of days like couple months but I was
19   still getting sub pay.
20        Q     You don't remember what you were making
21   at Broward?
22        A     I wasn't interim at Broward.  I can't
23   remember the pay.  I think it was like $74 a day.
24        Q     I'm sure we've got that some place.  Let
25   me show you the next document or let me back up.
```

```
 1    When you moved from Pompano Beach to your current
 2    address, were you married to Mr. Sears at that
 3    point in time?
 4         A    No, I wasn't.
 5         Q    Tell us who Mr. Sears is.
 6         A    Now or then?  He's my husband now.
 7         Q    He is your husband now?
 8         A    Yes.
 9         Q    What's his first name?
10         A    David.
11         Q    Were you living with Mr. Sears at the
12    point in time when you moved --
13         A    When I moved to --
14         Q    -- from Pompano Beach to the address that
15    we can't read on the --
16         A    No, I wasn't.
17         Q    When did you start living with Mr. Sears?
18         A    About 1996.
19         Q    Do you know about when?
20         A    No, I don't know the exact month.  I only
21    know the year.
22         Q    Was it before you were married to him?
23         A    Was I living with him before?
24         Q    Yes.
25         A    No.
```

```
 1        Q     I'm trying to figure out the next
 2   document here then.  Which is again two pages bate
 3   stamped 0017, 0018.
 4        A     You're trying to understand this
 5   (Indicating)?
 6        Q     No, the front page.  Specifically up at
 7   the top it says name Cherl Hall Sears but it
 8   appears to be dated July or signed by you July 21st
 9   1994.
10        A     This here (Indicating)?
11        Q     Yes.  The date right above where you
12   signed it is probably the best thing to go by.
13        A     This doesn't look like my writing here
14   where it says Sears (Indicating).
15        Q     I'm just trying to understand if you
16   weren't married to Mr. Sears in 1994 why would this
17   name be on this document?
18        A     I lost my train of thought but I know
19   that's not my writing.  I don't even write Sears.
20   Somebody had to add that.  I did get married in
21   '94.  '95 I think it was.  '95 I got married.
22        Q     So you weren't married to David Sears in
23   1994?
24        A     No, if I recall I think it was '95.
25        Q     And this shows your old Pompano Beach
```

```
 1    address as well, does it not?
 2         A       That's correct.
 3         Q       So how would anyone -- you say this is
 4    not your writing on the top portion of this?
 5         A       This is not my writing where Sears was
 6    added and this is my signature --
 7              MR. BERKOWITZ:  Is there a question
 8         pending?
 9    BY MR. ROGERS:
10         Q       I'm just trying to understand.  The
11    question was it's not her writing I believe she
12    said it's not her writing in the top section that's
13    entitled personnel or personal information.
14         A       That's not my writing.
15         Q       Do you know whose writing it is?
16         A       No, I don't.
17         Q       Down in the academic record portion about
18    three down, is that your writing?
19         A       The Florida Memorial, yes, that's my
20    writing.
21         Q       And then did you fill out the portion of
22    this document below that that talks about arrest
23    revocation record?
24         A       Yes, that looks like I filled it out.
25         Q       We did already establish that this is
```

```
1    your signature on the bottom of 0017?
2        A     That's correct.
3        Q     Tell us what this document is.
4        A     This is a request for substitute teaching
5    certificate.
6        Q     Why did you file this?
7        A     Actually I -- this here because in '92 I
8    had already filed for substitute teacher's
9    certificate so I don't know where this came about.
10   Why did I have to redo it.
11       Q     Well, the question I asked you earlier
12   was or let's say had to do with substitute
13   teacher's certificate you had prior to coming to
14   Broward County in 1992 was issued by --
15       A     Somebody changed this.  That's not even
16   my --
17       Q     You're referring to what now?
18       A     I guess I skipped over.  Somebody crossed
19   out Hall and put Sears.
20       Q     Tell me what the second page of this
21   document that's 0018 is.
22       A     This is the substitute teacher's
23   certificate that I received.
24       Q     The dates on this are July 1, 1994
25   through June 30th 1999?
```

```
 1      A      I guess that's the valid period.  Whoever
 2   crossed this out and put Sears that's the same
 3   person that wrote this.  I didn't do that.  You see
 4   where Hall is crossed out and Sears is wrote that's
 5   the same writing.  That is not my handwriting.
 6      Q      Is the Cherl Hall your handwriting?
 7      A      Yes, the Cherl Hall.  That's my
 8   handwriting.
 9      Q      I guess that clears that up then.  As of
10   the date that you signed this on July 21, 1994 is
11   the information as to arrests and convictions on
12   this form correct?
13      A      Yes.
14      Q      So you hadn't entered a plea of no
15   contest to any crime other than a traffic violation
16   as of that date?
17      A      I don't recall.  No.
18      Q      Did it happen or didn't it happen?
19      A      As of July 21st '94 I don't think it had
20   happened when I went through this.
21            MR. ROGERS:  This will be Defendant's
22         Exhibit No. 4.
23               (Defendant's Exhibit No. 4 was
24                 marked for identification.)
25
```

```
 1   BY MR. ROGERS:
 2       Q    We just refreshed your recollection here.
 3   Let me show you a document and ask if you can --
 4   it's unnumbered believe it or not but I believe we
 5   got that from your counsel.  Can you tell me what
 6   that document is?
 7       A    It's Florida marriage license.
 8       Q    Is that your signature that appears on
 9   that license?
10       A    Yes.
11       Q    Just for identification purposes it shows
12   an audit control number at the bottom of B136002;
13   is that correct?
14       A    Yes.
15       Q    When did you get married to David Stephon
16   Sears?
17       A    July 21st 1995.
18       Q    This indicates that you had been married
19   before that?
20       A    Yes.
21       Q    Is it correct that your last marriage
22   ended in divorce on January 15, 1992?
23       A    I don't remember the correct date but I
24   guess this is what it says on here.
25       Q    Who were you married to prior to
```

```
 1    Mr. Sears?
 2         A    Cleofus Hall.
 3              MR. ROGERS:  Let's just move this in as
 4         five I guess.
 5                   (Defendant's Exhibit No. 5 was
 6                   marked for identification.)
 7    BY MR. ROGERS:
 8         Q    When did you meet David Sears?
 9         A    Back in -- I don't know, 1992.
10         Q    In 1992 when you first moved to Broward
11    County?
12         A    Yes.
13         Q    Were you aware at the time that you met
14    Mr. Sears that he had a criminal background dating
15    back to 1987?
16         A    Yes.
17         Q    How did you become aware of that?
18         A    Because he told me.
19         Q    Tell me what offenses that you were aware
20    that he had committed as of 1992 when you first met
21    him.
22         A    The offenses that I was aware of?
23         Q    Yes.
24         A    What he told me he had committed?
25         Q    What he told you he had done.
```

```
 1        A      He had been to prison on a racketeering
 2   charge or something like that.
 3        Q      He had actually been in prison?
 4        A      Right.
 5        Q      Were you aware that he had been on parole
 6   for sale or purchase of heroin?
 7        A      No, I wasn't aware of that.
 8        Q      Were you aware that he was on parole for
 9   cocaine possession in 1989?
10        A      I was aware that he had been -- I don't
11   know about parole but I thought he had been
12   prisoned for cocaine, yes.
13        Q      Were you aware that he had been on parole
14   for carrying a concealed firearm in November 1989?
15        A      No.
16        Q      What years is it you were aware that he
17   was in prison from?
18        A      What years?
19        Q      How many years was he in prison?
20        A      Before me or during the time he was with
21   me?  I think he had been one time for three months
22   when he had been with me.  I don't know how much he
23   had served before he had been with me.
24        Q      And you say you believe that was a
25   conspiracy charge of some kind?
```

```
 1        A      Racketeering he had told me.
 2        Q      This shows him as a prison inmate for
 3   carrying a concealed firearm, cocaine possession,
 4   cocaine sale, manufacture and delivery on a variety
 5   of different dates but as of 1992 all you knew was
 6   that he had been in jail for three months at some
 7   point; is that true?
 8        A      That's after the fact.  During the period
 9   of time that I have been with him he had been for
10   like three months.
11        Q      Do you know if he was in jail before you?
12        A      Oh, yes, I knew he had served time but I
13   didn't know how much time he had served on a
14   racketeering charge.
15        Q      Do you know when he served that time?
16        A      No.
17        Q      Was it before you met him in 1992?
18        A      Yes.  It was definitely before.
19        Q      On the other time that he served while
20   you knew him was about when if you recall?
21        A      When did he serve it?
22        Q      Right.
23        A      I think '93 or '94.
24        Q      Now, did there come a time in 1995 when
25   you were arrested along with Mr. Hall?
```

```
 1        A      Sears.

 2        Q      Or Mr. Sears rather, I'm sorry.

 3        A      Yes, I did.

 4        Q      Let me show you a couple of documents and

 5   ask you if you can identify those for me.  We'll

 6   start with the document that's bate stamped 0103

 7   through 0112.  I ask if you've seen that before.

 8        A      Have I seen it before?

 9        Q      Yes.

10        A      No.  I haven't seen it.

11        Q      Let's go through some of the information

12   in it if we can.  As of June 15th Mr. Sears was

13   apparently booked.  Was he working for Lester Lawn

14   Service?

15        A      June 15th?

16        Q      When he was arrested.

17        A      Yes, I'm familiar with him doing some

18   lawn service work with Lester Lawn Service.

19        Q      Was he getting paid in cash or was he

20   getting paid in the normal fashion with a check

21   with taxes being taken out?

22        A      As far as I know I don't know about the

23   taxes.  I think he was getting paid in cash.

24        Q      This indicates that on June 15th

25   Mr. Sears was --
```

1      A      Where are you?

2      Q      Front page of that.  Mr. Sears was

3   arrested and charged with murder, second count of

4   operating a motor vehicle against restriction and a

5   third count of possession of cocaine.  Were you

6   with him at the point in time when he was arrested

7   on those charges?

8      A      Yes.

9      Q      Tell us what happened.

10     A      I was in the car with him.  The police

11  stopped the car.  David was driving the car.  I was

12  a passenger in the car.  Actually he had picked me

13  up from my house and on the way to the mall.  On

14  our way to the mall the police stopped the car and

15  they told us to get out of the car and I asked him

16  what was the reason why they wanted us out of the

17  car.  They said the car had fitted a description

18  of -- the car that we was in had fit a description

19  of a person that had murdered -- supposedly

20  murdered someone.

21          During that time we got out of the car

22  and they went I guess put me in the car, put him in

23  the car and they searched the car and searching the

24  car they found cocaine.  So they took both of us in

25  custody.  They took me somewhere and they

1  questioned me about a murder which I knew nothing

2  about.

3          They questioned me only about the murder.

4  They didn't ask me anything about the cocaine that

5  was in the car and after I didn't know anything

6  about the murder they decided to arrest me too.  I

7  guess they arrested David and they arrested me.

8      Q    Now, were you living with David Sears at

9  the point in time when the arrest occurred?

10     A    In --

11     Q    In June, 1995.

12     A    No.  He used to come by spend the night

13 and stuff but I wasn't actually living with him.

14     Q    At that point if you weren't living with

15 him I don't know what the appropriate phraseology

16 were you seeing him exclusively since 1992 or when

17 did you start to --

18     A    Yes, we were seeing each other off and on

19 a lot.

20     Q    Were you also seeing other people?

21     A    No, I wasn't.

22     Q    So he was your steady boyfriend from 1992

23 on?

24     A    Yes.

25     Q    Is that an appropriate way to say it?

```
 1        A    Yes.
 2        Q    Now, why was he -- who owned the car
 3    first off?
 4        A    I owned the car.
 5        Q    What kind of car was it?
 6        A    It was a -- I don't know what year.  It
 7    was a Cadillac white with a blue rag.
 8        Q    Blue rag means what?
 9        A    Rag top.  The top was dark blue.
10        Q    Was it convertible or just --
11        A    Just a regular rag top.  It wasn't
12    convertible.
13        Q    How did Mr. Sears come to be driving your
14    car?
15        A    I let him borrow it.  I let him hold it.
16        Q    Do you remember what day of the week this
17    was?
18        A    No.  I know it was through the week.
19        Q    Was it a weekday?
20        A    Yes, it was a weekday.
21        Q    About what point in time did Mr. Sears
22    come and pick you up?
23        A    I can't remember that.
24        Q    Where were you when he picked you up?
25        A    I was at my home.
```

1     Q     Do you know if you had worked that day as
2  a substitute teacher?
3     A     No, at that time I was doing my summer
4  job.  I was on another job for summer employment.
5     Q     What did you do for summer employment?
6     A     I worked for BETA, Broward County
7  Employment and Training where I worked with kids
8  with helping them with job placements.  I did job
9  placement for youth.
10    Q     So maybe we can ask that now.  At any
11  point while you were working for Broward County
12  School Board did you work summer school as a
13  substitute teacher?
14    A     No.
15    Q     So your summers were free?
16    A     No, I worked every summer but not with
17  the School Board.  I did it with BETA, Broward
18  County Employment and Training.
19    Q     On the day you were arrested had you
20  worked for BETA that day?
21    A     No, I was off sick that day actually.
22    Q     You were off sick but why did Mr. Sears
23  come and pick you up?
24    A     Because I wanted to go to the mall.
25    Q     Even though you called in sick that day?

```
 1        A     Yes.

 2        Q     How did you contact Mr. Sears to let him

 3   know that?

 4        A     I think I beeped him.

 5        Q     Had he had your car the whole day?

 6        A     Yes.

 7        Q     Was that customary for you to give him

 8   your car just let him have it for the whole day?

 9        A     Yes, I had two.

10        Q     You had two cars?

11        A     He holds it a lot.

12        Q     What was the other car you have?

13        A     A 240 Nissan.

14        Q     But the car was in your name?

15        A     Right.

16        Q     Now, did you have any knowledge that

17   Mr. Sears had 14 grams of cocaine stashed in your

18   car when he picked you up that day?

19        A     No, I didn't.

20        Q     Had you ever seen him with cocaine

21   before?

22        A     No, I haven't.

23        Q     Then the part of the police report also

24   indicates that when you were arrested you had $50

25   or actually $53 in one dollar bills rolled up with
```

```
 1    a rubber band around it.  Did you in fact have that
 2    money?
 3         A    I had $53 worth of the ones.
 4         Q    Was it rolled up in a --
 5         A    I don't recall it being rolled up.  It
 6    was in my wallet.
 7         Q    Why would you have $53 in ones?
 8         A    I just had it.  $53 in ones that he gave
 9    me.
10         Q    He gave it to you?
11         A    Yes.
12         Q    Was it rolled in a rubber band or not?
13         A    No, it wasn't.  It was in my wallet.
14         Q    Now, do you know what eventually happened
15    to the murder charge against Mr. Sears?
16         A    Yes, I do.
17         Q    What happened?
18         A    He went before a grand jury and the
19    charges were dropped.
20         Q    What happened to the other two charges of
21    possessing cocaine and driving with a restricted
22    license?
23         A    The possession charge he went to prison
24    on.
25         Q    How long did he go to prison?
```

```
 1        A     Like 11 months.
 2              MR. ROGERS:  I would like to have this
 3        attached as the next exhibit.
 4                   (Defendant's Exhibit No. 6 was
 5                   marked for identification.)
 6   BY MR. ROGERS:
 7        Q     The next document I have for you is bate
 8   stamped 0150, 0151.  I'll show this to your lawyer
 9   and ask if you've ever seen that.
10        A     Yes, I seen this before.
11        Q     Where did you see it?
12        A     I ordered a copy of the police report and
13   I ordered it when I went to become a full-time
14   teacher with a Broward County School Board from
15   non-instruction to instructional I ordered a police
16   report that I gave them along with my application.
17   I had to submit it to the School Board.
18        Q     Now, were you interviewed by this police
19   officer?
20        A     No, I wasn't.
21        Q     Had you ever seen this police officer
22   before that day that you got arrested on --
23        A     Actually I don't know who wrote the
24   police report.  It was several polices there so I
25   don't know who wrote the report.
```

1    Q    This one appears to be the report by the
2    officer that had the drug sniffing dog?
3    A    It was several of them there so --
4    Q    Do you recall a specific officer having a
5    drug sniffing dog at the point in time when you
6    were arrested?
7    A    It was a dog there but there were several
8    police officers and I was in the car. I didn't
9    actually see what was going on.
10    Q    Now, at the point in time when you were
11    arrested and I'm trying to figure out the dates
12    here, one says June 15th and one says June 14th.
13    Do you know definitely which date you were
14    arrested?
15    A    No, I don't.
16    Q    Maybe that it was -- was it late at
17    night?
18    A    It was in the daytime.
19    Q    About what time of day?
20    A    I want to say around noon. I'm not sure.
21    Q    So the police stopped you --
22    A    It wasn't just one police. It was
23    several police. They were following the car
24    because the car fitted the description that the
25    murderer was supposed to be driving so it was

```
 1    detectives and police officers.
 2        Q     It was more than one police car behind
 3    you?
 4        A     Right.  It was like an undercover police
 5    car and then several other polices came along.
 6        Q     So how many officers would you say were
 7    on the scene?
 8        A     I would say about four or five I guess.
 9        Q     There was an officer with a drug
10    detection dog?
11        A     Yes.
12        Q     Now, this report indicates that the
13    dog -- I'll use the officer's words alerted on $53
14    that was in your purse.  Did they take your purse
15    from you?
16        A     They searched my purse.
17        Q     Were you standing there present?
18        A     Yes.
19        Q     Do you recall if the dog came up and
20    sniffed your purse?
21        A     No dog was by me.  No dog was by my purse
22    either.  They just took the money.
23        Q     They took the money out of your purse?
24        A     Yes.
25        Q     Did they take your purse completely from
```

```
 1    you?
 2         A     No, just took the money.
 3         Q     But they searched it and then left you in
 4    the back of a police car with your purse?
 5         A     Yes.
 6         Q     After they had taken out this $53 in one
 7    dollar bills?
 8         A     Exactly.
 9         Q     Was it common for Mr. Sears to have lots
10    of money in one dollar bills?
11         A     Well, he worked for a lawn service so I
12    guess he -- I don't know how they paid him.
13         Q     It seemed like a lot of one dollar bills.
14    Had he given you that much money in one dollar
15    bills before?
16              MR. BERKOWITZ:  Object to the form.
17              THE WITNESS:  No.
18    BY MR. ROGERS:
19         Q     He had never given you that much money in
20    one dollar bills before; is that the answer?
21              MR. BERKOWITZ:  You can answer.
22              THE WITNESS:  No.  No.
23    BY MR. ROGERS:
24         Q     Had he given you money before?
25         A     Yes, he gave me money before.
```

```
 1        Q      What denominations did he normally give
 2   you money in?
 3        A      What do you mean?
 4        Q      Tens, twenties, fives, whatever.
 5        A      It varied.
 6        Q      Did he ever give you money that was
 7   rolled up with a rubber band around it?
 8        A      No, he don't give me money that way.
 9        Q      How much money would you say he gave you
10   a week?
11        A      I don't have a figure for that.
12        Q      Would he give you money every week?
13        A      No.
14        Q      How frequently?
15        A      Every now and then as needed.  If I
16   needed it.
17        Q      After you were arrested what jurisdiction
18   arrested you, do you know?
19        A      The City of Ft. Lauderdale.
20        Q      Where were you taken after you were
21   arrested?
22        A      To the Broward County jail downtown.
23        Q      How long did you stay in custody there?
24        A      A couple hours.
25        Q      Did you bond out?
```

```
 1        A     Yes.
 2        Q     How did you bond out?
 3        A     My brother bonded me out.
 4        Q     And the charge was one felony count of
 5   possession of cocaine?
 6        A     Yes.
 7        Q     And you're only in custody for a couple
 8   of hours?
 9        A     Yes.
10        Q     What happened to Mr. Sears?
11        A     He stayed in custody.  He didn't have a
12   bond because they had him on hold for the murder
13   but after he went before a grand jury he bonded out
14   which he stayed there for about six weeks.
15        Q     So he was actually in jail for about six
16   weeks?
17        A     Yes.
18        Q     How did he finally get out?
19        A     After they dropped the murder charges
20   then he had a bond on the possession charge.
21        Q     Did you bond him out or did someone else
22   bond him out?
23        A     I can't remember.  I think I bonded him
24   out.
25              MR. ROGERS:  Let's attach this as
```

```
 1          Defendant's Exhibit No. 7 and I'm referring
 2          again to the police report this's 0150 and
 3          0151.
 4                    (Defendant's Exhibit No. 7 was
 5                    marked for identification.)
 6   BY MR. ROGERS:
 7       Q    Then I believe if we go back through the
 8   exhibits you married David Sears on July 21st 1995?
 9       A    Yes.
10       Q    What made you decide to marry him on July
11   21st 1995?
12       A    Because I loved him.
13       Q    Was there any effort to get you to
14   testify against him by the police?
15       A    Oh, no.
16       Q    Was that the day he got out of jail on
17   the murder charge?
18       A    Like the next day.
19       Q    So tell me about -- did you go back to
20   work for the Broward School Board for the 1995,
21   1996 school year as a substitute teacher?
22       A    Yes.
23       Q    Did you tell anyone at Broward School
24   Board that you had been arrested for felony cocaine
25   possession?
```

```
1        A      No, I didn't.

2        Q      Why not?

3        A      I didn't know I was supposed to.

4        Q      You didn't even mention it to anybody?

5        A      No.

6        Q      You were arrested in June.  What happened

7   after you were arrested and bonded out?

8        A      I went back to work with Broward County

9   Employment and Training.

10       Q      Then that ended about when?

11       A      August.

12       Q      And then August you would go back to work

13  for the School Board as a substitute teacher?

14       A      That's correct.

15       Q      Were you working on a regular basis in

16  1995 as a substitute teacher?

17       A      Yes.

18       Q      How many days a week would you say?

19       A      Four to five days a week.

20       Q      Same two schools Ely and Castle Hill?

21       A      No, actually -- '95 I don't think I was

22  at Ely then.  I was several schools at that time.

23       Q      So you were a floater more or less going

24  wherever they needed you?

25       A      Right.
```

```
 1        Q     But you were still working four or five
 2   days a week?
 3        A     That's correct.
 4        Q     Do you recall specifically what schools
 5   you worked at at all?
 6        A     Castle Hill, Lauderhill Middle.
 7   Basically Castle Hill.
 8        Q     Teaching what levels?
 9        A     K through five or middle school levels.
10   I was also at Lauderdale Manors which I became a
11   pool sub and a pool sub is when you're at the
12   school all the time whether they have a substitute
13   position for you or not you're at the school and
14   whenever a teacher is absent they just plug you in.
15        Q     I show that as being in 1996, am I right
16   on that?
17        A     Well, it probably was '96.
18        Q     We'll get to that.  Weren't you concerned
19   that somebody at the school would find out that you
20   had been arrested?
21        A     No, I didn't worry about it.
22        Q     Now, did you have to go to court on that
23   felony arrest?
24        A     Yes, I went to like a little hearing.
25        Q     How many different times?
```

```
1      A      About two.  About two times.
2      Q      Did you have a lawyer represent you in
3   connection with that felony arrest?
4      A      Yes.
5      Q      Was it a public defender or was it a
6   private lawyer?
7      A      Private lawyer.
8      Q      You wrote in documents you gave to the
9   School Board later that you were told by your
10   lawyer that you could plead no contest to this and
11   you would have a clean record.
12      A      I can elect to attend a pretrial
13   intervention program where after one year that my
14   case would be dismissed because he stated to me
15   that -- I guess they was charging us separately and
16   not together.  He stated to me it would be in my
17   best interest to do that because it was going to be
18   hard for me to get off because the car was in my
19   name and seeing that the car is in my name it's
20   saying that it's my possession.  David admitted to
21   saying that the drugs was his.
22      Q      David Sears admitted that the drugs was
23   his?
24      A      Yes, he did and they still didn't want to
25   let me go.
```

```
 1        Q      Did the police or any police agency try

 2   to take your car, the Cadillac that the drugs were

 3   in by forfeiture?

 4        A      Yes, they did.

 5        Q      They did take the car?

 6        A      Yes, they did.

 7        Q      Then you went to two different hearings.

 8   At some point you entered a plea of no contest?

 9        A      Yes, I think that's what it was, no

10   contest.

11        Q      Also entered a pretrial intervention

12   program?

13        A      Yes.

14        Q      Tell me what that pretrial intervention

15   program consisted of.

16        A      It consisted of classes on drug

17   treatment.

18        Q      Now, had you ever used drugs before this

19   arrest?

20        A      No.

21        Q      Never?

22        A      No.

23        Q      Had you ever been with Mr. Sears when he

24   was using drugs?

25        A      No.
```

```
 1          Q       So it's your testimony he didn't use
 2    drugs in your presence?
 3          A       No, not as I know.  I never know him to
 4    use drugs.
 5          Q       Were you surprised when you heard that
 6    there was all these drugs in your car?
 7          A       Yes, I was surprised.
 8          Q       You were aware that he had been --
 9    Mr. Sears had been arrested previously and spent
10    time in jail; correct?
11          A       Yes.  But to my knowledge he had stopped.
12          Q       And yet after he came out of jail you
13    married him?
14          A       Yes.
15          Q       Now, you said that the pretrial
16    intervention program you had to attend classes and
17    then you mentioned something about a one year
18    period after that?
19          A       No, that was for one year I had to attend
20    counseling classes.
21          Q       What happened to your knowledge if --
22    what would have happened?
23          A       After it was complete.
24          Q       If you had not successfully completed
25    that pretrial intervention program?
```

```
1        A      I could have been charged for the arrest
2    I guess.  I had to --
3        Q      You could go back to jail?
4        A      It could have either gone to jail or
5    probation or whatever.  Either way so I'm not sure.
6        Q      But that's where I'm curious why you
7    wouldn't tell somebody at the school that you faced
8    this potential of going to jail.
9               MR. BERKOWITZ:  Object to the form of
10        the question.
11   BY MR. ROGERS:
12       Q      Is there a reason why you didn't tell
13   someone at the school board that you were in this
14   pretrial intervention program?
15       A      For one reason I had no doubt that I
16   wouldn't complete the one year pretrial
17   intervention program.
18       Q      Was Mr. Sears already incarcerated and
19   out of the picture at this point?
20       A      He was out.
21       Q      He was out of jail?
22       A      Yes.
23       Q      You married him on July 21st 1995?
24       A      Yes.
25       Q      Was he living with you after that point
```

```
 1    in time full time?
 2         A    After that time he moved in.
 3         Q    When, if you recall, did he finally get
 4    put in jail?
 5         A    Yes, he did.  He had to go back to court
 6    on the cocaine charges.  The reason I married my
 7    husband is because the six weeks that he was
 8    incarcerated he became -- he turned his life around
 9    while he was in there and he became saved and I
10    trusted and believed in that so for that reason I
11    married him.
12              I had been with him for all those years
13    and I believe that he had changed so that's why I
14    married him.  The six weeks that he was in there
15    for the murder and cocaine charges he accepted
16    Christ as his personal savior and once he did that
17    when he got out he wanted to get married so that's
18    why I married him.
19         Q    Now, to your knowledge was he arrested
20    again or was he arrested again in 1996 for cocaine
21    possession charges?
22         A    I can't remember.  I think so.
23         Q    Did he go back to jail or what happened?
24         A    He went to prison.  He went to prison.  I
25    know he went to prison on a cocaine charge.
```

```
 1        Q      This was after he had already been
 2   arrested on the homicide and let go?
 3        A      Yes, but he wasn't let go.  He was only
 4   out on a bond so he still was facing that charge,
 5   the cocaine charge.
 6        Q      So if he went to prison in 1996 it would
 7   have been on that same cocaine charge?
 8        A      Right.
 9        Q      You're still married to the gentleman;
10   correct?
11        A      Yes, I am.
12        Q      Has he been arrested for anything since
13   then?
14        A      No.
15        Q      Nothing at all?
16        A      No.
17        Q      Now, you mentioned that you had worked in
18   Broward as well as what I'll call casual substitute
19   which is somebody who just moves from school to
20   school or develops a relationship as an interim
21   substitute.  Tell us what an interim substitute is.
22        A      An interim substitute is where you
23   substitute in a subject area where I substitute in
24   the ESE class.  I actually had been substituting in
25   that class all year.  I had been in that class all
```

1    year and in February after they weren't able to

2    hire any more teachers I was able to stay in that

3    classroom and receive teacher's pay, beginning

4    teacher's pay for the rest of the year.

5        Q    That was by my records as of say

6    March 1998 through June 1998; is that correct?

7        A    Right.  I had been in the class I think

8    about since like September but the teacher's pay

9    kicked in in March.

10       Q    You sure you had been in that class since

11   September?

12       A    Yes, I think it was around September

13   because when I was at the school I was a pool sub

14   there and I went from a pool sub to being placed in

15   that classroom.

16       Q    As an interim sub that meant that you

17   were only -- you could only be employed in the end

18   of the school year; is that correct?

19       A    Yes.

20       Q    Did you get paid differently as an

21   interim sub?

22       A    Yes, I got beginning teacher's pay.

23       Q    Do you remember what you were getting as

24   a substitute?

25       A    I was a pool sub.  Twelve dollars an hour

```
 1    at seven point five hours a day and that was every
 2    day because the pool sub is just like -- you don't
 3    get benefits but you work every day.
 4        Q     I show that you were a pool substitute
 5    from October 1996 to June 1996; is that right?
 6        A     That's correct.
 7        Q     And what school were you at as a pool
 8    sub?
 9        A     Lauderdale Manors Elementary.
10        Q     If I understand you correctly as a pool
11    substitute you were reporting to the same school
12    every day?
13        A     Yes, you're at that location every day.
14        Q     You just fill in for whatever classes
15    they need?
16        A     Right.  They don't even call you.  If
17    they don't have an assignment for you to do you do
18    something in the office.
19        Q     Then I also show that you were a pool
20    substitute from October 1997 through March of 1998?
21        A     Yes.  That's what I was but in one class.
22    See, as a pool sub you're supposed to shift from
23    classroom to classroom whenever the teacher is
24    absent you plug in so from whatever date it was.
25        Q     I know it's October.
```

```
 1        A       When I went to Lauderdale Middle I was
 2    hired as a pool sub so what I was supposed to plug
 3    in for whatever teacher was absent but because of
 4    my job performance I was put in a class where a
 5    teacher was out and I stayed in that class until
 6    the rest of the year to the end of the school year
 7    but they changed my pay from pool sub to interim
 8    sub where as the interim sub you get teacher's pay
 9    so it went from pool sub to interim sub.
10        Q       As an interim sub that was at Lauderdale
11    Middle?
12        A       Lauderhill Middle.
13        Q       As an interim sub did you get benefits?
14        A       No, no benefits.
15        Q       But you did get paid at the beginning
16    teacher's rate?
17        A       That's correct.
18        Q       Now, in the complaint in this action and
19    we'll go over the complaint allegation by
20    allegation after lunch but you state that in the
21    beginning of the 1998, 1999 school year you were
22    offered a full time teaching job; is that correct?
23        A       What happened is after the end of the
24    year when I was an interim sub what they do is the
25    principal normally tells the teachers who is coming
```

```
 1   back and who is not coming back.  At the end of the
 2   year she had assigned me to coming back to that
 3   classroom but she was going to hire me as a teacher
 4   out of field so at the beginning of I think it was
 5   '98 when school started the following year I was
 6   there the first week of school in that same
 7   classroom.  It was a matter of going through the
 8   paperwork, the correct paperwork in order to hire
 9   me.
10      Q    But you were still being paid as a
11   substitute?
12      A    Interim sub but when I started back at
13   the beginning of the year I had to drop back down
14   to sub until she hired me.
15      Q    What was the name of the principal?
16      A    Rebecca Dahl, D-a-h-l.
17      Q    Was Ms. Dahl under the impression that
18   you had all the credentials you needed to be hired
19   as a full-time teacher?
20      A    Yes.
21      Q    Who had told her that?
22      A    Who told her?
23      Q    Yes.
24      A    You said who told her that?
25      Q    Right.
```

```
 1        A      I showed her my Florida teacher's
 2   temporary teaching certificate and I had a degree.
 3        Q      Let's go through that again.  Let me show
 4   you a document bate stamped 0219 through 0222 and
 5   ask if you can identify that for me?
 6        A      Yes.
 7        Q      What is that document?
 8        A      This is a statement Eligible for
 9   Department of Education which comes from
10   Tallahassee which is giving you permission to teach
11   temporarily for two years only on the stipulation
12   you complete the coursework and teacher's
13   examinations.
14        Q      Now, the date on this document appears on
15   the front as February 24th 1998?
16        A      Yes.
17        Q      Did you receive it around that time?
18        A      Yes.
19        Q      On this document on the first page states
20   I guess it's the third full paragraph "based upon
21   current requirements, you will be eligible for a
22   two-year nonrenewable temporary certificate valid
23   for two consecutive school fiscal years covering
24   middle grades social science (5-9) when" colon and
25   then it requires you to complete the following
```

1   requirements which is three semester hours in

2   western civilization etcetera and three semesters

3   hours in geography.

4       A    That's correct.

5       Q    So this says you would be eligible for a

6   full-time teaching certificate if you completed

7   those requirements?

8       A    I am eligible for two years and after the

9   two years if I don't complete it then I'm not

10  eligible for non-renewable.  This is saying that

11  I'm eligible for two years.

12      Q    You read it differently than I do but did

13  you discuss this document with anybody from the

14  School Board?

15      A    No, I didn't.

16      Q    But you understood this as meaning that

17  you were eligible to teach?

18      A    Yes, for two years.

19      Q    Without taking these courses?

20      A    Yes, I have two years to complete this.

21  After the two years it cannot be renewed if I

22  didn't complete what I had to complete in here.

23      Q    Who did you get that understanding of

24  this document from?

25      A    I talked to several teachers about it.  I

1    know several teachers that is teaching under
2    this -- this allows you to teach for two years and
3    complete everything that you need to complete and
4    if you don't complete it within two years then
5    you're not allowed to renew it.  That's why I said
6    renew.  Non-renewable.  With this I can teach for
7    two years.
8         Q    Did you ever discuss your understanding
9    of this document again we're talking about 0219
10   through 222 bate stamped with anyone in
11   instructional staffing from the School Board?
12        A    No, I didn't discuss it with them.  They
13   asked me did I have this.  This is one of the
14   requirements.  You have to have this.  If I didn't
15   have this I wouldn't be eligible to teach and the
16   principal knows that.  That's why she went to hire
17   me.  She knows without this she couldn't hire me.
18   I discussed it with her.  She said did I have a two
19   year temporary teaching certificate.  I told her
20   yes and by telling her yes she knew she would be
21   able to hire me.
22        Q    Did you show her this document?
23        A    Yes, she seen it.
24        Q    This is Rebecca Dahl that we're talking
25   about?

```
1        A    Yes.  She was going to sign an out of
2   field waiver because I was doing ESE and she
3   switched me over to science.
4        Q    This principal, Ms. Dahl, was under the
5   impression she could hire you as a teacher in an
6   out of field waiver.  Explain to me what your
7   understanding of an out of field waiver is.
8        A    Meaning that with this -- see, with the
9   School Board it's a lot of different ways that they
10  can hire you.  The out of field waiver where she
11  took me from ESE first she was going to hire me in
12  ESE the class I was in she was going to hire me as
13  teacher and sign the out of field waiver.
14            I don't know how long you can do it but
15  you can teach out of field.  They can sign it if
16  they got a legit reason they can sign an out of
17  field waiver in order for you to teach an out of
18  field area meaning that out of social science.  I
19  have a two year temporary permit that will permit
20  me to teach in social science.  This is saying that
21  I could teach in social science grades five through
22  nine so she was going to sign out of field waiver
23  because she wanted me to do ESE.
24       Q    Did she lead you to believe that she
25  could approve an out of field waiver by herself?
```

```
 1         A     No, she knew she was going to have to get
 2    it signed off.
 3         Q     By an area superintendent and all the way
 4    up the chain of command; correct?
 5         A     What she had to go through I don't know
 6    but that's what she was going to do.
 7         Q     Just back up for me and tell me what she
 8    said to you and what you said to her with reference
 9    to your being hired in a full-time position for the
10    1998, 1999 school year?
11         A     That she was going to hire me in social
12    science.  She brought me back at the beginning of
13    the year to hire me in ESE but she changed it.  She
14    needed someone in social science.  She moved me
15    from ESE to science.
16               When I moved over to science that's when
17    she spoke to me and told me she was going to see
18    about doing a -- I think an out of field waiver and
19    that she wanted me to go downtown to get cleared so
20    she got me off work to go down and get cleared.
21         Q     Now, this is at the beginning of the
22    1998, 1999 school year?
23         A     Yes.
24               MR. ROGERS:  We better put this in
25          before we forget about it.  Defendant's
```

```
 1              Exhibit No. 8 will be the document dated
 2         February 24, 1998 bate stamped 0219 through
 3         0222.
 4                      (Defendant's Exhibit No. 8 was
 5                      marked for identification.)
 6    BY MR. ROGERS:
 7         Q     Let me show you a document that's bate
 8    stamped 0113, 0114.  It appears to bare your
 9    signature on the second page dated September 16,
10    1998 and ask if you can identify that for me?
11         A     Yes, this is application for
12    instructional teaching.
13         Q     This is an application for what?
14         A     Teachers.  Any instructional position.
15    This is for regular teaching, not substitute.
16    Substitute teaching is non-instructional.
17         Q     Substitute teaching hopefully is
18    instructional but this is for a full-time job as
19    opposed to a sub job; is that right?
20         A     Right.
21         Q     And you stated on here that you have a
22    two year temporary certificate down towards the
23    bottom?
24         A     Oh, yes.
25         Q     Now, help me if you can, the line right
```

```
 1   below that talks about if you have applied for a
 2   Florida educator's certificate.  What's the date
 3   that you say you applied for that certificate?
 4        A     I can't actually read it.  It looks like
 5   something was changed.  I can't read the first
 6   part.  I see the 24, '98.
 7        Q     What's the date on the previous exhibit?
 8        A     On here?
 9        Q     Yes.
10        A     The 24th.  February 24th.
11        Q     Had you applied for a Florida teacher's
12   certificate before February 24th 1998?
13        A     I'm not sure if this is when I received
14   the certificate but I had to put in for it ahead of
15   time so I don't know what date that I actually
16   applied for it.  I think this was the date that I
17   received it back, the clearance date.
18        Q     The document that's in front of you
19   though is your application for a full-time teaching
20   position dated September 16th 1998?
21        A     Yes.
22        Q     Is that correct?
23        A     Yes.
24        Q     Now, you mentioned your principal sent
25   you down to get clearance?
```

1      A      Right.

2      Q      Is the date that you went to the School

3    Board to get clearance the same date that you

4    filled out this document, September 16, 1998?

5      A      That I can't remember.  It was in

6    September.  I don't know the exact date.  I went

7    down to fill out this application and to put in for

8    full-time teaching.

9      Q      I think we'll be able to clear that up as

10    we go along.  When you say you went down where did

11    you go to?

12      A      To the actual School Board downtown

13    Ft. Lauderdale across from the courthouse.  The

14    administration building.

15      Q      Do you know who you talked to when you

16    went there?

17      A      No.  Actually I turned in all the

18    information I needed to turn in.  I know everything

19    had to go through the security clearance

20    department.

21      Q      Did you have these documents before you

22    went to the School Board main office building?

23      A      I picked it up.  I picked it up and

24    brought everything back in.

25      Q      So you had all these documents already

```
 1    filled out at the point in time when you showed up
 2    to get clearance?
 3        A    Yes.
 4             MR. ROGERS:  Let's make this the next
 5        exhibit.  Again it's 0113, 0114 application
 6        dated 9/16/98.
 7                  (Defendant's Exhibit No. 9 was
 8                  marked for identification.)
 9    BY MR. ROGERS:
10        Q    Let me show you the next document.  It's
11    bate stamped 0139, 0140 as bearing the date of
12    9/16/98 and ask if you've seen that before?
13        A    Yes.
14        Q    Is that your signature that appears on
15    the second page of the document 0140?
16        A    Yes.
17        Q    Had you picked this document up and
18    filled it out previously as well?
19        A    Yes, it was along with this.  All this
20    was together.  It was a packet.
21        Q    So the prior exhibit which was number
22    nine and this -- these two pages were all part of
23    one packet?
24        A    Right.
25        Q    Now, had you discussed with the principal
```

```
 1    you say that wanted to hire you the fact that you
 2    had this arrest on your record?
 3         A     No, I didn't.
 4         Q     Is there a reason why you didn't do that?
 5         A     No, because the case was dismissed so I
 6    didn't figure I needed to discuss it with them.
 7         Q     Did anybody ever tell you that the fact
 8    that a case was dismissed doesn't mean anything for
 9    a teacher or anybody who works with kids?
10         A     No, they didn't.
11         Q     Now, you filled this out and you show --
12    again referring to page 0140 you showed date of
13    arrest 6/95.  Did you provide a copy of the police
14    report at the point in time where you submitted
15    this document?
16         A     Yes, I did.  I had to provide the police
17    report along with deposition showing that the case
18    was dismissed.
19         Q     When you submitted this the first time
20    there on whatever date, 9/16 or the day you went to
21    the School Board building to turn all this stuff
22    in?
23         A     All of it was submitted at one time along
24    with the application.
25         Q     In this form on the second page you say
```

```
 1    you were ordered to attend a pretrial intervention
 2    program?
 3        A     Under the counsel of my lawyer.  A judge
 4    didn't order me to attend it.  A judge didn't order
 5    me to do that.
 6        Q     Meaning you pled no contest to a felony
 7    charge of cocaine possession with the understanding
 8    that you would go into a pretrial intervention
 9    program; correct?
10        A     Right, and my case would be dismissed.
11        Q     Provided you completed the program after
12    one year?
13        A     Right.
14        Q     You never told Rebecca Dahl, the
15    principal at the school that you were talking about
16    that you had been arrested or had been in this
17    program?
18        A     No, after the fact.  After the fact.
19        Q     When did you tell her after the fact?
20        A     I guess someone from the School Board
21    called her and asked her did she know about it and
22    I guess she told them no and she called me into the
23    office and questioned me about it and I told her
24    what had happened.
25        Q     What did she tell you?
```

```
 1        A      She gave me instructions on how to file
 2   an appeal and I had to write the appeal to
 3   Mr. Harold Blitman and also the lady over security
 4   clearance told me what I needed to do.  I had to
 5   file an appeal with the School Board which I tried
 6   to do on my own.  I wrote the letter to Mr. Harold
 7   Blitman and it still was denied.
 8            MR. ROGERS:  Let's go ahead and mark
 9        this before we get into the rest of it.  This
10        is Defendant's Exhibit No. 10, document 0139,
11        0140.
12                 (Defendant's Exhibit No. 10 was
13                  marked for identification.)
14            MR. BERKOWITZ:  Off the record for a
15        minute.
16                 (Discussion held off the record.)
17                 (Thereupon, a short recess was
18                  taken.)
19   BY MR. ROGERS:
20        Q      We are back on the record and it's now
21   about ten minutes after one.  Now, as far as the
22   security background check that's now -- the
23   security form that you filled out that's attached
24   to your deposition as Exhibit 10, that was
25   something I think you already said and I apologize
```

1    for going back over it but you had filled out ahead

2    of time?

3        A    Right.

4        Q    And you had not discussed it with the

5    principal at your school until after you found out

6    that security clearance committee had rejected you?

7        A    Yes.

8        Q    How did you find that out?

9        A    Through the principal.  She came --

10       Q    The principal --

11       A    I was in the classroom and she had one of

12   the office staff to come to the classroom and

13   escorted me out of the classroom and she had

14   someone to cover my class and I went up to her

15   office and she spoke with me about this, about the

16   case.

17       Q    What did she tell you?

18       A    She asked me about the arrest on my

19   application and she asked me was it true and I told

20   her yes and she told me that my application is not

21   really rejected now, that I can file an appeal

22   because she don't know whether they can deny me --

23   deny me from being employed because the case was

24   dismissed.  She said as long as I didn't have a

25   conviction and she asked me was it a conviction and

```
1    I told her no.
2         Q    Now, do you know about when that happened
3    as far as when the principal called you to her
4    office and said security clearance has rejected
5    you?
6         A    It was sometime in September.
7         Q    You said --
8         A    Around about this date.  It was like --
9    when I turned in this information it was like a
10   week or so.
11        Q    Now, did your principal indicate that she
12   was surprised that you hadn't told her about the
13   arrest?
14        A    No.  She said she had had a similar case
15   where she had worked with another teacher before
16   that had been in trouble.
17        Q    Did she tell you the name of that
18   teacher?
19        A    No, she didn't.
20        Q    What was the outcome in that similar
21   case?
22        A    I think the person got their job back.  I
23   don't know the details of the case or what happened
24   but she had worked with someone.  She helped
25   them -- got cleared.  They had been in some type of
```

1    trouble.  I don't know in detail what it was that's
2    why she told me what to go through.  She had talked
3    to Gracie Diaz.
4         Q    Now, let me show you another document and
5    ask if you can tell me if you received that or not?
6         A    Yes, I received that.
7         Q    Is that your signature on the return
8    receipt on the second page?
9         A    Yes.
10             MR. ROGERS:  Now, we're referring to
11         for the record to bate stamp 0154 a letter
12         dated October 7th 1998 to Ms. Sears from
13         Ms. Gracie Diaz, director of instructional
14         staffing and a return receipt dated
15         October 14th, 1998.  Let's go ahead and put
16         that in as 11.
17                  (Defendant's Exhibit No. 11 was
18                  marked for identification.)
19    BY MR. ROGERS:
20         Q    If you look at that document on
21    October 14th you already knew for some time prior
22    to that from your principal that security clearance
23    had rejected you as unemployable by the school
24    district; correct?
25         A    Right.

```
 1          Q      When the principal came and took you out
 2     of the classroom and took you to her office did she
 3     let you go back to the class and continue teaching
 4     that day?
 5          A      No, she wasn't allowed.
 6          Q      Did you remain working for the rest of
 7     the day?
 8          A      No.
 9          Q      So you just basically went home?
10          A      Right.  She wasn't allowed to let me go
11     back into the classroom.  They called her.
12          Q      Do you know who called her?
13          A      I think she spoke with Gracie.  Gracie
14     Diaz.
15          Q      But you weren't there for the
16     conversation?
17          A      No.
18          Q      And she didn't say who called her?
19          A      She said she spoke with Gracie Diaz.
20          Q      And then the principal and we're speaking
21     again about Ms. Dahl?
22          A      Right.
23          Q      Told you she had worked with another
24     teacher and was able to get things cleared up?
25          A      Right.
```

```
 1        Q      And also told you about the appeal
 2   process?
 3        A      Right.
 4        Q      Let me show you the next document and see
 5   if you can identify that for me (Indicating).
 6        A      Along with the -- I can't remember her
 7   name but I was speaking with another lady that was
 8   over the security clearance department.  She was
 9   telling me about the procedures that I had to take
10   to -- in order to file the appeal.
11        Q      Do you know who?
12        A      I can't remember her name.
13        Q      Was it before you sent this letter on or
14   about October 6th 1998?
15        A      It was before because it was two letters
16   that I ended up sending.  It was before.
17        Q      Well, this is a one page document dated
18   October 6, 1998 to Mr. Hal Blitman, B-l-i-t-m-a-n,
19   Associate Superintendent of District Administration
20   from yourself bate stamped 0145.  Now, was this the
21   whole appeal, this one document?
22        A      No, there was another one before this.
23   This is the one that -- actually it was one that
24   she advised me on and I think this was the one.
25   This was the second notice.  It was one that I sent
```

```
 1    before I think.  Before this one.
 2        Q    When you say she advised you on?
 3        A    Ms. Dahl.
 4        Q    Do you have a copy of that document
 5    because it wasn't something that your counsel had
 6    apparently because it wasn't provided to us?
 7        A    I probably have it at home somewhere
 8    because it was two of them I sent.  I think this is
 9    the second one I sent.
10        Q    I take it the first one that you sent was
11    sometime before October 6th?
12        A    I think so.
13        Q    That was something that Ms. Dahl helped
14    you put together?
15        A    She just -- she actually didn't.  She
16    read over it before I sent it in.
17        Q    Now, this is after she's taken you out of
18    the classroom sometime in September and sent you
19    home and not allowed you to teach any more?
20        A    Yes.
21        Q    Did you go back to the school and meet
22    with her and ever read over the --
23        A    I went back to the school.  Her secretary
24    typed it up for me.
25        Q    The secretary actually typed it for you?
```

```
 1        A     Yes.
 2        Q     Do you recall what that one said if it
 3   was anything different than this one referring to
 4   0145?
 5        A     It was -- basically the same but worded
 6   differently.
 7        Q     Why did you send two of them?
 8        A     I can't remember.  I can't remember the
 9   reason why I sent the second one.
10        Q     Meaning is the second the one we've got
11   in front of you now?
12        A     This is the second one.
13        Q     When you sent this, speaking of the
14   letter dated October 6, '98, was this all that was
15   with it or were there other documents?
16        A     This was all that was with it.
17        Q     When you sent the first one was it also a
18   one page document?
19        A     Yes.
20        Q     Did you ever meet with Mr. Blitman about
21   this?
22        A     No, I didn't meet with him.  They say
23   they had a hearing on it but I wasn't there.
24        Q     Did you ask for a meeting with
25   Mr. Blitman?
```

```
 1        A      Yes, I filed for the appeal.  I didn't
 2   directly ask for a meeting with him.  I filed for
 3   an appeal and he said it was reviewed but I wasn't
 4   present when it was reviewed and I know similar
 5   teachers that has been in trouble that I had spoken
 6   to that had an appeal deal with the School Board
 7   and they was there actually at the appeal.
 8        Q      Were these people substitute teachers or
 9   were these full-time teachers?
10        A      I don't know whether they were subs at
11   the time or full-time teachers but they're
12   full-time teachers now.  I think they was going
13   through clearance just like I was.
14        Q      And you say that these are teachers that
15   you know that had a meeting with whom?
16        A      I don't know directly who they had one
17   with or what I don't know the names but they went
18   for an appeal.
19        Q      And they actually physically had a
20   hearing in front of someone?
21        A      Right.  They was there for the appeal
22   which I wasn't present.
23        Q      Now, you filed this appeal.  You never
24   asked for a meeting directly with Mr. Blitman?
25        A      No.
```

```
 1        Q    Why didn't you?
 2        A    Because once I called and asked about the
 3   appeal they said that it was already reviewed and
 4   that they had already made a decision so I didn't
 5   want to go further in details by myself.  After
 6   that time that's why I seeked for a lawyer because
 7   I didn't think that I was going to be able to get
 8   to him myself.
 9             MR. ROGERS:  Let's go ahead and put
10        this one in.  This is 0145, October 6th 1998
11        as Defendant's Exhibit No. 12.
12                  (Defendant's Exhibit No. 12 was
13                  marked for identification.)
14   BY MR. ROGERS:
15        Q    Let me show you the next document on
16   this.  For purposes of the record this is a letter
17   dated December 10, 1998.  It appears to be to you
18   from Gracie Diaz Director of Instructional Staffing
19   with someone else having signed her name for
20   Ms. Diaz, one page document bate stamped 0156.  Do
21   you recall having received this document?
22        A    Yes.
23        Q    Now, this indicates that the security
24   clearance committee met on November 24th 1998 and
25   denied your appeal.  There's a long time frame in
```

```
 1    here between when you were taken out of the
 2    classroom and when you finally get this notice or
 3    the security clearance committee meets for the
 4    second time on November 24. What, if anything,
 5    were you doing during that period to try to have
 6    any meetings or get any hearings?
 7        A    No, I had to wait on their response
 8    because I had to contact them through letters so it
 9    was on their time. I had to wait until they got
10    back to me. Every time I kept calling they kept
11    saying we're reviewing it. The information got to
12    the correct department so I had to wait on them.
13              MR. ROGERS:  Let's go ahead and attach
14         this as Defendant's Exhibit No. 13.
15                   (Defendant's Exhibit No. 13 was
16                   marked for identification.)
17    BY MR. ROGERS:
18        Q    Now, you spoke earlier about knowing
19    about other teachers that did receive some sort of
20    a hearing in front of someone whereas you didn't.
21    Can you give me any names on people that you know
22    that had hearings?
23        A    Yes, but I don't know if I want to
24    involve them.
25        Q    All you would be doing is saying they had
```

```
 1   hearings.  That's nothing wrong either way.
 2        A     I would rather not answer.
 3        Q     You don't have a choice unless he directs
 4   you not to answer.
 5        A     Do I have a choice to involve them?
 6              MR. BERKOWITZ:  I think you have to
 7        answer the question.
 8   BY MR. ROGERS:
 9        Q     All you'll be saying is they had
10   hearings.
11        A     Okay, Rodney Gray and Mr. Green.  I don't
12   know his first name.  He was at Lauderhill Middle.
13        Q     Mr. Green from Lauderdale Middle?
14        A     Lauderhill.
15        Q     I keep doing that.
16        A     That's okay.
17        Q     Who was the first one?
18        A     Rodney Gray.
19        Q     Do you know about when these hearings
20   occurred?
21        A     No.
22        Q     Do you know whether either one of these
23   two individuals were already under contract with
24   the School Board at the point in time when they had
25   hearings?
```

```
1        A    No.  I don't know.  I don't know the
2   answer.  What I'm saying when I say no I don't
3   know.
4        Q    That's fine.  Do you know if -- I may
5   have asked this but just for clarity purposes do
6   you know who these two people had hearings in front
7   of?
8        A    No.
9        Q    You don't know whether it was School
10  Board or the security clearance committee?
11       A    It was the School Board but I don't know
12  whether it was security clearance committee or
13  higher, I don't know.
14       Q    Now, in reference to the security
15  clearance committee you talked -- I think you said
16  before that you talked to two different people one
17  of them being Gracie Diaz.
18       A    Actually I didn't really talk to Gracie
19  Diaz that much.  I can't remember.  It was one
20  young lady it was an older lady that was -- I want
21  to say her first name was Mary but I can't remember
22  that she was helping me out with security clearance
23  department and she was telling me which steps they
24  had to take.  I think it was a grace period in
25  between like thirty days before they can review.
```

```
 1   They had thirty days to review the appeal.  I can't
 2   remember now.  I think it was Mary I'm not sure.
 3       Q    Let me show you that.  This is the -- you
 4   tell me if you've ever seen that before.  That's
 5   easier.
 6       A    Have I ever seen this before?
 7       Q    Yes.
 8       A    No.
 9       Q    For the record we're speaking of a one
10   page document dated July 16, 1998 bate stamped
11   0053.  If you look at the people listed on the
12   portion of the memorandum did you have occasion to
13   speak to any of these people that were on the
14   security clearance committee either before your
15   application was rejected or between that period and
16   the appeal?
17       A    Did I have a chance to speak with them?
18       Q    Right.  Or did you speak with them?
19       A    I can't remember whether I spoke with
20   Ms. Diaz but it was someone I spoke to in Ms. Diaz'
21   office that told me to just reapply in the next
22   year.  Just give it one year and then reapply again
23   but I can't recall the name.
24       Q    This was just somebody that you spoke to
25   on the telephone?
```

```
 1        A      Right.
 2        Q      We think it may have been Mary?
 3        A      No, this wasn't Mary.  This is someone
 4   that was Ms. Diaz' office.
 5        Q      Whoever that person was suggested that
 6   you let it go and apply again the following year?
 7        A      Right.
 8        Q      Did you ever receive anything in writing
 9   to that effect?
10        A      No.
11        Q      I think you already told us you never had
12   a face-to-face meeting with Hal Blitman?
13        A      No, never.
14        Q      Did you ever have a face-to-face meeting
15   with Sheila Dudley?
16        A      No.
17        Q      Never met with Ms. Diaz?
18        A      No.
19        Q      How about Chief Hardy of the school
20   police department?
21        A      No.
22        Q      Rebecca Jones from employee relations?
23        A      I can't remember meeting with any of
24   those.
25        Q      Anybody on this list you can't remember
```

1    meeting with?

2        A    No.

3            MR. ROGERS:  Let's put this in as

4        Defendant's Exhibit No. 14.

5                (Defendant's Exhibit No. 14 was

6                marked for identification.)

7    BY MR. ROGERS:

8        Q    Let me show you a document, two pages

9    bate stamped 0120, 0121 dated September 29, 1998

10    and ask if you've seen that before?

11        A    Yes, I've seen this before.

12        Q    Now, as of this point in time in 1998 to

13    your recollection had you already been taken out of

14    the classroom?

15        A    I think so.  Yes, I think so.  Yes, this

16    came after the fact.

17        Q    So this went to your home after the fact

18    after you had already been taken out of the

19    classroom by principal Rebecca Dahl?

20        A    Right.

21        Q    Now, this indicates that you have to

22    provide instructional staffing with credential

23    evaluation from the department of education.  Did

24    you ever do that?

25        A    Yes, that's the two year temporary permit

1  that I was telling you from Tallahassee.

2       Q      When did you do that?  When did you

3  provide this information after September 29, 1998?

4       A      I think it was information that they had

5  already.  I can't recall.  I don't know if they

6  already had this and they needed another copy of

7  it.  I think I still took it down there and dropped

8  it off.  After this date.  I think I dropped

9  another one off after this date.  When I dropped it

10  off I didn't tell them the situation that I have

11  still put it in my file.

12       Q      Do you know who you spoke to that day?

13       A      No, just people at the front desk that

14  you give the information to and they put it in your

15  file.  I think it was after this date.

16       Q      Is that in the employment center in

17  the --

18       A      Bottom floor.

19       Q      First floor of the downtown

20  administration building?

21       A      That's correct.

22       Q      It only shows here that you have two

23  references when you're supposed to have three.

24       A      I only needed two because I already had

25  three from the -- from subbing and they told me

```
 1   these were the only two I needed.
 2        Q     This other document you gave them is the
 3   document we already have in evidence that you say
 4   is your eligibility or your certificate of
 5   eligibility that was a two year certificate?
 6        A     Right.  Ms. Dahl sent her letter of
 7   reference and Mr. Buchanan sent his letter of
 8   reference.  This was the principal at the middle
 9   school Rebecca Dahl.
10        Q     But at this point in time in September of
11   1998 Ms. Dahl had already removed you from the
12   classroom because security clearance had rejected
13   your application; correct?
14        A     Exactly.
15              MR. ROGERS:  Let's attach it as 15.
16                  (Defendant's Exhibit No. 15 was
17                  marked for identification.)
18   BY MR. ROGERS:
19        Q     Now, let me show you a document that
20   appears to be an official transcript.  Actually it
21   says unauthorized copy but an official transcript
22   of Phillips University, Inc. in Enid, Oklahoma.
23   Can you identify that and tell me what it is?
24        A     These are classes whenever she had me in
25   ESE department, the ESE department these are
```

1  classes I took because I was going to school
2  because I was going to switch over from social
3  science to the ESE department so I took courses
4  within that field so I could become certified in
5  that field so these are college courses that I
6  completed and I had them sent to the school board.
7      Q    I presume that you sent a document
8  different than an unauthorized copy of a transcript
9  to the School Board?
10     A    No, it was the official transcript.  I
11 think that the main one went to Tallahassee and
12 this one went to the School Board so it can go in
13 my files.
14     Q    Were you ever advised that these courses
15 didn't meet the requirements on what you called the
16 certificate of eligibility?
17     A    Yes, because I was going in a different
18 field.  I knew that.
19     Q    So you had not complied with the
20 requirements on the certificate?
21     A    Yes, I had.  Some of these courses would
22 overlap this here.  You can take -- you don't have
23 to take direct courses they're saying.  They have
24 other courses that would substitute for those
25 courses.

```
 1        Q      Who told you that?
 2        A      Tallahassee.
 3        Q      Do you know who you talked to in
 4   Tallahassee?
 5        A      No.
 6        Q      Have you ever spoken to anyone in
 7   academic certification of Broward School Board?
 8        A      No.
 9        Q      So you have never spoken with Diane
10   Gordon or any of the people in credentials and
11   certification?
12        A      No.
13        Q      Why is that?
14        A      I didn't need to.
15        Q      Were you told by someone in Tallahassee
16   that these courses met the requirements for this
17   temporary teaching certificate?
18        A      This has nothing to do with this.  I was
19   going in a different area and I knew what classes
20   to take for me to go in that different area.
21        Q      So you were not trying to meet the
22   requirements?
23        A      I had time.  I had two years.  My two
24   years expired -- I only had two courses to take
25   which would take six weeks to take two classes so I
```

```
 1    had two years to do that temporary certificate.  I
 2    was working on two things at once and I had more
 3    classes to take for ESE so I started those courses
 4    first.
 5        Q     Again, we're speaking of the
 6    February 24th 1998 document to you from Bureau of
 7    Teacher Certification Florida Department of
 8    Education subject statement of eligibility?
 9        A     Okay.
10        Q     And is it your understanding that you did
11    not have to take the courses that are listed in
12    this February 24th document that's bate stamped
13    0219 in order to be eligible to teach as a
14    full-time teacher in Florida?
15        A     No, this had nothing to do with this.  I
16    had two years which just expired January of this
17    year.  This was did in '98.  I was going in a
18    different direction.  I could be certified in two
19    years.  I decided to start this first and then I
20    could do this.  It only takes me six weeks to
21    complete two courses for social science.
22        Q     Did you ever complete the two courses
23    that they spoke to of in this February 24th 1998
24    letter?
25        A     No, because I was terminated so I didn't
```

```
 1    do that.  I put everything on hold to find out was
 2    I going to be cleared through Broward County School
 3    Board.
 4        Q     But as of December 10th you knew or
 5    whatever the date of the letter is where your
 6    appeal had been denied you knew you were not going
 7    to be cleared through the Broward County School
 8    Board?
 9        A     That's why I got a lawyer.  So I put
10    everything on hold.
11        Q     So to this date you have not completed
12    the two courses that are --
13        A     That's correct.
14        Q     One, three hours in geography and three
15    hours in western civilization?
16        A     That's correct.
17        Q     Now, back to the document that's not bate
18    stamped but it appears -- it's from Phillips
19    University, Inc. and it bears a date of 7/17/98.
20    Why did you submit this to the School Board?
21        A     Because you have to do -- any courses you
22    take you have to do an update and they put it in
23    your file.  Whatever area you want to go into it's
24    already in your file and they calculate the hours
25    and find out whether you're eligible to teach in
```

1    that area. The class that I had did my interim sub
2    in was ESE class. I liked that class so I decided
3    to go into that field so I knew what I had to do
4    was take classes in that field in order to become
5    certified in that field.
6              I was going to work on both of them at
7    the same time. I had more courses to do in here so
8    I started with the more courses that I had to do in
9    ESE first. I was going to be double certified
10    because I could file for temporary teachers permit
11    in more than one area. You don't have to do it in
12    one area. That's why I started this because I
13    enjoyed working with the ESE kids rather than doing
14    social science which only took me six weeks to
15    complete this.
16        Q     It would have been six weeks if you had
17    not been working; correct?
18        A     Yes.
19        Q     When you say six weeks?
20        A     Right.
21              MR. ROGERS:  Let's attach this as
22        Defendant's Exhibit No. 16.
23                   (Defendant's Exhibit No. 16 was
24                    marked for identification.)
25

```
 1   BY MR. ROGERS:
 2       Q    Now, when you received the letter from
 3   personnel administrator Mickey Dillard that's
 4   already attached to your deposition dated
 5   September 29, 1998 that said you were eligible for
 6   substitute teaching only what did you think about
 7   that in view of the fact the principal had already
 8   taken you out of the classroom?
 9       A    I thought I was going to be able to sub
10   and not just teach permanently in the classroom.
11       Q    Were you able to sub?
12       A    No.
13       Q    What did you do, if anything, to try to
14   get clearance to return as a substitute teacher?
15       A    I called -- I don't know who I spoke
16   with.  I called down there again and they told me
17   that I wasn't able to substitute either.  I can't
18   remember the names but I did a lot of phone calls.
19   I didn't write anything down.
20       Q    About when did you make these phone
21   calls?
22       A    After these letters when I received the
23   letters.
24       Q    Again, we have a span of time here
25   between September 29th and sometime in December
```

1    when your appeal was denied.

2        A    Actually every time I submitted a letter

3    when I would call I would wait on their response

4    because every time I would call they were saying

5    they hadn't gotten to it yet and they had a certain

6    amount of time to get to my appeal.  There was

7    nothing I could do.  That's why I seeked for a

8    lawyer because I wasn't getting through to

9    anything.

10       Q    Now, you mentioned other people before

11   that you believed had received hearings from the

12   School Board.  Do you know of anyone who was in

13   your situation meaning having had a felony criminal

14   arrest or nolo plea or no contest plea and pretrial

15   intervention who is now being permitted to

16   substitute teach for the School Board?

17       A    Do I know any?

18       Q    Right.

19       A    The guy's name that I gave you.  They

20   didn't go through the pretrial intervention program

21   but they have an arrest record.

22       Q    Do they have a conviction record to your

23   knowledge?

24       A    That I don't know.

25       Q    Do you know of anybody else other than

```
 1    the two folks you just mentioned?
 2        A    I don't know their names offhand but I do
 3    know of some more people.
 4        Q    Do you know what schools they're at, any
 5    way that we could try to identify them?
 6        A    No, but it's Broward County.  I don't
 7    know what schools they are in.
 8        Q    Now, for the period while you were
 9    employed by the School Board I have here a document
10    that appears to be a corrected W2 form bate stamped
11    0190, 0191 and it skips one here.  I guess it's
12    because of -- then 0193 and 0194 and ask if you can
13    identify that for me.
14        A    Yes.
15        Q    Can you tell me what happened with
16    respect to this corrected form?
17        A    I can't remember exactly what happened.
18    I think I had a wrong figure or miscalculation and
19    internal revenue corrected it.
20        Q    Well, the W2 is normally issued by the
21    School Board; correct?
22        A    Right.
23        Q    Why did the School Board issue this
24    different W2 form?
25        A    Oh this.  The School Board -- I don't
```

```
 1    know.  They made the mistake with the W2 not me.
 2        Q     Well, did you file the document that's
 3    attached?
 4        A     This is '96.  I can't remember.
 5        Q     Looks like it was filed 4/14/97 on bate
 6    stamp 0193?
 7        A     Why they did this I don't know.  They
 8    made the correction.  The School Board made the
 9    correction.  I think this came after.  I'm not sure
10    why they made the correction.
11        Q     I don't read your handwriting all that
12    well but on 0193 I think the last entry I see is
13    that your signature on 0193?
14        A     Yes, that's my signature.
15        Q     Line twenty it says amount you owe.
16    What's the amount there?
17        A     $63.
18              MR. ROGERS:  That is $63 not $6,000.
19        Let's go ahead and attach this as Exhibit 17.
20                    (Defendant's Exhibit No. 17 was
21                    marked for identification.)
22    BY MR. ROGERS:
23        Q     Going through this file last night I
24    noticed your attorney said he produced 1998 tax
25    returns, 1999 tax returns and one way or another I
```

1    don't have those.  I'm not saying he didn't produce

2    them.  I'm just saying I don't have them.  Did you

3    file tax returns in 1999?

4         A    Yes.

5         Q    You still have copies of those?

6         A    Yes, I have copies.

7              MR. ROGERS:  Are you willing to produce

8         those without --

9              MR. BERKOWITZ:  We'll produce them.

10   BY MR. ROGERS:

11        Q    Let me just cover that.  Let me show you

12   a two page document dated -- actually it's unsigned

13   and undated but this was what was produced to us.

14   It's bate stamped 0195 and 0196 and ask if that's a

15   copy of your 1998 federal income tax return?

16        A    Yes.

17        Q    Does this accurately reflect your income

18   for the year 1998?

19        A    Yes.

20        Q    If you look at the front page of this did

21   you file this jointly with your husband?

22        A    No.

23        Q    Was there a reason you didn't file it

24   jointly?

25        A    No, I just don't -- I file separately.

```
 1    Head of household.
 2        Q    Did you prepare this or did you go to
 3    someone else to prepare it like an H & R Block or
 4    tax preparer?
 5        A    No, me and a friend prepared it.
 6             MR. ROGERS:  Why don't we attach this
 7        one as Defendant's Exhibit No. 18.
 8                 (Defendant's Exhibit No. 18 was
 9                 marked for identification.)
10    BY MR. ROGERS:
11        Q    We know now at this point or do we, have
12    you worked for the School Board of Broward County
13    at all since you were removed from the classroom
14    that day sometime we think in September 1998?
15        A    No.
16        Q    Have you ever reapplied for employment
17    with the School Board?
18        A    No.
19        Q    Is there a reason why you didn't?
20        A    Because they told me I wasn't employable
21    with the Broward County School Board and I seek an
22    attorney and I assume if I'm suing them they're not
23    going to try to employ me until the situation is
24    squared away.
25        Q    But I thought you said that when you
```

```
 1    spoke with someone on the telephone in
 2    instructional staffing they said wait a year and
 3    reapply?
 4        A    Right but at that time I had obtained a
 5    lawyer.
 6        Q    Did they know you obtained a lawyer as of
 7    that point?
 8        A    Yes.
 9        Q    But they're still saying wait a year and
10    reapply?
11        A    When the lady said wait a year and
12    reapply she didn't know at that time that I had
13    obtained a lawyer.
14        Q    You never did reapply?
15        A    No.
16        Q    What have you been doing in the period
17    since September 1998 as far as employment?
18        A    Working for BETA and receiving
19    unemployment.
20        Q    When you say working for BETA what --
21        A    Broward County Employment and Training.
22        Q    I'm familiar with the agency.  What have
23    your hours been, have you been working forty hours
24    a week?
25        A    Yes, only on a part-time basis which was
```

```
 1     summer.
 2         Q      So you worked forty a week during the
 3     summer?
 4         A      Yes.
 5         Q      Of what years?
 6         A      '96, '97, '98.  I think last year was the
 7     only year I didn't work the summer employment for
 8     them.
 9         Q      That would be '99?
10         A      Right.
11         Q      That you didn't work in the summer of
12     '99?
13         A      No.
14         Q      What other employment have you had?
15         A      That's it.
16         Q      Have you tried to get jobs in any other
17     field?
18         A      No, I didn't because actually what
19     happened with the School Board I didn't want to try
20     to face that again and I was used to working with
21     Broward County employment and I knew they didn't do
22     background checks so I actually wanted to wait and
23     see what happened with the School Board before I
24     decided to go and apply for other jobs.
25         Q      So what have you been living on?
```

```
 1         A     My husband.
 2         Q     So you worked for BETA up until the end
 3    of the summer in 1998?
 4         A     Yes.
 5         Q     You didn't work for them in 1999?
 6         A     Right.
 7         Q     Is there a reason you didn't work for
 8    them in 1999?
 9         A     I just didn't apply.
10         Q     So you didn't bother?
11         A     No.
12         Q     Was there work available for you if you
13    wanted it?
14         A     For the summer employment?
15         Q     For the summer of '99.
16         A     I'm not sure.
17         Q     Otherwise you --
18         A     Actually the program -- BETA turned the
19    program over to Urban League of Broward County.
20         Q     That's Urban League of Broward County?
21         A     Of Broward County.
22         Q     So you've not applied any place else, any
23    other school district, any other employer since --
24         A     No, I didn't apply for the School Board
25    because they said I was not employable with the
```

```
 1    School Board so I followed their directions.  They
 2    sent a letter saying I was not employable with the
 3    Broward County School Board.
 4        Q    We've established that much but you
 5    didn't go out and apply at Motorola or Dade County
 6    School Board or Palm Beach School Board or any
 7    other private employer to try to get a job?
 8        A    No, I didn't because I was working for
 9    BETA.
10        Q    But you were only working for BETA --
11        A    I was receiving unemployment.
12        Q    How long were you receiving unemployment?
13        A    For about a year.
14        Q    But just I want to make sure we're
15    crystal clear on this.  You have not applied
16    anywhere else for employment since you were removed
17    from the --
18        A    I'm working now.
19        Q    Tell me about that.
20        A    I work for Psycho Therapeutic Juvenile
21    Services working with juveniles and gangs.
22        Q    How much do you make at that?
23        A    $24,000 a year.
24        Q    How long have you had that job?
25        A    Just started about four weeks ago.
```

```
 1        Q    Were you employed by anyone else prior to
 2   that position?
 3        A    No.
 4        Q    So from September 1998 through four weeks
 5   ago but for your summer employment you have not had
 6   any other positions?
 7        A    No.
 8        Q    And how did you come to get this position
 9   you have now?
10        A    In the newspaper.  The reason why -- like
11   I told you whenever I went through the School Board
12   and I was terminated for employment because my case
13   was dismissed I didn't want to go through that
14   again.  That affected me in a lot of ways so I
15   didn't want to go through that so what I did is a
16   friend of mine told me about getting my record
17   expunged so I went through getting my record
18   expunged and once I got my record expunged then I
19   seeked employment so my record is expunged as of
20   now.
21        Q    What's your understanding of your record
22   being expunged?
23        A    That means there's no record of it.  It's
24   clear.
25        Q    But is it your understanding that if you
```

```
 1    went to apply to the Dade County School Board here
 2    they would have no access to your record?
 3        A    No, I think that's one of the questions
 4    on there that if -- they asked you to explain if
 5    you have a record expunged.
 6        Q    Meaning it can be expunged for other
 7    purposes but it wouldn't be expunged for working
 8    for School Boards or law enforcement or a number of
 9    other areas?
10        A    Right but I didn't get it done for the
11    School Board.  I got it done for other jobs.
12        Q    Is there anything that prevented you from
13    getting your record expunged at an earlier date?
14        A    I didn't know about it.
15        Q    How did you find out about it?
16        A    A friend of mine told me about it.
17        Q    Did you have to have a lawyer to do it or
18    were you able to do it yourself?
19        A    I had a lawyer do it.
20        Q    About when did you actually get the
21    records expunged?
22        A    I'm not sure of the date.  About three or
23    four months ago.
24        Q    So it's during the year 2000 sometime?
25        A    I think so.
```

```
 1      Q     Now, your current employer, what do you
 2   do there?
 3      A     I work with juveniles and I counsel them
 4   on -- juveniles that's out in gangs that's active
 5   in gangs.  I do counseling with them and try to
 6   detour them from being in the gangs.
 7      Q     Did you have to receive any type of
 8   security clearance to get this kind of work?
 9      A     Yes, I did.
10      Q     Did you report your past cocaine arrest
11   to this agency?
12      A     I didn't have to.  I didn't have a
13   conviction.
14      Q     Is this an HRS registered agency?
15      A     Yes, it works with the School Board.  It
16   works with DJJ, Department of Juvenile Justice.
17      Q     And is it a private agency?
18      A     Non-profit organization that's funded
19   through BSO.
20      Q     So it's actually funded through BSO?
21      A     Yes.
22      Q     Did BSO do the background check to your
23   knowledge?
24      A     Yes.
25      Q     And one way or another they hired you?
```

```
 1        A     They actually did -- I had to do a
 2   background check for I guess Broward County which I
 3   went to the county to do the background check.
 4   Came back nothing founded and they have to do a
 5   federal background check, nationwide background
 6   check.
 7        Q     And to your knowledge no one found your
 8   past conviction?
 9        A     No.
10              MR. BERKOWITZ:  Object to the form.
11   BY MR. ROGERS:
12        Q     No one found your past pretrial
13   intervention nolo contendre plea?
14        A     Not as I know of.  It didn't say it on
15   the police report.  That's the only background
16   check.
17        Q     Now, have you ever received a Florida
18   teaching certificate?
19        A     No.  Just temporary.
20        Q     And you never reapplied for your -- even
21   your substitute certificate back from Broward
22   County School Board; correct?
23        A     I wasn't allowed.  I have a check that I
24   sent in to renew the substitute certificate and
25   School Board sent it back to me.
```

101

```
 1        Q    So you did apply at some point?
 2        A    Yes, once they -- that they sent me -- it
 3   must have been a mix up they sent me something in
 4   the mail to renew a five year substitute teaching
 5   certificate and I sent in the money order with it
 6   and they sent it back denying it so some kind of
 7   way it got to me in the mail but when I sent it in
 8   they denied it and they said I wasn't employable
 9   with the School Board so I did try it that way as
10   you spoke I thought about it.
11        Q    Now, you state in your complaint that you
12   suffered great embarrassment, humiliation and
13   mental pain based upon being not hired by the
14   School Board.  What are we talking about here?
15        A    First of all I was embarrassed when they
16   came in the classroom and took me out of the
17   classroom and wasn't able to return.  I suffered
18   financially.  I suffered mentally.
19        Q    Let's back up a second if we can.  When
20   they took you out of the classroom did they bring
21   in armed guards or did the principal come in
22   herself?
23        A    She sent someone in and had a teacher
24   come take over the classroom.
25        Q    There was nothing unusual in that if she
```

```
 1   wanted to come down to the office in the manner in
 2   which she did, was there?
 3       A    No.
 4       Q    Not like she sent up three cops and --
 5       A    No, she didn't.
 6       Q    And the deans or anything to get you.  So
 7   the embarrassment and humiliation that you're
 8   talking about is when you were removed from the
 9   classroom?
10       A    Yes, that was embarrassing me.  For me
11   never to return and then the kids asking me
12   "Ms. Sears, why didn't you come back to class?"  I
13   didn't know what to tell them.
14       Q    When would the kids get a chance to ask
15   you?
16       A    I see them all the time in the community.
17   I coached volleyball.  I even had -- before they
18   terminated me I had -- she had also gave me a job
19   coaching volleyball.  I had volleyball players come
20   up to me asking me why I'm not teaching.
21       Q    Did you keep to volleyball coach position
22   after?
23       A    I couldn't.  She had to terminate me.
24       Q    How much did you make as a volleyball
25   coach?
```

```
 1        A      It was like $1,600 for the season which I
 2   never -- I never received anyways so --
 3        Q      You didn't receive it because you didn't
 4   coach it?
 5        A      Right.
 6        Q      Because you couldn't work.  Now, you also
 7   speak in the complaint about great mental pain.
 8   Have you seen any doctors as the result of this
 9   mental pain?
10        A      No, I didn't have any insurance to go do
11   that.  I just took over-the-counter medication.
12        Q      What over-the-counter medication did you
13   take?
14        A      Like Tylenol.
15        Q      So you had headaches?
16        A      Right and stress down my neck.
17        Q      So that's what we're talking, headaches
18   and stress down your neck?
19        A      Yes.
20        Q      Now, you didn't have any health insurance
21   do to do that before when you were a substitute
22   teacher before, did you?
23        A      No, I didn't.  I wasn't sick before then
24   either.
25        Q      Well, have you seen any doctors since
```

```
 1    then?

 2         A     No.

 3         Q     None at all?

 4         A     No.

 5         Q     Haven't seen any psychiatrists?

 6         A     No.

 7         Q     No psychologists?

 8         A     No.

 9         Q     Now, the school that you went to or you

10    got the credit from, Phillips University, Inc., am

11    I correct that that's in Enid, Oklahoma?

12         A     That's where the main campus is located.

13    They have an off branch campus located on Florida

14    Memorial campus in Miami.

15         Q     So is this a correspondence school?

16         A     What do you mean like --

17         Q     Like you stay home and you write them

18    letters.

19         A     No, you actually go down there and take

20    class.  They have an off branch.  Like if you have

21    an FAU off campus branch in Miami or Broward

22    County.  They have an off branch campus there.

23         Q     This is a school that has sort of

24    satellite branch at Florida Memorial?

25         A     Exactly.
```

```
 1          Q      To your knowledge is Phillips University
 2    bankrupt or has it gone out of business since then?
 3          A      No, not to my knowledge.
 4          Q      Did you ever find out whether it was
 5    accredited by the Florida Department of Education?
 6          A      Yes, it's an accredited school.
 7          Q      How do you know that?
 8          A      They gave me an information package on it
 9    when I went to register.
10          Q      Do you have any of that information still
11    around at home?
12          A      Yes, I should have it.
13          Q      Would you provide that to your lawyer and
14    let him provide that to us?
15          A      Yes.
16                 MR. ROGERS:  Will you agree to do that?
17                 MR. BERKOWITZ:  Yes.
18    BY MR. ROGERS:
19          Q      Let me show you a document and ask if
20    you've ever seen it before (Indicating).
21          A      Yes.
22          Q      Now, this is your second amended
23    complaint in this action?
24          A      Yes.
25          Q      Did you see this before it was filed?
```

```
 1        A      Before?

 2        Q      Yes.

 3        A      Oh, yes.

 4        Q      You went to your lawyer's office and

 5   looked at it or he mailed it to you or something

 6   like that?

 7        A      Yes, he mailed it to me.

 8        Q      Do you agree that everything in this is

 9   true and correct?

10        A      Yes.

11        Q      What's your understanding about how the

12   School Board hires full-time certificated teachers?

13        A      It's different steps.  You can get a five

14   year.  You can get a two year.  When I say full

15   time I'm meaning -- I was meaning that I can be

16   hired as a teacher with benefits, teacher's pay for

17   two years under my certificate and if I didn't

18   complete whatever I had to complete then I would be

19   terminated.

20        Q      Now, who told you that again?  That may

21   be important for everybody to have.

22        A      Tallahassee.  It's a hot line that you

23   can call and speak to people in Tallahassee,

24   Tallahassee and they'll give you all this

25   information.
```

```
 1        Q      Someone in Tallahassee told you that the
 2   document that they sent you entitled you to teach
 3   in Florida as a full-time teacher?
 4        A      Permanent for two years.
 5        Q      For up to two years and what did you have
 6   to do within that two year period?
 7        A      During that two years I had to pass
 8   teacher's certification tests and I also had to
 9   complete the two courses that I need to complete.
10        Q      When you say teacher certification test
11   what did you have to pass?
12        A      Okay, the teacher certification test is
13   just a basic test all teachers have to pass.  I
14   passed that test.  The next test is you have to
15   pass whatever subject area you're going to teach
16   meaning that the two year temporary certificate was
17   for social science so I had to take the social
18   science test and pass that along with completing
19   the two courses that I had to take.
20        Q      Did you pass the second test that you're
21   referring to?
22        A      No, I didn't.  I took it but I didn't
23   pass it.
24        Q      Did you just not receive the passing
25   score?
```

108

```
 1        A      Right.  That's what happened.
 2        Q      Now, as a substitute teacher you were
 3   aware, were you not, you weren't guaranteed any
 4   particular number of days of employment each year?
 5        A      Number of calls, yes.
 6        Q      So you couldn't tell from one day to the
 7   next whether you were going to work or not?
 8        A      Right.
 9        Q      You were free to turn down the job if you
10   didn't want it; right?
11        A      That's correct.  But in order to be
12   eligible to sub you had to sub a certain amount of
13   days per year.  I don't know that it wasn't many
14   days per year in order to keep your substitute
15   certificate current.
16              So if you didn't work a certain amount of
17   days per year I guess you would be terminated and
18   you would have to reapply.
19        Q      Is this what you're referring to?  I
20   think number of days you were referring to is on
21   one of the earlier ones.  We may as well attach
22   this one as the requirements for substitute
23   teachers.  Do you recall seeing this document
24   before (Indicating)?
25        A      I don't recall seeing it.  Probably
```

```
 1   because the things I did for substitute were back
 2   in '92 so I might have that at the beginning.  It
 3   doesn't look familiar to me.
 4        Q    You never held anything but a substitute
 5   teacher position, did you, up until a point in time
 6   when you were removed from the classroom?
 7        A    I had a two year temporary teaching
 8   permit before then.
 9        Q    But you are not hired by a School Board
10   as anything but a substitute teacher?
11        A    Pool sub for one year.
12        Q    Interim teacher and rest of the time
13   substitute teacher?
14        A    Right.
15        Q    Each one of those positions you got a
16   daily rate of pay; correct?
17        A    Right.
18        Q    When you were a pool sub is it correct to
19   say that you knew you were not guaranteed
20   employment after the end of that school year?
21        A    Yes, as the pool sub you're guaranteed it
22   for that year only and next year you have to
23   reapply.
24        Q    Then the same with the interim sub?
25        A    Right.
```

```
 1          Q    Meaning you're not guaranteed employment

 2    after your interim employment --

 3          A    Is over, that's correct.

 4               MR. ROGERS:  Let's put this in.  This

 5          is bate stamped 0267 and 0268.  4/16/98

 6          addition of requirements for substitute

 7          teachers for the Broward County School Board.

 8                    (Defendant's Exhibit No. 19 was

 9                    marked for identification.)

10               THE WITNESS:  Do you have anything like

11          this for the full-time teachers?

12               MR. ROGERS:  Not with me here.

13    BY MR. ROGERS:

14          Q    One of the other things you say in the

15    complaint is the School Board has some sort of rule

16    or practice of not employing people as substitutes

17    or teachers if they have a criminal conviction; is

18    that correct?

19               MR. BERKOWITZ:  Object to the form of

20          the question.

21    BY MR. ROGERS:

22          Q    I mean the complaint says that.  You said

23    you read it.

24          A    Can you restate that?

25          Q    The complaint states -- you said that you
```

111

```
1    read this compliant before your lawyer filed it.
2        A    I read it a time back.  Restate the
3    question.
4        Q    The complaint says that the School Board
5    does not hire anyone as a substitute or as a
6    full-time teacher if they have a prior arrest
7    regardless of conviction?
8        A    Does the School Board say that?  You're
9    asking me did I say the School Board said that?
10       Q    Yes.
11           MR. BERKOWITZ:  Object to the form of
12       the question.  You can answer.
13   BY MR. ROGERS:
14       Q    It's a little bit unclear.  I agree the
15   way we framed it around here.  Let me ask it a
16   different way.  You've told me the names of at
17   least two people who you know of that are working
18   for the School Board but had some sort of a
19   criminal history; correct?
20       A    Yes.
21       Q    And you've also said that your principal
22   at the point in time when she first heard about --
23   this is back in September of 1998 when principal
24   Rebecca Dahl first heard that the security
25   clearance committee had rejected your application
```

```
 1    that she was aware of other people who appealed
 2    successfully; is that correct?
 3        A    That's correct.
 4        Q    But we don't know the name of that
 5    person?
 6        A    The name of the person?
 7        Q    The one that Rebecca Dahl is speaking of.
 8        A    Oh no, I don't know the name.
 9        Q    Now, apart from the hearing that you
10    requested with or the appeal that you filed with
11    Mr. Blitman had you ever filed any sort of formal
12    request for hearing before the School Board?
13        A    No.
14             MR. ROGERS:  Let's attach the complaint
15        as Exhibit 20.
16                  (Defendant's Exhibit No. 20 was
17                  marked for identification.)
18             MR. ROGERS:  How about if we take about
19        a five minute break?
20             MR. BERKOWITZ:  Fine.
21                  (Thereupon, a short recess was
22                  taken.)
23    BY MR. ROGERS:
24        Q    We're back on the record.  It's about
25    2:25.  I think we'll be able to make it by 3:30
```

113

```
 1    with no problem.
 2              Just for clarification purposes who do
 3    you say you're working for now?
 4         A    Psycho Therapeutic Juvenile Services.
 5         Q    Can you spell that just for --
 6         A    Let me write it at the same time.
 7         Q    I think I know what you're saying but I
 8    see the court reporter, wince.
 9         A    P-s-y-c-h-o-t-h-e-r-a-p-e-u-t-i-c.
10         Q    Psycho Therapeutic Juvenile Services?
11         A    Right.
12         Q    That's a private non-profit agency?
13         A    Right.  That's funded through BSO and
14    Department of Juvenile Justice.
15         Q    Do you know who the contact person would
16    be at BSO for that agency?
17         A    No, I don't.
18         Q    Do you know who the contact person would
19    be through the Department of Juvenile Justice?
20         A    No, I don't.
21         Q    Who hired you there?  Who is your
22    immediate supervisor?
23         A    Joseph Broconi.
24         Q    Can you spell his last name?
25         A    B-r-o-c-o-n-n-i.
```

```
 1        Q     Where is this place of business located?
 2        A     2700 Southwest 4th Avenue,
 3    Ft. Lauderdale, Florida.
 4        Q     And you work there you said for the last
 5    four months?
 6        A     Weeks.
 7        Q     Sorry.  I misspoke.  Did you work for
 8    BETA during the summer of 2000?
 9        A     No.
10        Q     Let me show you a document.  It's styled
11    as Plaintiff's Notice of Filing Answers to
12    Interrogatories.  It bears certificate of service
13    dated 29 June 2000.  Have you seen that before?
14        A     Yes.
15        Q     Is that your signature on the -- actually
16    two of them that appear on page five of that
17    document?
18        A     Yes.
19        Q     Numbered page three faxed page five.  Is
20    everything in these answers true and correct to the
21    best of your knowledge?
22        A     Yes.
23        Q     Let's just make sure we know what each of
24    these people that you've listed under numbered
25    paragraph one in your response.  We know that
```

```
 1    Rebecca Dahl was the principal at Lauderhill Middle
 2    School.  Have you kept in touch with her?
 3        A    No, I haven't.
 4        Q    Have you spoken with her at all since
 5    that day that she helped you write your appeal?
 6        A    No.
 7        Q    And you've never spoken to Gracie Diaz;
 8    correct?
 9        A    Maybe one time.  I can't recall.  I think
10    I spoke to her one time on a phone call.
11        Q    Who is Lamaras Cooper?
12        A    She works at the Lauderhill Middle and
13    she's office staff.  She's a friend of mine.
14        Q    What knowledge would she have of your
15    case here?
16        A    I used to talk with her about my job
17    duties and different things that I was doing at the
18    school.
19        Q    Would this be during the period while you
20    were working at the school as a substitute?
21        A    Right, working, yes.
22        Q    Have you spoken with her since you left
23    the school?
24        A    Yes, I have.
25        Q    Now, does she also have knowledge that
```

```
 1    there are other teachers working for Broward County
 2    School Board that have let's say criminal records
 3    in their past?
 4        A    She stated one of them but she didn't
 5    give me a name.  A girl that had a similar
 6    situation to mine.
 7        Q    Do we know about when that situation
 8    arose?
 9        A    No, I don't know.
10        Q    And you say you've kept in touch with
11    Ms. Cooper since you were --
12        A    On occasions.  Not many.
13        Q    Is she like a regular social guest at
14    your home or anything like that?
15        A    No.
16        Q    Where have you run into her?
17        A    At the school.  I met her at the school
18    doing subbing.
19        Q    But since you left the school you haven't
20    subbed; right?
21        A    No, I haven't.
22        Q    So when have you run into her since you
23    left the school and we're talking about since
24    September 1998?
25        A    At the football field.  My husband
```

```
 1    coaches football and she be to the football.  I run

 2    into her at different sports activities.

 3         Q     Does your husband get paid to coach

 4    football for the Broward School Board?

 5         A     He don't coach for the Broward School

 6    Board.

 7         Q     Who does he coach for?

 8         A     It's little league.

 9         Q     Little league?

10         A     Yes, the City of Lauderdale Lakes.

11         Q     Who is Mr. Lockhart?

12         A     That was one of the co-workers.  One of

13    the teachers that was in the department when I was

14    doing ESE.

15         Q     What does he know about the School

16    Board's supposed policy of not hiring people with

17    criminal backgrounds?

18         A     I don't know.

19         Q     So why is he --

20         A     I spoke to him about my situation.

21         Q     When did you speak to him about your

22    situation?

23         A     During the -- after the time that it

24    happened.

25         Q     Now, even though Rebecca Dahl had you
```

```
 1   escorted from the classroom you're still permitted
 2   back in the school to go in and talk to her when
 3   you want?
 4        A    They didn't -- this was after school.
 5   They didn't tell me that I wasn't allowed to go on
 6   school campuses.
 7        Q    I want to make sure of that.
 8        A    She didn't tell me that.
 9        Q    I take it you got along all right with
10   Ms. Dahl?
11        A    Yes, she was a great lady.
12        Q    Now, Mr. Lockhart, when did you talk to
13   him about your situation?
14        A    After they denied me employment.
15        Q    Was this after you had been taken out of
16   the classroom?
17        A    Yes.
18        Q    And you spoke to him at the school?
19        A    I've called him on the telephone at home.
20        Q    Is he -- go ahead.
21        A    He was on the same teaching team that I
22   was on.  Before they moved out of ESE.  They moved
23   me out of ESE at the beginning of the year and put
24   me in science.  We taught the same kids.  They just
25   went from classroom to classroom.
```

```
 1          Q      So this is --
 2          A      He just have knowledge of the my teaching
 3    experience just as a co-worker.  I also spoke to
 4    him briefly about what happened and why I wasn't
 5    returning back.
 6          Q      Was he able to give you any advice on
 7    what you should do as far as your appeal or did you
 8    ask?
 9          A      I didn't go that far.
10          Q      You never asked?
11          A      No, I just told him about the situation.
12          Q      To your knowledge does he have any
13    knowledge of any other people working for Broward
14    School Board that have similar criminal pasts?
15          A      If he didn't he didn't say it.
16          Q      The last one is Ms. Cameron.  Who is she?
17          A      She was another teacher that worked with
18    me.  She's not aware of what happened.
19          Q      She is not aware that you were removed
20    from the classroom?
21          A      The reason why.  I didn't talk to her
22    about why I wasn't coming back.
23          Q      So the reason that she is listed here is
24    because she has knowledge of your performance while
25    you were there as a substitute teacher?
```

```
 1          A      Exactly.  Almost the same with
 2    Mr. Cameron but he's familiar with what happened.
 3    He doesn't know much about details.
 4          Q      It says Ms. Cameron, is that a typo?
 5          A      I'm sorry.  Ms.  Mr. Lockhart.
 6          Q      Ms. Cameron and Mr. Lockhart.  To your
 7    knowledge are they still at the school?
 8          A      Yes, those two are.
 9          Q      Now, apart from the people that you
10    already told us about are you aware of anyone else
11    presently working for Broward School Board in a
12    pupil contact or student contact position who has a
13    past arrest record for narcotics violations?
14          A      No, not that I know of.
15          Q      You are aware of these other people?
16          A      Yes.
17          Q      Ones you have already mentioned to us and
18    when you spoke to Principal Dahl did she state what
19    the nature of the problem she had helped the other
20    teacher or applicant?
21          A      No, she didn't.  I think it just had
22    something to do with an arrest or conviction.  I
23    don't know exactly in what nature.
24          Q      We don't know if it was a felony or drug
25    conviction or not?
```

```
1        A     No.
2        Q     Principal Dahl is still at that school,
3    isn't she?
4        A     She's at another school.
5        Q     What school is she at?
6        A     Sunrise Middle School.
7              MR. ROGERS:  Let's attach this as
8        Defendant's Exhibit No. 21.
9                   (Defendant's Exhibit No. 21 was
10                  marked for identification.)
11   BY MR. ROGERS:
12       Q     Now, the documents I'm looking at now are
13   what we call a Request for Production of documents
14   and the response that your lawyer filed to that
15   Request for Production of documents.  That means we
16   want you to give access to documents that you may
17   have relevant to your case.
18             One of the requests that we made was for
19   any and all personal memoranda, diaries, journals,
20   appointment books, calendars or other documents
21   that you prepared that contain any reference to
22   your employment with the School Board.
23             Do you have any such diary, any kind of
24   records or anything that you have written down at
25   home that pertains to your employment with the
```

```
 1    School Board?

 2         A    No.

 3         Q    You never kept a little journal to

 4    yourself saying today they told me they won't hire

 5    me because I was --

 6         A    No, I didn't.  I failed to do that.

 7         Q    So no such documents exist?

 8         A    No.  Not as I know of.  I can't remember

 9    writing anything down.

10         Q    Now, have you ever seen a copy of the

11    collective bargaining agreement between Broward

12    Teachers Union and the School Board of Broward

13    County?

14         A    No.

15         Q    How did you know what the beginning

16    teacher's salary was when you started working as an

17    interim sub?

18         A    I have -- my best friend is -- she

19    teaches with the School Board on a temporary -- the

20    same thing that had two year temporary permit she

21    does same thing and she was getting paid like

22    $32,000 and something.  I have a co-worker and

23    friends that I know that all works with the School

24    Board.

25         Q    They were getting paid $32,000 and
```

```
 1   something?
 2       A    Yes.  I don't know the exact figure.
 3       Q    Well, you had no full time teaching
 4   experience at the point in time when you applied
 5   with Broward School Board; correct?
 6       A    Correct.  That's why I was applying so I
 7   could start teaching because once I got the two
 8   year temporary permit that enabled me to become
 9   full time for two years.
10       Q    Who is the person that you're referring
11   to that has the two year temporary permit that's
12   the same as the one we looked at here today?
13       A    Kora Walls.
14       Q    Can you spell that?
15       A    Several teachers on the two year
16   contracts.  Plenty of them in Broward County.
17       Q    Tell me who you can think of right now?
18       A    Kora Walls.  She can give you -- K-o-r-a
19   W-a-l-l-s.
20       Q    What school is she at?
21       A    She's at Ely High School now.
22       Q    Any others you can think of?
23       A    Not offhand.
24       Q    You said there's plenty of them and now
25   you can't think of any of them.
```

```
 1        A     I don't know their names offhand.
 2        Q     How do you know there's plenty of them?
 3        A     Because I've been around them and Kora
 4   has told me that several of them that has temporary
 5   permits that had to go back to subbing because they
 6   didn't complete what they had to complete within
 7   the two years.   That's one of the requirements for
 8   Broward County.
 9             A lot of times you go through two year
10   and go through five years and after the five years
11   you can receive a contract.   The five year
12   contract.
13        Q     We're talking about teaching certificates
14   as opposed to contracts though; right?
15        A     Right.
16        Q     Now, are you aware of any documents or
17   School Board policies that would have absolutely
18   prohibited you from being hired because you had
19   this arrest in your background?
20        A     No, I'm not.
21        Q     You've already stated it but let me
22   clarify.   You have not seen any doctors or received
23   any treatment for physical or emotional injuries
24   since leaving the School Board in September 1998?
25        A     No.
```

```
 1        Q      So there couldn't be any record of any
 2   treatment because you haven't received any?
 3        A      Right.
 4        Q      In reference to employers that you had
 5   since leaving the School Board in 1998 the only
 6   employer prior to the psychiatric center is that
 7   appropriate to --
 8        A      Psycho Therapeutic Juvenile Services.
 9        Q      The only employer you had other than that
10   agency since 1998 has been BETA for one summer?
11        A      "Uh-hum."  Not just --
12        Q      Two summers maybe?
13        A      Two at the most.
14        Q      I think you said you worked in 1998 but
15   did not work in 1999?
16        A      I think it was one year.  It's just been
17   one summer that I didn't work since that time.
18        Q      Well, if you worked it would be reflected
19   on your tax return; correct?
20        A      Correct.
21        Q      And '99 is the year we're missing at the
22   moment so they're going to provide that to us that
23   can close that up.
24        A      Right.
25        Q      You never applied anywhere else?
```

```
 1        A    No.
 2        Q    How could you receive unemployment
 3   compensation benefits without applying?
 4        A    Without applying for --
 5        Q    For work.
 6        A    I seeked -- I seeked employment like over
 7   the phone but I didn't receive any.
 8        Q    Because usually for unemployment don't
 9   they make you apply several different places?
10        A    Yes.
11        Q    But all you ever did was call people on
12   the phone?
13        A    Right.
14        Q    Never went and filled out an application
15   anywhere?
16        A    No, I called them over the phone and I
17   wrote down what I called and I submitted it.
18        Q    The unemployment compensation people
19   accepted that and went ahead and paid you?
20        A    Yes.
21        Q    Who holds title to your house at the
22   moment, you or Mr. Sears?
23        A    Me.
24        Q    Just in your name only?
25        A    Yes.
```

```
 1      Q      I may have asked this but forgive me if I
 2   did.  Mr. Sears was not living with you full time
 3   at your residence before the date that he was
 4   arrested?
 5      A      No.
 6      Q      But he would stay there occasionally?
 7      A      Yes.  Spend the night sometimes.
 8      Q      Do you know what jail Mr. Sears was
 9   actually put in?
10      A      What you mean, county jail?
11      Q      Was it county or one of the state
12   facilities?  Did he stay in Broward County Jail or
13   was he put in Raford or where?
14      A      He went to -- he was in Broward County
15   Jail but whenever you serve prison time you have to
16   go to a state facility.
17      Q      He was in the state facility?
18      A      Yes.
19      Q      Which state facility?
20      A      Wiwahitchka.
21      Q      Were you trying to say the same of one?
22      A      That's the name of the facility where he
23   was.
24          MR. BERKOWITZ:  Try to spell that one.
25          THE WITNESS:  I can't spell that one.
```

```
 1              MR. ROGERS:  We could probably pick up
 2         a phone book or something.
 3    BY MR. ROGERS:
 4         Q    Did you go and visit Mr. Sears at that
 5    place?
 6         A    One time I went to visit him.
 7         Q    Where was this state prison located?
 8         A    The place where I told you, Wiwahitchka
 9    up by Panama City.
10         Q    Long trip.  Now, has Mr. Sears been
11    arrested since he got out of prison from the last
12    cocaine bust?
13         A    No.
14         Q    How about you, you've never been arrested
15    since then?
16         A    Never.
17         Q    I guess we have to ask this.  What were
18    you making at the point in time when you were
19    removed from the classroom, the regular Broward
20    School Board sub rate?
21         A    Yes, at that time because when I was
22    getting the interim pay at the end of the school
23    year and when she wanted me to come back she had to
24    bring me back as a regular sub and then do the
25    paperwork so I was just getting regular substitute
```

```
 1    pay.
 2        Q     You would have to get regular substitute
 3    pay for most of the year before she could bring you
 4    back as an interim sub; correct?
 5        A     She wasn't bringing me back as an interim
 6    sub.  She was bringing me back as a permanent
 7    teacher.  That's why I had to go back down to the
 8    School Board and reapply because I was coming from
 9    part time to full time.  When I went to do this,
10    this is when I had to go back through and had to be
11    fingerprinted and had to go back through the
12    security clearance so this is where it stopped.
13            That's why it stopped me from becoming
14    full time.  This is why the background check had to
15    come back around and the police report this is
16    where all of it arose from.  When I seek full time
17    I was stopped because the arrest.
18        Q     But you had been fingerprinted before?
19        A     Right.
20        Q     And I believe 1992 we think it was?
21        A     That's right.
22        Q     Were you fingerprinted for the job you
23    had as a substitute teacher in Fort Myers?
24        A     Yes.
25        Q     We don't know what the daily rate for
```

```
 1    subs was at that point but that should be something

 2    that's easy enough to determine?

 3         A     You're talking about before I got -- I

 4    can't remember.  I'm not going to try to guess.

 5         Q     Don't guess at something.  It's something

 6    that's easy enough for us to establish.  My

 7    recollection is it's something between sixty and

 8    eighty dollars a day for substitutes.  Does that

 9    sound right?

10         A     I think it was a little higher.  I don't

11    know exactly what it was.  I don't think it was

12    eighty.  It was higher.

13         Q     I just did an arbitration where I'm

14    thinking it was around eighty for the pool sub.

15         A     I want to guess -- if I guess -- for the

16    pool sub the pool sub was $12 an hour I know that.

17    The pool sub was $12 an hour and the regular sub

18    was like $10 an hour.

19         Q     In your interrogatory responses you said

20    you were making $21 an hour?

21         A     That was for the interim.

22         Q     That's supposed to be the beginning

23    teacher's rate?

24         A     Yes.

25         Q     But there again you were never hired full
```

```
 1   time by the School Board as a full-time teacher;
 2   correct?
 3       A     Right.  It didn't get that far.  It
 4   stopped.
 5       Q     And the only status you ever had with the
 6   school board is as a substitute teacher?
 7       A     Yes.
 8             MR. ROGERS:  We're done.
 9             MR. BERKOWITZ:  I don't have any
10       questions.  She'll waive.
11                     (Witness excused.)
12                     (Thereupon, at 2:55 p.m., the
13                     deposition was concluded.)
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1                          CERTIFICATE OF OATH

 2

 3         STATE OF FLORIDA   )

 4         COUNTY OF DADE     )

 5

 6                     I, the undersigned authority, certify

 7         that ___Cheryl Sears_____ personally

 8         appeared before me and was duly sworn.

 9

10                     WITNESS my hand and official seal this

11         22nd day of _November_, 2000.

12

13

14

15

16         _____
           RICK LEVY
17         Notary Public - State of Florida
           My Commission No. CC 516954
18         Expires:  December 7, 2003

19

20

21

22

23

24

25
```

1                                CERTIFICATE

2        STATE OF FLORIDA    )
         COUNTY OF DADE      )

3

                    I, RICK LEVY, Registered Professional
4        Reporter, do hereby certify that I was authorized
         to and did stenographically report the foregoing
5        deposition in stenotype; and that the foregoing
         pages, numbered from 1 to _133_, inclusive, are a
6        true and correct transcription of my shorthand
         notes of said deposition.

7

                    I further certify that I am not a
8        relative, employee attorney or counsel of any of
         the parties, nor am I a relative or employee of any
9        of the parties, attorney or counsel connected with
         the action, nor am I financially interested in the
10       action.

11                  I further certify that I have delivered
         the original copy of said deposition to
12       __Gordon Rogers_____, Esquire, to be retained
         by him/her pending further order of the Court.

13

         WITNESS my hand and official seal in the City of
14       Fort Lauderdale, County of Broward, State of Florida,
         this __22nd____ day of _November___, 2000.

15

16

17                  Rick Levy, RPR
                    Notary Public - State of Florida

18

19

20

21

22

23

24

25

CHERL D. HALL
5445 NW 16th Street
Lauderhill, FL 33313
(305) 733-9597

**JOB OBJECTIVE:**   Challenging position in the Social
Services area where my criminal justice
education and training are needed.

**EDUCATION:**   B.A. Degree Criminal Justice, 1989
Florida Memorial College, Miami, FL

**RELATED COURSES:**   Sociology of Deviance
Causes/Prevention of Delinquency
Criminal Law I and II
Corrections: Service and Philosophy

Bethune Cookman College, 1984-85
Daytona Beach, FL: (General Education)

Earned Diploma: Ft. Myers High School

**RECENT EXPERIENCE:**

8/89 - 4/91   School Board of Lee County
Central Avenue, Ft. Myers, FL
**SUBSTITUTE TEACHER:** Substituted in
temporary assignments: County School

12/89 - 3/90   US Department of Agriculture
2744 Edison Avenue
Ft. Myers, FL
**INSPECTOR:** Inspected citrus for canker
according to US Agricultural Department
Guidelines. Advised growers on proce-
dures required in regard to canker
situation.

**INTERNSHIPS I & II
EXPERIENCE:**

6/89 - 8/89   HRS Price Halfway House
2515 Ortiz Avenue
Ft. Myers, FL
**GROUP TREATMENT LEADER:** Supervised
juveniles during group meetings and
counseling sessions.

DEFENDANT'S
EXHIBIT
1
RR   11/8/00

0026

Page 2
CHERL D. HALL
(305) 733-9597

1/89 - 4/89

HRS Youth Services
245 W. 74th Place
Hialeah, FL
**ASSISTANT CHILDREN, YOUTH AND FAMILY SERVICES:** Supervised juveniles to

ensure they completed community service requirements.

**SUMMER EMPLOYMENT:**
Summer 1987

City of Ft. Myers
Ft. Myers, FL
**RECREATION LEADER:** Supervised youth ages 6-13 at Dunbar Recreation Center in competitive sports and recreational activities including filed trips.

Summer 1986

Lee County Private Industry Council
Evans Avenue, Ft. Myers, FL
**SUMMER YOUTH MONITOR:** Monitored youth activities and worksites for agency providing youth employment under the Job Training Partnership Act Programs (JTPA). Reported orally and in writing on youth progress and on exceptions when detected.

Summer 1985

Lee County Probation Office
1700 Monroe St., Ft. Myers, FL
**RECEPTIONIST:** Front desk responsibilities, telephone, and clerical duties.

Summer 1984

Ft. Myers Recreation Center
1773 Evans Avenue, Ft. Myers, FL
**RECREATION AIDE:** Assisted children 13 and under in recreation activities.

Summer 1983

HRS Ft. Myers Food Stamp Office
2120 Collier Avenue, Ft. Myers, FL
**RECEPTIONIST**

Summer 1982

Dunbar Recreation Center
Edison Avenue, Ft. Myers, FL
**RECREATION AIDE**

**EXTRA-CURRICULAR ACTIVITIES:**

Florida Memorial Women's Basketball and Track Teams; Kappa Kourt Sweetheart Club.

**REFERENCES:**

Available upon request.

0027

## SECURITY CHECK (MISDEMEANOR OR FELONY CONVICTION)

OTHER THAN FOR A MINOR TRAFFIC VIOLATION, HAVE YOU EVER BEEN CONVICTED. FOUND GUILTY, ENTERED A PLEA OF NOLE CONTENDERE NO CONTEST? TO A CRIME, OR ARE THERE ANY CRIMINAL CHARGES NOW PENDING AGAINST YOU? _____ YES ✓ NO A YES OR NO ANSWER IS REQUIRED BY FLORIDA LAW. YOUR ANSWER TO THIS QUESTION WILL BE CHECKED AGAINST LOCAL, STATE AND FEDERAL RECORDS. IF YOU DO NOT ANSWER THIS QUESTION ACCURATELY, YOU MAY NOT BE EMPLOYABLE. IF YOU CHECK THE YES BOX YOU MUST GIVE THE INFORMATION REQUESTED FOR EACH CHARGE. PLEASE ATTACH SEPARATE SHEET IF YOU NEED MORE SPACE

| DATE | CITY STATE | OFFENSE | PENALTY · DISPOSITION |
|------|------------|---------|-----------------------|
|      |            |         |                       |
|      |            |         |                       |
|      |            |         |                       |

## PERSONAL STATEMENT

THIS SECTION MUST BE COMPLETED IN YOUR OWN HANDWRITING. USING YOUR PREVIOUS WORK EXPERIENCE AS THE VEHICLE MAKE SPECIFIC STATEMENTS ABOUT YOURSELF THAT WOULD MARKET YOU AS A VIABLE CANDIDATE FOR A TEACHING POSITION IN OUR DISTRICT

*I feel that I will be a viable candidate for a Teaching position in your district. Because of my Substituting Experience in following Certified Teachers instruction on Educating Students in rades K-12. And also because of my background in working with Kids. I have also experience Teaching independently for sub weeks Teaching Special Ed Classes in all Cuuse areas Grade 6-8.*

## SUPPLEMENTAL INFORMATION

APPLICATIONS REMAIN ACTIVE FOR A PERIOD OF SIX MONTHS FOLLOWING THE DATE OF APPLICATION. APPLICATIONS WILL BE DESTROYED IF NOT UPDATED.

PERMISSION IS HEREBY GIVEN ANY AGENCY OF THE GOVERNMENT OF THE UNITED STATES, AND / OR ANY OTHER AGENCY PERSON FIRM OR CORPORATION HOLDING RECORDS CONSIDERED CONFIDENTIAL TO FURNISH THE SPECIAL INVESTIGATIVE UNIT OF THE BROWARD COUNTY PUBLIC SCHOOL SYSTEM ALL INFORMATION DESIRED INVOLVING ME IN ANY WAY UPON REQUEST. SUCH RECORDS I UNDERSTAND MAY INCLUDE REASONS FOR TERMINATION OF EMPLOYMENT, REASONS FOR DISCHARGE FROM MILITARY SERVICE, CRIMINAL HISTORY, ON THE JOB PERFORMANCE, COMPLETE HISTORY OF INJURIES SUFFERED INCLUDING DISABILITY, EDUCATIONAL RECORDS, OR ANY OTHER PERSONAL INFORMATION WHICH MAY NOT BE OTHERWISE OBTAINED WITHOUT PRIOR AGREEMENT. INCLUDED IN THIS GRANT OF AUTHORITY IS MY PERMISSION TO FORMER EMPLOYERS AND OTHER PERSONS ACQUAINTED WITH ME OR IN POSSESSION OF INFORMATION CONCERNING ME, TO SUPPLY SUCH INFORMATION TO THE SPECIAL INVESTIGATIVE UNIT

I CERTIFY THE ABOVE ENTRIES ARE TRUE, COMPLETE, AND CORRECT TO THE BEST OF MY KNOWLEDGE AND BELIEF AND ARE MADE IN GOOD FAITH. I UNDERSTAND THAT A KNOWING AND WILLFUL FALSE STATEMENT ON THIS FORM MAY RESULT IN IMMEDIATE DISMISSAL.

Cheri Hall                          1-27-92

SIGNATURE                           DATE

4070 C
REV: 12/90

THE SCHOOL BOARD OF BROWARD COUNTY, FLORIDA
DEPARTMENT OF INSTRUCTIONAL STAFFING
P. O. BOX 5408
FT. LAUDERDALE, FL 33310

APPLICATION FOR INSTRUCTIONAL POSITION

OFFICE USE ONLY
TEAM NO ___ 6
TYPE APPLICANT SD
ENTRY PRTY 1 - 2 - 3
CERT FLDS (1) OM
PERS. ADMIN BH

INT ___
REF ___
SCH ___

INDIVIDUAL DATA _____  1-27-92   ANY Time
SOCIAL SECURITY NUMBER   APPLICATION DATE   DATE AVAILABLE

NAME  Hall   Cheryl   Dunise   Hutchins
LAST   FIRST   MIDDLE   MAIDEN

CURRENT ADDRESS
5445 N.W 16th St  Lauder Hill  FL  33313
NO & STREET   CITY   STATE   ZIP
UNTIL _____ DATE

RECEIVE
JAN 28 1992
SUB-CENTRAL

PERMANENT ADDRESS
5445 N.W 16  Lauder Hill  FL  33313
NO & STREET   CITY   STATE   ZIP

TELEPHONE  970-3891    ALT TELEPHONE  733-9547

ARE YOU A FORMER BROWARD COUNTY TEACHER? [ ] YES [X] NO
IF "YES" COMPLETE THE FOLLOWING LINE
NAME AT TIME OF RESIGNATION _____
DATE OF RESIGNATION _____

POSITION DESIRED  [ ] TEACHER (FULL TIME)  [X] TEACHER (SUBSTITUTE)
[ ] TEACHER (PART TIME)  [X] COACH ONLY  [ ] OTHER _____

GRADE LEVEL  [X] EARLY CHILDHOOD  [X] ELEM (1-5)  [X] MIDDLE (6-8)
[X] HIGH (9-12)  [X] ADULT / VOCATIONAL

SUBJECT PREFERENCE
English   Social Stud   P.E
1ST PREFERENCE   2ND PREFERENCE   3RD PREFERENCE

DATA ENTERED
JAN 29 1992
CS

COACHING EXTRACURRICULAR ACTIVITIES (PLEASE LIST)
ACTIVITY   YEARS OF PARTICIPATION   ACTIVITY LOCATION
_____ CHECK IF COMPETENT TO COACH [ ]
_____ CHECK IF COMPETENT TO COACH [ ]
_____ CHECK IF COMPETENT TO COACH [ ]

FOREIGN LANGUAGE (S)  1. _____ [ ] READ [ ] SPEAK [ ] WRITE
2. _____ [ ] READ [ ] SPEAK [ ] WRITE

0029

**EDUCATION**

LIST ALL COLLEGES/UNIVERSITIES FROM WHICH DEGREES WERE GRANTED, AND COMPLETE COURSEWORK SUMMARY

| COLLEGE/UNIVERSITY | ADDRESS STREET CITY STATE ZIP | YEARS FROM | YEARS TO | DATE OF GRAD | DEGREE | MAJOR | # OF SEM. HOURS | GPA * | GPA ** |
|---|---|---|---|---|---|---|---|---|---|
| Florida Memorial College | 15800 NW 48 Ave. Miami, FL 33154 | Aug 1985 | Aug 1989 | A-9 1989 | B.A Degree | Criminal Justice | 124 | 2.6 | |
| | | | | | | | | | |
| | | | | | | | | | |

*GRADE PT. AV. (MAJOR)
**GRADE PT. AV. (OVERALL)

**TEACHING EXPERIENCE**
A. STUDENT TEACHING (SUPERVISED INTERNSHIP)

| DATE | SCHOOL NAME AND ADDRESS STREET CITY. STATE ZIP | AREA CODE & PHONE NO. | NAME OF COOPERATING TEACHER | NAME OF COLLEGE SUPERVISOR | GRADE/SUBJECT TAUGHT |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |

B. TEACHING EXPERIENCE  BEGIN WITH MOST RECENT AND LIST ALL EXPERIENCES IN CHRONOLOGICAL ORDER  IF MORE SPACE IS NEEDED, ATTACH ADDITIONAL SHEET

| YEARS FROM TO | NAME OF SCHOOL | ADDRESS STREET. CITY. STATE. ZIP | AREA CODE & PHONE NO. | NAME OF PRINCIPAL/ SUPERVISOR | GRADE/ SUBJECT TAUGHT | FULL TIME PART TIME SUB. |
|---|---|---|---|---|---|---|
| 19 91 TO 19 91 | Sanessat Middle School | 1856 Sanessat LN Fort Myers, FL | 813 997 2131 | Mr. Robinson | Special Ed. All Subjects K-8 Grades | Fall Time Sub. |
| 19 TO 19 | | | | 🗸 | | |
| 19 TO 19 | | | | | | |

TOTAL YEARS OF CONTRACTUAL TEACHING EXPERIENCE  (FULL TIME UNDER CONTRACT).

**NON-TEACHING WORK EXPERIENCE**
BEGIN WITH YOUR MOST RECENT AND INCLUDE PAST TEN (10) YEARS OF EMPLOYMENT HISTORY  IF MORE SPACE IS NEEDED, ATTACH ADDITIONAL SHEET

| YEARS FROM TO | NAME OF FIRM OR BUSINESS | ADDRESS STREET, CITY, STATE, ZIP | AREA CODE & PHONE NO | NAME OF SUPERVISOR | YOUR POSITION |
|---|---|---|---|---|---|
| 1991 TO 1991 | Broward County Parks & Recreation | North Broward Park 4400. N.B. 18th Ave Pompano Beach FL 334 | 305 786-2175 | Mendel Wicraff | Recreation Aid |
| 1989 TO 1991 | Lee County School Board | 2055 Central Ave Fort Myers, FL | 813 334-1402 | Mr. Robinson | Substitute Teacher |
| 1987 TO 1987 | City of Fort Myers Parks & Recreation | Edison Ave, Fort Myers, FL 23201 | 813 384-7296 | Lee Ford | Recreation Leader |

## CERTIFICATION

A CANDIDATE MUST HOLD, OR BE ELIGIBLE FOR, A VALID FLORIDA EDUCATOR'S CERTIFICATE FOR THE SUBJECT AND LEVEL IN WHICH HIRED TO TEACH. INQUIRIES ABOUT CERTIFICATION REQUIREMENTS IN FLORIDA SHOULD BE DIRECTED TO THE CERTIFICATION SECTION, DEPARTMENT OF EDUCATION, TALLAHASSEE, FLORIDA 32399

DESCRIBE ANY FLORIDA EDUCATOR'S CERTIFICATE (S) YOU HAVE BEEN ISSUED (INCLUDE TYPE, DATE ISSUED, DATE EXPIRED, SUBJECT AND LEVELS)   _Sustitute  Certicate,  July 1,1989 —_

_June 30, 1994   K-12   Academic._

IF YOU HAVE APPLIED FOR A FLORIDA EDUCATOR'S CERTIFICATE PROVIDE THE FOLLOWING

DATE APPLIED _____ 19 ___   SUBJECT(S REQUESTED   _____

INCLUDE A COPY OF YOUR STATEMENT OF ELIGIBILITY FROM THE FLORIDA DEPARTMENT OF EDUCATION. (IF YOU HAVE NOT RECEIVED IT, SEND COPY WHEN RECEIVED.) INCLUDE COPIES OF SCORES FOR ANY FLORIDA CERTIFICATION TEST (S) YOU HAVE TAKEN

IF YOU HOLD, OR HAVE HELD TEACHING CERTIFICATES IN ANY OTHER STATE, PROVIDE THE NAME OF THE STATE, THE TYPE OF CERTIFICATE, DATES ISSUED AND EXPIRED, AND SUBJECT (S).

_____
_____
_____

HAVE YOU EVER HAD A TEACHING CERTIFICATE FROM ANY STATE SUSPENDED OR REVOKED ?

_____ YES   _✓_ NO   STATE _____   EXPLAIN _____
_____

### BEGINNING TEACHER PROGRAM

PERSONS APPLYING FOR AN INITIAL FULL TIME FLORIDA EDUCATOR'S CERTIFICATE ARE REQUIRED TO PARTICIPATE IN THE FLORIDA BEGINNING TEACHER PROGRAM. THE PROGRAM PROVIDES 196 DAYS OF SUPERVISED SUPPORT SERVICE DURING THE FIRST YEAR OF TEACHING IN A FLORIDA SCHOOL.

IF YOU HAVE PARTICIPATED IN A FLORIDA BEGINNING TEACHER PROGRAM, NAME THE
DISTRICT _____   START _____ 19 ____   END _____ 19 ____

REASON FOR NOT COMPLETING THE PROGRAM _____

WITH VERIFICATION / DOCUMENTATION OF AT LEAST ONE (1) FULL SCHOOL YEAR OF ELEMENTARY OR SECONDARY TEACHING EXPERIENCE IN A UNITED STATES OR U S DEPENDENTS SCHOOL YOU MAY BE ELIGIBLE FOR THE EXPERIENCED PROGRAM. YOU MUST HAVE BEGUN ON THE DAY TEACHERS REPORTED TO WORK AND CONTINUED UNTIL THE LAST DAY TEACHERS WORKED AT THE END OF THE SCHOOL YEAR.

SCHOOL _____   START_ ___/19__   END __/__/19___

ADDRESS_____

EXPERIENCE MUST BE OFFICIALLY VERIFIED AND DOCUMENTED WHEN EMPLOYED.

Instructional Staffing Department

## SUBSTITUTE TEACHER CLEARANCE FORM

Cherl D. Hall

Name

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

Social Security Number

☑ Fingerprinted 1-28-91 RW

☑ Social Security Card

☑ Personal Data Form

☑ W 4 Form

☑ Loyalty Oath

☑ I 9 Form

☑ Retirement

☐ Substitute Finder Curriculum Form

☐ Substitute Finder Location Form

☑ Complete Application

☑ Security Check RP 1/28/92

☐ Satisfactory References

☑ Complete Transcripts
  ☑ Bachelor's Degree or higher ___
  ☐ *Non-degreed (60 semester hours with proof of enrollment)

Comments _____

Please read the following statements carefully. Your signature below signifies that you agree with these statements and Broward County School Board policy as conditions of your employment.

I understand that my name may be removed from the approved substitute teacher list when three or more schools have either negatively evaluated my work as a substitute teacher or have requested that I not return to their location.

I understand that six refusals per month to accept substitute assignments may be grounds to remove my name from the approved substitute teacher list.

I understand that I must call Sub Central's voice mail at 768-8694 the first time I substitute at any given location, otherwise I will not get paid for said work.

I understand that there are currently over 3,000 substitutes on the board approved substitute list and that steady employment is not guaranteed.

According to Florida State Statute, I understand that if I have an interruption of service which exceeds ninety days, or if I do not work for this school year, I will have to pay $40.00 (fee for fingerprint processing) and be fingerprinted again.

I understand that my applicant file will be destroyed, if I do not work for the Broward County School Board.

I understand, I must work during this school term and return the Substitute Agreement Form, which is mailed in May, in order to be renewed each school year.

*In order to be renewed as a substitute teacher, I must submit to Sub Central a letter from the college verifying proof of enrollment working towards a degree at the beginning of each school year.

I may begin as a substitute teacher on 2/4/92. (The Substitute Teacher Clearance Form is valid for thirty days from this date.)

Cherl D. Hall

Signature of Applicant

Date 1-28/92

Loren Harris

Signature of Authorized Staff Member

Date 1/28/9

Original/File - Yellow/Employee

10/07/91

DEFENDANT'S
EXHIBIT

2
RT  11/8/00

0039

RECEIVED
OCT 04 534
SUB-CENTRAL

SSV
Cope

ATTENTION: SUB CENTRAL

I am writing this letter to inform you.
that I have moved from 851 North Powerline Rd
Pompano Bch, Fl 33064. and I now reside at
4730 N.W. 7th Terr Lauderhill, Fl 33353 I am now asking
you'll to please make a note of this information
and to please update my file with the new
information as soon as possible. If you have any
Questions you may contact me 954-777-5963
is my home number.

Think you
Y.A. Cherl
S s# 847563

**POOR QUALITY DOCUMENT**

New
Address

RECEIVED
OCT 05 1994
Personnel Records

DATA
OCT 5

DEFENDANT'S
EXHIBIT
3
11/8/00

0050

BK 95   CAFS

## School Board of Broward County
## Request for a Substitute Teaching Certificate
### Sub-Central
600 Southeast 3rd Avenue, Ft. Lauderdale, FL 33301

AUG 01 1994

SF

**PERSONAL INFORMATION**

Social Security Number

Phone Number: (305) 970-4169

Birthdate (MM/DD/YY): 6-23-66

Last Name: HALL SEARS
First Name: Cher L
Middle Name: Hutchins

Street (Apt. #): 851 North Powerline Rd #175
City: Pompano Beh
State: FL
Zip: 33069

**CERTIFICATE INFORMATION**

CHECK ONE

( ) I hold a valid State of Florida Certificate (copy attached). Therefore, I do not need to apply for an Initial Broward County Substitute Certificate. **RECEIVED**
Subject Area/s: _____
Validity Period: _____

MAY 25 1995

( ) I hold a valid Broward County Certificate (copy attached). Therefore, I do not need to apply for an Initial Broward County Substitute Certificate. Personnel Records
Validity Period: _____   Subject Area/s: _____

(✓) **INITIAL BROWARD SUBSTITUTE TEACHING CERTIFICATE (5 YEARS):**
Apply for a substitute certificate if you do not hold a valid Florida or Broward County Educator's Certificate.
Fee: $54.00 money order payable to The School Board of Broward County.   Fee is non-refundable.

**ACADEMIC RECORD**

| Name of College(s)/Branch Campus | State | Type of Degree | Graduation Date | Major |
|---|---|---|---|---|
| Florida Memorial Colleg. | FL | B.S Degree | 1989 | Criminal Justice |
| | | | | |
| | | | | |

**ARREST/REVOCATION RECORD**

[ ] YES  [X] NO  Have you ever been convicted, found guilty, or entered a plea of nolo contendere (no Contest) to a crime other than a traffic violation? A YES or NO answer is required by Florida law. If you checked the YES box, you must give the information requested for each charge. If more space is needed, use the back.

| City Where Arrested | State | Date of Arrest | Charge(s) | Disposition(s) |
|---|---|---|---|---|
| | | | | |

[ ] YES  [X] NO  Have you ever had a teaching certificate revoked, suspended, or denied by any state; or is there any action pending against your certificate or application in any state? (A determination of academic ineligibility is not considered denial of a certificate.) If Yes, which state? _____

[ ] YES  [X] NO  Have you ever been placed on probation, suspended, or reprimanded by the Education Commission of the State of Florida?

DEFENDANT'S EXHIBIT 4

I certify that the above entries are true, complete, and correct to the best of my knowledge and ___ made in good faith. I understand that a knowing and willful false statement on this form may result in immediate dismissal.

RK 11/8/00

**RECEIVED**

Signature: Cherl Hall

AUG 01 1994

Date: 7/21/94



# THE SCHOOL BOARD OF BROWARD COUNTY, FLORIDA

*This Certifies That*

CAROL DENISE MAE SEARS

*having satisfactorily completed all requirements of law, State Board of Education Rules and School Board of Broward County Policies, thereby demonstrating satisfactory evidence of professional competence in the coverages listed below, is hereby issued this Educator's Certificate and is entitled to all Rights and Privileges appertaining thereto.*

**CERTIFICATE TYPE**     SUBSTITUTE TEACHER

**VALIDITY PERIOD**     JULY 1, 1994 – JUNE 30, 1999

### SUBJECT COVERAGES

6 077 SUBSTITUTE TEACHER

*Level:
0. Early Childhood
5. Grades K-8
8. Grades K-3
F. No Specified Level
T. Inservice II

1. Grades 6-12
6. Grades K-12
C. Grades 5-9
G. PK-Grade 3

2. Adult
7. Vocational
D. Grades PK-12
P. Program

3. Grades 1-6
A. Birth-Age 3
E. Endorsement
S. Inservice I*

Department of
Education Number
0000000

a. 1

Coordinator, Certification/Incentives

Superintendent of Schools

SOCIAL SECURITY NUMBER

**DUPLICATE**

0018

FLORIDA MARRIAGE RECORD

| | |
|---|---|
| APPLICATION NO. | |

**GROOM DATA**

1. GROOM'S NAME (First Middle Last): **DAVID STEPHON SEARS**
2. DATE OF BIRTH (Month Day Year): **MAR 11, 1967**

3a. RESIDENCE — CITY TOWN OR LOCATION: **FORT LAUDERDALE**
3b. COUNTY: **BROWARD**
3c. STATE: **FLORIDA**
4. BIRTHPLACE (State or Foreign Country): **BAHAMAS ISLANDS**

**BRIDE DATA**

5a. BRIDE'S NAME (First Middle Last): **CHERL DENISE HALL**
5b. MAIDEN SURNAME (if different): **HUTCHINS**
6. DATE OF BIRTH (Month Day Year): **JUN 23, 1966**

7a. RESIDENCE — CITY TOWN OR LOCATION: **FORT LAUDERDALE**
7b. COUNTY: **BROWARD**
7c. STATE: **FLORIDA**
8. BIRTHPLACE (State or Foreign Country): **ALABAMA**

**APPLICATION TO MARRY**

**AFFIDAVIT OF BRIDE AND GROOM**

WE THE APPLICANTS NAMED IN THIS CERTIFICATE, EACH FOR HIMSELF, STATE THAT THE INFORMATION PROVIDED ON THIS RECORD IS CORRECT TO THE BEST OF OUR KNOWLEDGE AND BELIEF THAT NO LEGAL OBJECTION TO THE MARRIAGE NOR THE ISSUANCE OF A LICENSE TO AUTHORIZE THE SAME IS KNOWN TO US AND HEREBY APPLY FOR A LICENSE TO MARRY

9. GROOM'S SIGNATURE Sign full name: *David Sears*
13. BRIDE'S SIGNATURE Sign full name: *Cherl Denise Hall*

10. SUBSCRIBED AND SWORN TO BEFORE ME ON **JUL 21, 1995**
11. TITLE OF ISSUING OFFICIAL: **DEPUTY CLERK**
14. SUBSCRIBED AND SWORN TO BEFORE ME ON **JUL 21, 1995**
15. TITLE OF ISSUING OFFICIAL: **DEPUTY CLERK**

12. SIGNATURE OF ISSUING OFFICIAL:
16. SIGNATURE OF ISSUING OFFICIAL:

**LICENSE TO MARRY**

AUTHORIZATION AND LICENSE IS HEREBY GIVEN TO ANY PERSON DULY AUTHORIZED BY THE LAWS OF THE STATE OF FLORIDA TO PERFORM A MARRIAGE CEREMONY WITHIN THE STATE OF FLORIDA TO SOLEMNIZE THE MARRIAGE OF THE ABOVE NAMED PERSONS **JUL 21, 1995**

17. DATE LICENSE ISSUED:
18. EXPIRATION DATE: **SEP 18, 1995**

THIS LICENSE MUST BE USED ON OR BEFORE THE ABOVE EXPIRATION DATE IN THE STATE OF FLORIDA IN ORDER TO BE RECORDED AND VALID

19a. SIGNATURE OF PERSON ISSUING LICENSE: *Robert E. Lockwood*
19b. TITLE: **CLERK OF COURTS**

**17th JUDICIAL CIRCUIT Broward County**

**CERTIFICATE OF MARRIAGE**

21. I HEREBY CERTIFY THAT THE ABOVE NAMED BRIDE AND GROOM WERE JOINED IN MARRIAGE IN ACCORDANCE WITH THE LAWS OF THE STATE OF FLORIDA ON **JUL 21, 1995** AT **FT. LAUDERDALE** CITY OR TOWN:

22a. SIGNATURE OF PERSON PERFORMING CEREMONY:
22b. NAME OF PERSON PERFORMING CEREMONY, TYPE OR PRINT: **K CARR**
22c. TITLE: **DEPUTY CLERK/BROWARD COUNTY** (SEAL)
22d. ADDRESS: **515 SW 2ND AVE FT LAUDERDALE, FL**

**RECORDED**

20. COUNTY: **BROWARD COUNTY**
25. DATE RETURNED:
26. RECORDED IN: BOOK ____ PAGE ____
23. SIGNATURE OF WITNESS TO CEREMONY:
27. CLERK OF COURT:
24. SIGNATURE OF WITNESS TO CEREMONY:

INFORMATION BELOW WILL NOT APPEAR ON CERTIFICATION ISSUED BY VITAL STATISTICS, EXCEPT UPON REQUEST

| | 28. RACE | 29. NUMBER OF THIS MARRIAGE | If PREVIOUSLY MARRIED SPECIFY No. | 30. LAST MARRIAGE ENDED BY (SPECIFY DEATH DIVORCE OR ANNULMENT) | 31. DATE LAST MARRIAGE ENDED |
|---|---|---|---|---|---|
| **GROOM** | **BLACK** | **01** | | | |
| | 32. RACE | 33. NUMBER OF THIS MARRIAGE | If PREVIOUSLY MARRIED SPECIFY No. | 34. LAST MARRIAGE ENDED BY (SPECIFY DEATH DIVORCE OR ANNULMENT) | 35. DATE LAST MARRIAGE ENDED |
| **BRIDE** | **BLACK** | **02** | | **DIVORCE** | **JAN 15, 1992** |

HRS Form 743B Dec 69
(Obsoletes previous editions)

This license not valid unless seal of Clerk. Circuit or County Court, appears thereon.

AUDIT CONTROL NO **B136002**

---

**DEFENDANT'S EXHIBIT**
**5**
RL  11/8/00

© Williams, Calvin 9-7-66

DEFENDANT'S EXHIBIT

PHOTO

11/8/00

**SHERIFF'S OFFICE**
**BROWARD CO., FL**

DATE _____

DATE ENTERED: _____

BY: _____

**RECORDS**

| BTS Number | Print Clearance BY | | Name Search | | Teletype | |
|---|---|---|---|---|---|---|
| 0007742081 | | | 7637 | | TT – 7578  00/00/00 | |

| Test Number | Offense Report Number | | BCCN Number | | Booking Sheet Control Date & Time | |
|---|---|---|---|---|---|---|
| BS9511138 | BS-950516697 | | | | 06/15/95  00:01 | |

| 1st Name | | First | | Middle | | SSN 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 | Probation N | Parole N |
|---|---|---|---|---|---|---|---|---|
| SEARS | | DAVID | | | | | | |

| aas Last Name | | First | | Middle | | Driver's License | State | |
|---|---|---|---|---|---|---|---|---|
| | | | | | | Yes  No | | |

| reet/Nik Name | | Race Sex | Hgt. | Wgt. | Eyes | Hair | Comp. | Age | Date of Birth | Place of Birth | SU | Ctz. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | B H | 504 | 130 | BRN | BLK | DRK | 028 | 03/11/67 | NASSAU | City H | US |

cars, Marks, Tatoos
TT RT ARM

| ermanent Address | | | Bldg. | Apt. | City | St/City. | Yrs. | Mths. |
|---|---|---|---|---|---|---|---|---|
| 4730  NW 11 | | | ST | | LAUDERHILL | FL | 06 | 60 |

| lesident of Broward County? | | Yrs. | Mths. | Resident of Florida? | | Yrs. | Mths. | Phone Number | U.S. Vet |
|---|---|---|---|---|---|---|---|---|---|
| YES | | 28 | 00 | YES | | 28 | 00 | 305-797-7968 | NO |

| DH | Other Medical | | |
|---|---|---|---|
| | TO BE SCREENED | | |

| mployer | Occupation |
|---|---|
| LASTER LAWN SERVICE | LAWN CARE |

| rints | Blood Alcohol | Vehicle Towed | Phone Call | Arrest Agcy. | Place of Arrest (Address) |
|---|---|---|---|---|---|
| YES | .00% | | | BS | 2601 W BROWARD BLVD |

| rrest Date | Arrest Time | Arresting Officer | I.D. Number | Officer NO | Unit | Zone | Beat | Shift |
|---|---|---|---|---|---|---|---|---|
| 06/14/95 | 23:55 | FARR | !  1256 | | | | | |

| ooking Date | Booking Time | Booking Officer | I.D. Number | Add Charge Officer | I.D. Number – |
|---|---|---|---|---|---|
| 06/15/95 | 05:53 | BERNERT | D BS4375 | | |

| Date | | Charges | | MagCode/comments | Capias/Warrant Number | | Bond |
|---|---|---|---|---|---|---|---|
| 061595 | 001 | MURDER | 6FY | D | NB | | |
| 061595 | 002 | OPER AGAINST RESTRICTION | XTY | D | | | 25.00 |
| 061595 | 003 | POSSESSION COCAINE | 3FY | D | | | 1000.00 |

12 – D – 21W – mmI.
D  27W  IOO

XBS 87 13803

BOOKING RMKS 29/54 7578  WC/7617  CHARGES 2 AND 3 ARE UNDER FT. LAUD.
CASE NUMBER 95-95287

SOS SO 87 13803

| Release Reason | | Released By | | Released To | Date Released | Time Rele |
|---|---|---|---|---|---|---|
| | | | | | | |

| Arrest No. | | Last Name | | First | Unattended Children? | |
|---|---|---|---|---|---|---|
| BS9511138 | SEARS | | | DAVID | | |

| Date | Time | Sex | Race | Date of Birth | Armed | Dang. | Resist | Rabbit | Suic. | Hmc | Othe |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 06/15/95 | 05:53 | M | B | 03/11/67 | | | | | | | |

| Sin No. | P-Box No. | Bulk No. | | Vehicle Towed To: | | |
|---|---|---|---|---|---|---|
| 1205 | | | | | | 0103 |

| Currency $ | | Language msg: |
|---|---|---|
| .80 | | DETAINEE SPEAKS ENGLISH |

□ ARREST FORM
-06...WPD    Document 34    Entered on FLSD Docket 12/27/2000    Page

| BROWARD COUNTY BS | 11178 | | | | | | OBTS. NO. |
|---|---|---|---|---|---|---|---|
| ARREST NO. | | | | | | | |
| BJO | | 95-5-16697 | | | | | |

| DEFENDANT'S LAST NAME | FIRST | MIDDLE | SUF | ALIAS/STREET NAME | | | CITIZENSHIP |
|---|---|---|---|---|---|---|---|
| Sears | David | | | | | | USA |

| RC | SEX | HGT. | EYES | HAIR | WGT. | COMP. | AGE | D.O.B. | BIRTHPLACE | SCARS, MARKS TT |
|---|---|---|---|---|---|---|---|---|---|---|
| B | M | 5'4" | Br | Blk | 120 | DK | 28 | 3-1-67 | Nassau Bahamas | R. Arm |

| PERMANENT ADDRESS | LOCAL ADDRESS | | |
|---|---|---|---|
| 1730 NW 11 St. Lauderhill, FL | 1730 NW 11 St. Lauderhill | | |

| RESIDENCE TYPE: (1) CITY (2) COUNTY (3) FLORIDA (4) OUT-OF-STATE | PLACE OF EMPLOYMENT | LENGTH |
|---|---|---|
| | Lester Lown Service | |

| HOW LONG DEFENDANT IN BROWARD COUNTY | BREATHALYZER BY/CCN | READING | PLACE OF ARREST Sears 2601 W. Browns. | DATE/TIME ARRESTED 6-14-95 | ARRESTING OFFICER(S) CCN Pare 1256 |
|---|---|---|---|---|---|

| OFFICER INJURED | UNIT | ZONE | BEAT | SHIFT | UNIT TRANSPORTING PRISONER | TRANSPORTING OFFICER/CCN | PICK-UP TIME: | DRUG TYPE |
|---|---|---|---|---|---|---|---|---|
| Y □ N ☒ | | | | | | | TIME ARRIVED AT BSO | |

| TYPE N-NA A-AMPHETAMINE | B-BARBITURATE C-COCAINE E-HEROIN | H-HALLUCINOGEN M-MARIJUANA O-OPIUM | P-PARAPHERNALIA/ EQUIPMENT S-SYNTHETIC | U-UNKNOWN Z-OTHER | ACTIVITY | ACTIVITY N-NA P-POSSESS | S-SELL B-BUY T-TRAFFIC | A-SMUGGLE O-DELIVER E-USE | M-MANUFACTURE/ PRODUCE/ CULTIVATE | K-DISPOSE/ DISTRIBUTE | Z-OTHER | INDICATION OF ALCOHOL INFLUENCE DRUG INFLUENCE | Y Y □ □ | N N □ □ | UK UK □ □ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

VEHICLE TOWED TO

| NAME OF VICTIM (IF CORPORATION, EXACT LEGAL NAME AND STATE OF INCORP.) | ADDRESS | PHONE # |
|---|---|---|
| Vincent Small | 1909 NW 46 Ave Lauderhill, FL | |

| COUNT NO. | OFFENSES CHARGED | CITATION #, IF APPLICABLE | F.S. # OR CAPIAS/WARRANT # |
|---|---|---|---|
| 1 | Murder | | 782.04 |
| | | | |
| | | | |
| | | | |

Before me this date personally appeared **Robert H** mu who being first duly sworn deposes and says that on **29** day **May** 19 **95** at **4701 NW 14 St Lauderhill, FL** (crime location) the above named defendant committed the above offenses charged and the facts showing probable cause to believe same are as follows:

City of Lauderhill Police officers responded to the Stop and Shop store in the above location. A black victim was shot and collapsed across the street at a private home. The victim died at Broward General Hospital later that evening.

Witness Wanda Sanders observed the defendant arrive at the scene in a

I swear the above statement is correct and true to the best of my knowledge and belief.

| OFFICER/AFFIANT'S SIGNATURE | OFFICER'S NAME/CCN RH Pare 1256 | OFFICER'S DIVISION |
|---|---|---|

STATE OF                    COUNTY OF

The foregoing instrument was acknowledged before me this **15** day of **June** 19 **95** who is personally known to me or who has produced (ID Type) ____ as identification and who ____ take an oath.      (DID OR DID NOT)

| DEPUTY CLERK OF THE COURT, NOTARY PUBLIC, OR ASSISTANT STATE ATTORNEY | TITLE OR RANK/CCN Police 206 | (SEAL OR STAMP) |
|---|---|---|

0104

SEVENTEENTH JUDICIAL CIRCUIT
BROWARD COUNTY
STATE OF FLORIDA

FIRST APPEARANCE / ARREST FORM
SHOULD ADDITIONAL SPACE BE NEEDED, USE PROBABLE CAUSE AFFIDAVIT CONTINUATION.

Orig - Court
2nd - State Atty
3rd - Filing Agency
4th - Arresting Agency

D COUNTY
NO.
FIRST    MIDDLE    SUF. HGT. WGT. RC SEX
5'4" 130 B 4
OBTS NO.
3167
ARRESTING OFFICER (S)/CCN
PHONE #

NDANT'S LAST NAME
EARS    DAVID

ADDRESS
1909 NW 46 Ave Lauderhill, FL

OF VICTIM (IF CORPORATION, EXACT LEGAL NAME AND STATE OF INCORP.)
VINCENT Stall

CITATION #, IF APPLICABLE

F.S. # OR CAPIAS/WARRANT #
792-04

OFFENSES CHARGED

COUNT NO.
1    Murder

Before me this date personally appeared  Robert H Parr  , 19 95  at  1791 NW 19 St Lauderhill  , who being first duly sworn
deposes and says that on  29  day of  MAY  , 19 95 at  (crime location) the
above named defendant committed the above offenses charged and the facts showing probable cause to believe same are as follows:

Cadillac with four Arabic Arabic? men AND Auto tuxininc? previous
the EAST side of the premises. Samuels observes the defendant
approach the victim and begin to argue with him.
The defendant was described as wearing a white tee-shirt.
The defendant was described as having a short Afro
haircut, and the handgun which the defendant carried was
concealed in his waistband. Samuels describes the shooter as 22-30
Samuels observed the shooter to pull out the pistol described
as an automatic then begin to strike the victim with the
pistol on to head and face. After entering the victim
the state Samuels hears a gunshot observes the victim
bleeding, observes the victim cross the street then collapse
onto a lawn.
Witness Samuels identifies the defendant from a photo lineup
and signed a photo lineup Affidavit
Samuels states that the vehicle left the scene southbound.

I swear the above statement is correct and true to the best of my knowledge and belief
OFFICER/AFFIANT'S SIGNATURE

OFFICER'S NAME/CCN
RH Parr  1256

OFFICER'S DIVISION

STATE OF
COUNTY OF

The foregoing instrument was acknowledged before me this  15  day of  JUNE  , 19 95  who is personally
known to me or who has produced (ID to Type)  as identification and who  (DID OR DID NOT)  take an oath.

TITLE OR RANK/CCN
Police Cob

DEPUTY CLERK OF THE COURT, NOTARY PUBLIC, OR ASSISTANT STATE ATTORNEY
FIRST APPEARANCE/ARREST FORM

(SEAL OR ST

0105

COMPLAINT/AFFIDAVIT
PROBABLE CAUSE AFFIDAVIT/CONTINUATION

| DEFENDANT'S LAST NAME | FIRST | MIDDLE | SUF. | HGT. | WGT. | RC | SEX | D.O.B. | OFFENSE REPORT | ARRESTING OFFICER (S)/CCN |
|---|---|---|---|---|---|---|---|---|---|---|
| Sears, | David | | | 5'4" | 130 | B | M | 3-11-67 | 95-5-1669 | R.H. Parr #1256 |

| NAME OF VICTIM (IF CORPORATION, EXACT LEGAL NAME AND STATE OF INCORP.) | ADDRESS | PHONE # |
|---|---|---|
| Vincent Small (Deceased) | 1909 NW 46 Ave, Lauderhill | |

| COUNT NO. | OFFENSES CHARGED | CITATION #, IF APPLICABLE | F.S. # OR CAPIAS/WARRANT # |
|---|---|---|---|
| 1 | Murder | | 782.04 |
| | | | |
| | | | |
| | | | |

Before me this date personally appeared **Robert H. Parr** who being first duly sworn deposes and says that on **29** day **May** , 19 **95** at **4701 NW14 St Lauderhill** (crime location) the above named defendant committed the above offenses charged and the facts showing probable cause to believe same are as follows:

Witness Aisha Eubanks and Jermaine Prince were both seat. in an automobile next to the crime scene. Both described the automobile driven by the shooter as white. Prince recalled that the shooter pulled a handgun from his waistband and began beating the victim in the face and head with the gun while the victim pleaded with him to stop the shooter fired one time striking the victim who was now on the ground. The witness saw the victim walk across the roadway and finally collapsed on a lawn. Ft Lauderdale Police stopped the defendant who was driving a white Cadillac with a blue fabric roof. Gold trim ornaments with light window tint. The defendant was arrested for a traffic offense and possession of crack cocaine, at which time your Affiant was called & advised witness Eubanks and Prince reported that the shooter looked similar to the person who committed the crime.

I swear the above statement is correct and true to the best of my knowledge and belief.

| OFFICER/AFFIANT'S SIGNATURE | R.H. Parr 1256 OFFICER'S NAME/CCN | OFFICER'S DIVISION |
|---|---|---|

STATE OF _____ COUNTY OF _____

The foregoing instrument was acknowledged before me this **15** day of **June** , 19 **95** who is personally known to me or who has produced (ID Type) _____ as identification and who _____ (DID OR DID NOT) take an oath.

Police 656

DEPUTY CLERK OF THE COURT, NOTARY PUBLIC, OR ASSISTANT STATE ATTORNEY     TITLE OR RANK/CCN

FIRST APPEARANCE/ARREST FORM

(SEAL OR STAMP)

Orig. - Court
2nd - State Atty
3rd - Filing Agen
4th - Arresting P

SEVENTEENTH JUDICIAL CIRCUIT
BROWARD COUNTY                                    0106

0107-WPD Document 34 Entered on FLSD Docket 12/22/2000

-06007-WPD

☐ ARREST FORM

COMPLAINT-AFFIDAVIT
PROBABLE CAUSE AFFIDAVIT CONTINUATION

| | | | | | | |
|---|---|---|---|---|---|---|
| ARREST NO. | | | | | | DTS NO. |

NAME OF DEFENDANT (LAST) NAME (FIRST) (MIDDLE) SUF. HGT WGT RACE SEX D.O.B. SS#/DR# ARRESTING AGENCY/LOCATION

Sear, David  5'4"  150  B  M  3/11/67  95-5-16617  P.H. Pun #12

NAME OF VICTIM (IF CORPORATION, EXACT LEGAL NAME AND STATE OF INCORP.)  ADDRESS  PHONE #

Vincent Small  1909 NW 46 Ave, Lauderhill

| COUNT NO. | OFFENSES CHARGED | CITATION #, IF APPLICABLE | F.S. # OR CAPIAS/WARRANT # |
|---|---|---|---|
| | Murder | | 782.04 |
| | | | |
| | | | |
| | | | |

Before me this date personally appeared **Robert H. Parr** who being first duly sworn deposes and says that on **24** day **May**, 19**95** at **4701 NW 14 St Lauderhill** (crime location) the above named defendant committed the above offenses charged and the facts showing probable cause to believe same are as follows:

(supporting witness Samuels Positive Identification)
The defendant additionally made a comment to the
transporting Ft Lauderdale Officer asking if we
wishing to question him about a "Robbery or a Killing
No one mentioned either crime to him.
Broward Associate Medical Examiner Dr. Price advised
that the victim died by a gunshot wound and the
manner of death was ruled to be a Homicide.
Witness Samuels was shown a photo lineup of the
defendant's vehicle + stated it looked like the
car she observed at the crime scene.
Defendant voluntarily submitted/demanded to a polygraph
examination. Upon conclusion, the results indicated the
defendant was deceptive on key questions surrounding the
shooting. Defendant denied all allegations regarding
the shooting incident.

I swear the above statement is correct and true to the best of my knowledge and belief.

OFFICER/AFFIANT'S SIGNATURE    RH Parr  12K   OFFICER'S DIVISION
                                OFFICER'S NAME/CCN

STATE OF                COUNTY OF

The foregoing instrument was acknowledged before me this **15** day of **JUNE**, 19**95**, who is personally known to me or who has produced (ID Type) _____ as identification and who _____ take an oath.  Police 26    (SEAL OR STAMP)
                                                    (DID OR DID NOT)

DEPUTY CLERK OF THE COURT, NOTARY PUBLIC, OR ASSISTANT STATE ATTORNEY    TITLE OR RANK/CCN

FIRST APPEARANCE/ARREST FORM

SEVENTEENTH JUDICIAL CIRCUIT
BROWARD COUNTY

Ong - Court
2nd - State Atty
3rd - Filing Agen
4th - Arresting A

0107

BROWARD COUNTY ARREST NO. 7/130

OBTS. NO.

:06cv-60106-WMPD ... Document ... Entered on FLSD Docket 12/29/2000 ... Pag

FILING AGENCY: Ft. Laud. P.D.    95-95287

| DEFENDANT'S LAST NAME | FIRST | MIDDLE | SUF | ALIAS/STREET NAME | CITIZENSHIP |
|---|---|---|---|---|---|
| SEARS | DAVID | NMN | | DAVE | R B.H |

| RC. | SEX | HGT. | EYES | HAIR | WGT. | COMP. | AGE | D.O.B. | BIRTHPLACE | SCARS, MARKS, TT |
|---|---|---|---|---|---|---|---|---|---|---|
| B | M | 5'4" | BRN | BLK | 135 | LT. | 28 | 3-11-67 | NASSAU, BAH. | R-TAT BAW |

PERMANENT ADDRESS: 4730 N.W. 11TH ST. LAUDERHILL, FL 33313

LOCAL ADDRESS: 4730 N.W. 11TH ST. L-HILL

PLACE OF EMPLOYMENT: LASTER LAWN SER   LENGTH 1½ YR

| RESIDENCE TYPE: | (1) CITY | (2) COUNTY | (3) FLORIDA | (4) OUT-OF-STATE |
|---|---|---|---|---|

HOW LONG DEFENDANT IN BROWARD COUNTY: 28 YRS.

BREATHALYZER BY/CCN   READING   PLACE OF ARREST: 1500 E. SUNRISE

DATE/TIME ARRESTED: 6-14-95   ARRESTING OFFICER/CCN: R.P. MARTIN

OFFICER INJURED Y☐ N☒   UNIT ZONE BEAT SHIFT: M-14 02 PTR. 2   UNIT TRANSPORTING PRISONER   TRANSPORTING OFFICER/CCN   PICK-UP TIME:   TIME ARRIVED AT BSO   DRUG TYPE

| TYPE | B-BARBITURATE | H-HALLUCINOGEN | P-PARAPHERNALIA/ | U-UNKNOWN | ACTIVITY | ACTIVITY | S-SELL | A-SMUGGLE | M-MANUFACTURE/ | E-DISPENSE | Z-OTHER | INDICATION OF: | Y | N | UK |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| N-NA | C-COCAINE | M-MARIJUANA | EQUIPMENT | Z-OTHER | | N-INH | B-BUY | D-DELIVER | PRODUCE | DISTRIBUTE | | ALCOHOL INFLUENCE | ☐ | ☐ | ☐ |
| A-AMPHETAMINE | E-HEROIN | O-OPIUM | S-SYNTHETIC | | | P-POSSESS | T-TRAFFIC | E-USE | CULTIVATE | | | DRUG INFLUENCE | ☐ | ☐ | ☐ |

VEHICLE TOWED TO RPD

| NAME OF VICTIM (IF CORPORATION, EXACT LEGAL NAME AND STATE OF INCORP.) | ADDRESS | PHONE # |
|---|---|---|
| | | |

| COUNT NO. | OFFENSES CHARGED | CITATION #, IF APPLICABLE | F.S. # OR CAPIAS/WARRANT # |
|---|---|---|---|
| 1 | OPERATING VEH. AGAINST RESTRICTIONS (BUSINESS PURPOSES ONLY) | 281816-K | 322.16 |
| 2 | POSSESSION OF COCAINE | | |

Before me this date personally appeared RICHARD ~ MARTIN who, being first duly sworn, deposes and says that on 14 day JUNE, 1995 at 1500 E. SUNRISE BLVD, FT LAUDERDALE, BROWARD COUNTY, the above named defendant committed the above offenses charged and the facts showing probable cause to believe same are as follows:

THE UNDERSIGNED OFFICER + OFF. D. PORIO INITIALLY OBSERVED THE ARRESTED VEHICLE IN THE 2300 BLK. OF N.W. 19TH ST. AS IT WA EASTBOUND. THE VEHICLE FIT THE DESCRIPTION OF A VEHICLE TH WAS A SUSPECT VEHICLE IN A HOMICIDE WHICH BSO WAS HAN LINE. DET. PARR OF BSO HAD GIVEN THESE OFFICERS CONTINUE

I swear the above statement is correct and true to the best of my knowledge and belief.

OFFICER/AFFIANT'S SIGNATURE: (signature)

OFFICER'S NAME/CCN: R.P. MARTIN 514

OFFICER'S DIVISION: PATROL

STATE OF    COUNTY OF

The foregoing instrument was acknowledged before me this 15 day of JUNE, 19 95 who is personally known to me or who has produced (ID Type) _____ as identification and who _____ (DID OR DID NOT) take an oath.

(SEAL OR STAMP)

DEPUTY CLERK OF THE COURT, NOTARY PUBLIC, OR ASSISTANT STATE ATTORNEY

TITLE OR RANK/CCN: Police Ofc.

0108

SEVENTEENTH JUDICIAL CIRCUIT
BROWARD COUNTY
STATE OF FLORIDA

FIRST APPEARANCE / ARREST FORM

SHOULD ADDITIONAL SPACE BE NEEDED, USE PROBABLE CAUSE AFFIDAVIT CONTINUATION.

Orig - Court
2nd - State Atty
3rd - Filing Agency
4th - Arresting Agency

BROWARD COUNTY

**COMPLAINT AFFIDAVIT**
**PROBABLE CAUSE AFFIDAVIT CONTINUATION**

| ARREST NO. | | | | | | | | OBTS NO. | | |
|---|---|---|---|---|---|---|---|---|---|---|
| DEFENDANT'S LAST NAME | FIRST | MIDDLE | SUF. | HGT. | WGT. | RC | SEX | D.O.B. | OFFENSE REPORT | ARRESTING OFFICER (S)/CCN |
| SEARS, DAVID | | | | 5'4 | 135 | | M | 3-11-67 | 95-95287 | R.P. MARTIN PORIO |

| NAME OF VICTIM (IF CORPORATION, EXACT LEGAL NAME AND STATE OF INCORP.) | | ADDRESS | PHONE # |
|---|---|---|---|

| COUNT NO. | OFFENSES CHARGED | CITATION #, IF APPLICABLE | F.S. # OR CAPIAS/WARRANT # |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |

Before me this date personally appeared ___RICHARD P. MARTIN___ who being first duly sworn deposes and says that on __14__ day __JUNE__, 19_95_, at __1500 E. SUNRISE BLVD.__ (city/location) of __BROWARD COUNTY__ above named defendant committed the above offenses charged and the facts showing probable cause to believe same are as follows:

A DESCRIPTION OF THE SUSPECT VEHICLE AS WELL AS A COMPOSITE OF THE POSSIBLE CULPRIT, ON MON. 6-13-95. ON THIS DATE OFF. MARTIN ATTEMPTED TO CATCH THE VEHICLE AS IT PROCEEDED EAST ON N.W. 19TH ST. BUT THE VEHICLE TURNED OFF OF NW 19 ST. IN THE AREA OF N.W. 20 AVE. TO N. 15 AVE. OFF. MARTIN PUT OUT A DESCRIPTION OF THE VEHICLE, AS WELL AS A BRIEF DESCRIPTION OF THE POSSIBLE SUSPECT + DIRECTED FLPD OFFICERS TO THE AREA OF W. SUNRISE + 15 AVE. A POMPANO P.D. DETECTIVE (DET. LACY A. CREW) THEN OBSERVED THE VEHICLE EASTBOUND ON W. SUNRISE BLVD. NEAR N.W. 9TH AVE. + DIRECTED FLPD MARKED UNITS TO THE AREA. WHEN SUFFICIANT UNITS WERE IN THE AREA A TRAFFIC STOP WAS MADE AT E. SUNRISE + N.E. 15 AVE. (FLPD OFFICERS LEDEGANG, CASTRO, PINTO-GONZALEZ, + M. MUNIZ). OFFICERS MARTIN + PORIO RESPONDED TO E. SUNRISE + NE 15 AVE. AND CHECKED THE DRIVER FOR A DRIVERS LICENSE, WHICH

CONTINUED

I swear the above statement is correct and true to the best of my knowledge and belief.

| OFFICER/AFFIANT'S SIGNATURE | OFFICER'S NAME/CCN | OFFICER'S DIVISION |
|---|---|---|
| | R.P. MARTIN 514 | PATROL |

STATE OF _____    COUNTY OF _____

0109

The foregoing instrument was acknowledged before me this __5__ day of __JUNE__, 19_95_, who is personally known to me or who has produced (ID Type) _____ as identification and who _____ (DID OR DID NOT) take an oath.

_____ (DEPUTY CLERK OF THE COURT, NOTARY PUBLIC, OR ASSISTANT STATE ATTORNEY)    BLUE ZOB (TITLE OR RANK/CCN)

(SEAL OR STAMP)

FIRST APPEARANCE/ARREST FORM

SEVENTEENTH JUDICAL CIRCUIT
BROWARD COUNTY

Orig - Court
2nd - State Atty
3rd - Filing Agency
4th - Arresting Ag

☐ COMPLAINT/AFFIDAVIT
PROBABLE CAUSE AFFIDAVIT CONTINUATION

Case No. -06-012-WPD Document 34   SUF. Entered on FLSD Docket 12/22/2000   Pag

| DEFENDANT'S LAST NAME | FIRST | MIDDLE | SUF. | HGT. | WGT | RC | SEX | D.O.B. | OFFENSE REPORT # | ARRESTING OFFICER/ID/CCN |
|---|---|---|---|---|---|---|---|---|---|---|
| SEARS | DAVID | | | 5'4 | 135 | B | M | 3-11-67 | 95-95087 | R P. MARTIN |

D. PORIO 114

NAME OF VICTIM (IF CORPORATION, EXACT LEGAL NAME AND STATE OF INCORP.)   ADDRESS   PHONE #

| COUNT NO. | OFFENSES CHARGED | CITATION #, IF APPLICABLE | F.S. # OR CAPIAS/WARRANT # |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |

Before me this date personally appeared __RICHARD P. MARTIN__ who being first duly swo
deposes and says that on __14__ day __JUNE__, 19__95__ at __1500 E. SUNRISE BLVD. (crime location)__
above named defendant committed the above offenses charged and the facts showing probable cause to believe same are as follows: __BROWARD COUNTY__

THE ARRESTED SEARS HAD, BUT IT HAD A RESTRICTION FOR
WORK PURPOSES ONLY, AND THE ARRESTED HAD RELATED TO
OFF. MARTIN THAT HE WAS NOT WORKING, RATHER HE & HIS
GIRLFRIEND (PASS. IN VEHICLE) CHERYL DENISE HALL WERE
GOING SHOPPING.

AT THIS POINT SEARS WAS PLACED UNDER ARREST FOR VIO.
OF RESTRICTIONS ON D.L. & A TOW TRUCK WAS CALLED TO
THE SCENE. IT SHOULD ALSO BE NOTED THAT SEARS HAD A
LARGE AMMOUNT OF CASH IN HIS POSSESSION & HE ALSO
HAS A PAST ARREST RECORD FOR NARCOTICS VIOLATIONS. OFF
MONIZ WAS ON THE SCENE WITH HIS DRUG DOG KONAN, WHO
WAS THEN UTILIZED TO CONDUCT A SEARCH OF THE VEHICLE.
THE DRUG DOG LOCATED 14 GMS OF COCAINE UNDER THE
DASH OF THE VEHICLE. THE DRUG DOG ALSO "HIT" ON THE
CASH THAT SEARS & HALL HAD IN THEIR POSSESSION. THE
VEHICLE WAS THEN TOWED TO F.L.P.D. CONFISCATION.

CONTINUED

I swear the above statement is correct and true to the best of my knowledge and belief.

OFFICER/AFFIANT'S SIGNATURE    K.P. MARTIN 511    PATROL
OFFICER'S NAME/CCN    OFFICER'S DIVISION

STATE OF ___   COUNTY OF ___

0110

The foregoing instrument was acknowledged before me this __2__ day of __JUNE__, 19__95__ who is personally
known to me or who has produced (ID Type) ___ as identification and who ___ take an oath. (DID OR DID NOT)    Blue 2ol

(SEAL OR STAMP)

DEPUTY CLERK OF THE COURT, NOTARY PUBLIC OR ASSISTANT STATE ATTORNEY    TITLE OR RANK/CCN
FIRST APPEARANCE/ARREST FORM

Orig - Court
2nd - State Atty
3rd - Filing Age
4th - Arresting

SEVENTEENTH JUDICAL CIRCUIT
BROWARD COUNTY

**BROWARD COUNTY**

| ARREST NO. | | | | | | | | | OBTS NO. | | |
| DEFENDANT'S LAST NAME | FIRST | MIDDLE | SUF. | HGT. | WGT. | RC | SEX | D.O.B. | OFFENSE REPORT | ARRESTING OFFICER (S)/CCN | |

SEARS, DAVID   5'4" 135 B m 3-11-67  95-95287  R.P. MARTIN S

D. POZZO  114

| NAME OF VICTIM (IF CORPORATION, EXACT LEGAL NAME AND STATE OF INCORP.) | ADDRESS | PHONE # |

| COUNT NO. | OFFENSES CHARGED | CITATION #, IF APPLICABLE | F.S. # OR CAPIAS/WARRANT # |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |

Before me this date personally appeared ___RICHARD P MARTIN___ who being first duly sworn deposes and says that on __19__ day __JUNE__, 19 95, 1500 E. SUNRISE BLVD. (Crime location) the above named defendant committed the above offenses charged and the facts showing probable cause to believe same are as follows: BROWARD COUNTY

THE NARCOTICS WAS VACTOX TESTED BY OFF. MONIZ + SHOWED

POSITIVE FOR COCAINE. THE NARCOTICS + CASH WAS PLACED

INTO EVIDENCE BY OFF. MONIZ.

DET. PARR + DET. O'NEAL ALSO RESPONDED TO E. SUNRISE +

15 AVE. + REQUESTED THAT BOTH SEARS + HALL BE BROUGH

TO BSO HEADQUARTERS SO THEY COULD FURTHER THEIR IN-

VESTIGATION OF THEIR HOMICIDE.

AT THIS POINT SEARS HAD BEEN CHARGED WITH VIO. OF RES

ON HIS D.L. + ALSO POSS. OF COCAINE, AND HALL WAS CHARG-

ED WITH POSS. OF COCAINE, WHICH OFF. MONIZ WAS INITIA-

TING.

I swear the above statement is correct and true to the best of my knowledge and belief.

_____       R.P. MARTIN 514       PATROL
OFFICER/AFFIANT'S SIGNATURE              OFFICER'S NAME/CCN            OFFICER'S DIVISION

STATE OF _____ COUNTY OF _____

0111

The foregoing instrument was acknowledged before me this 15 day of JUN, 19 95, who is personally known to me or who has produced (ID Type) _____ as identification and who _____ (DID OR DID NOT) take an oath.

(SEAL OR STAMP)

POLICE 2d

DEPUTY CLERK OF THE COURT, NOTARY PUBLIC. OR ASSISTANT STATE ATTORNEY       TITLE OR RANK/CCN

FIRST APPEARANCE/ARREST FORM

SEVENTEENTH JUDICAL CIRCUIT
BROWARD COUNTY

Orig - Court
2nd - State Atty
3rd - Filing Agenc
4th - Arresting Ag

[ ] **17th Judicial Circuit in and for Broward County**
[ ] **In the County Court in and for Broward County**

**CLOCK IN**

| DIVISION: | | |
|---|---|---|
| [ ] **CRIMINAL**<br>[ ] **TRAFFIC**<br>[ ] **OTHER** | **ORDER** | |

THE STATE OF FLORIDA VS.    *DAVID SEARS*

**CASE NUMBER**
*GRAND JURY*

**PLAINTIFF**                    **DEFENDANT**

---

CHARGE *MURDER IN THE FIRST*
*DEGREE*

*THE GRAND JURY HAVING THIS DATE-*
*-JULY 5, 1995, SPRING TERM GRAND JURY,*
*RETURNED A NO TRUE BILL AS TO THE*
*DEFENDANT, IT IS HEREBY ORDERED*
*THAT THE DEFENDANT SHALL BE*
*RELEASED FROM CUSTODY AS TO THIS*
*CASE ONLY.*

DONE AND ORDERED THIS _20_ DAY OF _JULY_ 19 _95_ , IN
BROWARD COUNTY, FLORIDA *NUNC PRO TUNC, JULY 5, 1995*

95 JUL 20 PM 4: 21

_____
**JUDGE**
*BRESCHER*

**COPIES:**    **BSO**   -   **SAO**

FORM #CC-252
REVISED 10/90

0112

CRIMINAL COUNTY ____ 15-651    SHALL    FIELDS MUST BE ANSWERED IF DEFENDANT NOT    CUSTODY    OBTS NO ____ 97-14

ARREST NO. ____

| FILING AGENT | OFFENSE REPORT | LOCAL I.D. NO. | | FBI | SS NO |
|---|---|---|---|---|---|

| DEFENDANT'S LAST NAME | FIRST | MIDDLE | SUF | ALIAS/STREET NAME | CITIZENSHIP |
|---|---|---|---|---|---|
| HALL | CHERYL | DENISE | | | |

| RC | SEX | HGT | EYES | HAIR | WGT | COMP | AGE | D.O.B. | BIRTHPLACE | SCARS, MARKS, TT |
|---|---|---|---|---|---|---|---|---|---|---|
| B | F | 5'03" | BRN | BLK | 130 | MED | 28 | 06-23-66 | | |

PERMANENT ADDRESS    LOCAL ADDRESS
SAME

4730 NW 11 ST LAUDERHILL, FL. 33313

| PLACE OF EMPLOYMENT | | LENGTH |
|---|---|---|

| RESIDENCE TYPE: | (1) CITY | (2) COUNTY | (3) FLORIDA | (4) OUT-OF-STATE |
|---|---|---|---|---|

| HOW LONG DEFENDANT IN BROWARD COUNTY | BREATHALYZER BY/CCN | READING | PLACE OF ARREST | DATE/TIME ARRESTED | ARRESTING OFFICER(S) CCN |
|---|---|---|---|---|---|
| | | | 1500 E. SUNRISE BLV | 06-14-95 1200 | M. J. MONIZ 810 |

| OFFICER INJURED | UNIT | ZONE | BEAT | SHIFT | UNIT. TRANSPORTING PRISONER | TRANSPORTING OFFICER/CCN | PICK-UP TIME | DRUG TYPE |
|---|---|---|---|---|---|---|---|---|
| Y ☐ N ☒ | X100102 | PAT | II | | | | TIME ARRIVED AT BSO | |

| TYPE | B-BARBITURATE | H-HALLUCINOGEN | P-PARAPHERNALIA | U-UNKNOWN | ACTIVITY | ACTIVITY | S-SELL | A-BAGGLE | M-MANUFACTURE | K-DISPENSE | Z-OTHER | INDICATION OF | Y | M | UK |
| N-N/A | C-COCAINE | M-MARIJUANA | EQUIPMENT | Z-OTHER | | H-HAS | B-BUY | B-DELIVER | PRODUCE | DISTRIBUTE | | ALCOHOL INFLUENCE | ☐ | ☐ | ☐ |
| A-AMPHETAMINE | E-HEROIN | O-OPIUM | S-SYNTHETIC | | | P-POSSESS | T-TRAFFIC | E-USE | CULTIVATE | | | DRUG INFLUENCE | ☐ | ☐ | ☐ |

ATTACH DEFENDANT'S PHOTO

DEFENDANT'S VEHICLE-MAKE _____ TYPE ____ YEAR ____ COLOR ____ VIN. NO. ____

VEHICLE TOWED TO _____ TAG NO. _____ OTHER IDENTIFIERS OR REMARK

DEFENDANT'S EXHIBIT
7
RR   11/8/00

| NAME OF VICTIM (IF CORPORATION, EXACT LEGAL NAME AND STATE OF INCORP.) | ADDRESS | PHONE # |
|---|---|---|
| STATE OF FLORIDA | | |

| COURT NO. | OFFENSES CHARGED | CITATION #, IF APPLICABLE | F.S. # OR CAPIAS/WARRANT # |
|---|---|---|---|
| ONE | POSS. OF COCAINE | | 893.13 |
| | | | |
| | | | |
| | | | |

PROBABLE CAUSE AFFIDAVIT

Before me this date personally appeared ___ MICHAEL J. MONIZ ___ who being first duly sworn deposes and says that on ___ 14 ___ day of ___ JUNE ___, 19 _95_, at _1500 BLK E. SUNRISE BLV_ (crime location) the above named defendant committed the above offenses charged and the facts showing probable cause to believe same are as follows: 1ST. AFID.

THE DEF. WAS A PASSENGER, IN HER VEH. (THE OWNER), WHICH

WAS BEING OPERATED BY HER LIVE IN BOYFRIEND DAVID SEARS.

THE VEH WAS STOPPED AND THE DRIVER DAVID SEARS WAS ARRE

PED. THE ARREST THE VEH WAS SEARCHED AND 14 GRAMS OF CRA

COCAINE WAS LOCATED BY A NARCOTICS DOG, IN THE FRONT PASSEN

I swear the above statement is correct and true to the best of my knowledge and belief.

_____    MICHAEL J. MONIZ 810    __ PATROL __
OFFICER/AFFIANT'S SIGNATURE    OFFICER'S NAME/CCN    OFFICER'S DIVISION

STATE OF ____    COUNTY OF ____

The foregoing instrument was acknowledged before me this _14th_ day of ___ JUNE ___, 19 _95_, who is personally known to me or who has produced (ID Type) _FL I.D_ as identification and who (DID OR DID NOT) take an oath.

6145

_____    (SEAL OR STAMP)
DEPUTY CLERK OF THE COURT NOTARY PUBLIC OR ASSISTANT STATE ATTORNEY    TITLE OR RANK/CCN

0150

SEVENTEENTH JUDICIAL CIRCUIT    FIRST APPEARANCE / ARREST FORM    Orig - Court
BROWARD COUNTY    2nd - State Atty
STATE OF FLORIDA    SHOULD ADDITIONAL SPACE BE NEEDED, USE PROBABLE CAUSE AFFIDAVIT CONTINUATION.    3rd - Filing Agency
BSO08 #2 (Rev 9/91)    4th - Arresting Agency
COURT COPY

BROWARD COUNTY
ARREST NO. 95-6857
FS NO.

| DEFENDANT'S LAST NAME | FIRST | MIDDLE | SUF. | HGT | WGT | RACE | SEX | D.O.B. | OFFENSE REPORT | ARRESTING OFFICER/CCN |
|---|---|---|---|---|---|---|---|---|---|---|
| HALL | ETHEL | DENISE | | 5'3" | 130 | B | F | 0623 46 | 95-95344 | M.J. MONIZ 810 |

NAME OF VICTIM (IF CORPORATION, EXACT LEGAL NAME AND STATE OF INCORP.)  STATE OF FLORIDA    ADDRESS    PHONE #

| COUNT NO. | OFFENSES CHARGED | CITATION #, IF APPLICABLE | F.S. # OR CAPIAS/WARRANT # |
|---|---|---|---|
| ONE | POSS. OF COCAINE | | 893.13 |
| | | | |
| | | | |
| | | | |

Before me this date personally appeared ___MICHAEL J. MONIZ___ who being first duly sworn deposes and says that on __14__ day __JUNE__, 19 _95_ at _1500 BLK B. SUNRISE BL_ (crime location) the above named defendant committed the above offenses charged and the facts showing probable cause to believe same are as follows:

COMPARTMENT BETWEEN THE DRIVER AND THE DEF. THE NARCOTIC DOG ALSO ALERTED ON $53.00 ($50.00 = 1 BUNDLE OF 50 $1.00 BILLS) IN THE DEF. PURSE.

(REF CASE # 95-95287

I swear the above statement is correct and true to the best of my knowledge and belief.

OFFICER/AFFIANT'S SIGNATURE    MICHAEL J. MONIZ 810    OFFICER'S DIVISION    PATROL
OFFICER'S NAME/CCN

0151

STATE OF    COUNTY OF
The foregoing instrument was acknowledged before me this __14th__ day of __June__, 19 _95_, who is personally known to me or who has produced (ID Type) ___FLPP___ as identification and who (did or did not) take an oath

(SEAL OR STAMP)

DEPUTY CLERK OF THE COURT, NOTARY PUBLIC OR ASSISTANT STATE ATTORNEY    TITLE OR RANK/CCN

FIRST APPEARANCE/ARREST FORM

ENTEENTH JUDICAL CIRCUIT
WARD COUNTY
TE OF FLORIDA
1-24 REV 8/91)

COURT COPY

Orig    Court
2nd    State Atty
3rd    Filing Agency
4th    Arresting Agency

DEFENDANT'S
EXHIBIT
8
11/9/00

# FLORIDA DEPARTMENT OF EDUCATION
### FRANK T. BROGAN
Commissioner of Education

TO: CHERL D SEARS
4730 NW 11 ST
LAUDER HILL, FL   33313

FEBRUARY 24, 1998

IN REPLY PLEASE REFER TO:
SSAN# 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

FROM:   BUREAU OF TEACHER CERTIFICATION

SUBJECT: STATEMENT OF ELIGIBILITY

**THIS IS YOUR STATEMENT OF ACADEMIC ELIGIBILITY FOR MIDDLE GRADES SOCIAL SCIENCE (5-9) VALID UNTIL FEBRUARY 24, 2000.**

The State of Florida issues two types of certificates for full-time teaching:  a nonrenewable Temporary Certificate valid for two years and a Professional Certificate valid for five years.  The attached Form CF-106a, FLORIDA TEACHER CERTIFICATION REQUIREMENTS, outlines the criteria for the issuance of these certificates.  The Temporary Certificate is issued to allow time to complete requirements for the Professional Certificate.

Your application for teacher certification has been received and evaluated.  Based upon current requirements, you will be eligible for a two-year nonrenewable Temporary Certificate valid for two consecutive school fiscal years covering MIDDLE GRADES SOCIAL SCIENCE (5-9) when:

You complete the following subject area specialization (subject content) requirements:

Three (3) semester hours in western civilization; or, European, Asian, African, Latin American, or Middle Eastern history

Three (3) semester hours in geography

You must complete the requirements specified above and maintain a 2.5 GPA in the subject area.  Courses utilized in this evaluation reflect an acceptable GPA.

Note:  The specialization requirements listed above must be completed prior to the issuance of the Temporary Certificate and no later than June 30th of the first year of the two-year validity period of the certificate.

You obtain employment with a Florida public, state supported, or nonpublic school which has an approved system for documenting the demonstration of required professional education competence. Your employer must

Bureau of Teacher Certification
The Florida Education Center ● Room 203 ● Tallahassee, Florida 32399 ● (Florida 1-800-445-6739)
An affirmative action/equal opportunity employer

0219

# FLORIDA DEPARTMENT OF EDUCATION
## FRANK T. BROGAN
Commissioner of Education

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                                              FEBRUARY 24, 1998
                                                         PAGE   2

request issuance of your certificate.

Your employer submits a fingerprint card which has been
processed by the Florida Department of Law Enforcement
and the Federal Bureau of Investigation.  If your
fingerprint report reflects an arrest record, your file
will be referred to Professional Practices Services for
further review. Issuance of your certificate will be
contingent upon the results of this review.

Please note that if you do not complete specialization
requirements, obtain employment, and issuance of your
certificate is not requested by FEBRUARY 24, 2000, your
Statement of Eligibility will expire.  Another application
and fee may be submitted within one year from the
expiration date of this Statement of Eligibility to
re-establish your eligibility based on these same
requirements.  However, if this Statement of Eligibility
has expired for more than one year when you submit another
application, your eligibility for certification will be
based on requirements which are in effect at the time the
next application is received.

To qualify for a five-year Professional Certificate,
requirements must be completed in the following three
categories: General Requirements, Professional Education
Requirements, and Specific Subject Requirements.

**YOU MUST COMPLETE THE FOLLOWING REQUIREMENTS FOR THE
ISSUANCE OF YOUR PROFESSIONAL CERTIFICATE:**

**GENERAL REQUIREMENTS -**

Submit official documentation of a passing score on the
Professional Education Subtest of the Florida Teacher
Certification Examination.

Submit official documentation of a passing score on the
College Level Academic Skills Test (CLAST).

Submit from a Florida district superintendent or the
chief administrative officer of a Florida state
supported or nonpublic school, official verification of
demonstration of required professional education
competence.

Bureau of Teacher Certification
The Florida Education Center ● Room 203 ● Tallahassee, Florida 32399 ● (Florida 1-800-445-6739)
An affirmative action/equal opportunity employer

0220

# FLORIDA DEPARTMENT OF EDUCATION

## FRANK T. BROGAN

Commissioner of Education

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

FEBRUARY 24, 1998
PAGE 3

Complete the recency-of-credit requirement either by earning six (6) semester hours of college credit from an accredited institution in an area in which you are seeking certification, or by earning 120 inservice points which are part of an approved Florida district Master Inservice Plan or a combination of college credit and inservice points. Sixty inservice points equate to three (3) semester hours.

Submit Application Form CG-10 and the appropriate fee as indicated on the application form.

**PROFESSIONAL EDUCATION REQUIREMENTS -**

20 semester hours in education courses which must include:

6 semester hours covering the sociological and psychological foundations of education

6 semester hours in general methods, curriculum, school administration, or school supervision

a course in special methods of teaching the subject in which you are seeking certification as indicated in the SPECIFIC SUBJECT REQUIREMENTS outlined below.

The practical teaching experience requirement as explained in the enclosed attachment.

**SPECIFIC SUBJECT REQUIREMENTS FOR MIDDLE GRADES SOCIAL SCIENCE (5-9)**

Complete the subject area specialization (content courses) specified for issuance of the two-year nonrenewable Temporary Certificate.

Submit official documentation of a passing score on the MIDDLE GRADES SOCIAL SCIENCE (5-9) subject area test

Complete the special methods requirement as follows:

2 semester hours in special methods of teaching social science in the middle grades

Bureau of Teacher Certification
The Florida Education Center ● Room 203 ● Tallahassee, Florida 32399 ● (Florida 1-800-445-6739)
An affirmative action/equal opportunity employer

**FLORIDA DEPARTMENT OF EDUCATION**
FRANK T. BROGAN
Commissioner of Education

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

FEBRUARY 24, 1998
PAGE  4

NOTE:  The college credit earned to complete the special
methods requirement will also be applicable toward the
total hours specified in PROFESSIONAL EDUCATION
REQUIREMENTS listed above.

PLEASE NOTE:  BASED ON CURRENT STATUTES, YOU MAY RECEIVE
ONLY ONE TEMPORARY CERTIFICATE, VALID FOR TWO YEARS, PRIOR
TO ISSUANCE OF THE PROFESSIONAL CERTIFICATE.  IF YOU HAVE
REQUESTED CERTIFICATION IN MORE THAN ONE SUBJECT, IT IS NOT
NECESSARY FOR YOU TO COMPLETE REQUIREMENTS SPECIFIED FOR
ALL SUBJECTS PRIOR TO ISSUANCE OF YOUR PROFESSIONAL
CERTIFICATE.  HOWEVER, IT IS ESSENTIAL THAT YOU COMPLETE
REQUIREMENTS SPECIFIED IN YOUR STATEMENT OF ELIGIBILITY FOR
GENERAL REQUIREMENTS, PROFESSIONAL EDUCATION REQUIREMENTS,
AND SPECIFIC SUBJECT REQUIREMENTS FOR THE PROFESSIONAL
CERTIFICATE IN AT LEAST ONE SUBJECT TO INSURE YOUR
ELIGIBILITY FOR ANOTHER CERTIFICATE FOR THE SCHOOL YEAR
IMMEDIATELY FOLLOWING THE EXPIRATION OF YOUR TEMPORARY
CERTIFICATE.

The Bureau of Teacher Certification will be pleased to
answer any questions that you may have after you have
carefully reviewed your Statement of Eligibility.  You may
direct written correspondence to: The Bureau of Teacher
Certification, Florida Department of Education, 325 West
Gaines Street, Tallahassee, FL, 32399-0400.  If you live in
Florida, you may call the Bureau of Teacher Certification
at 1-800-445-6739.  (You CANNOT reach the Bureau by
substituting the area code "850" for the "800" toll-free
extension).  If you live outside the State, you may reach
the Bureau at 850-488-2317.

ENCLOSURE(S)
 PTER

STAFF: JCT

Bureau of Teacher Certification
The Florida Education Center ● Room 203 ● Tallahassee, Florida 32399 ● (Florida 1-800-445-6739)
An affirmative action/equal opportunity employer

0222

**DATA ENTERED**
OCT 07 1998

*UPDATE*

**SRP**

The School Board of Broward County, Florida
Department of Instructional Staffing
600 SE 3rd Avenue, Fort Lauderdale, FL 33301

PLEASE ALLOW FOUR TO SIX WEEKS FOR YOUR UPDATE TO BE
PROCESSED

**FOR OFFICE USE ONLY**

Type Appl
Cert Fields _317_
Name                        Position    Yr
_K. Vahl_              _10-50_  _979_
_High Buchanen_   _56-01_  _939_

Comments:

# APPLICATION FOR INSTRUCTIONAL POSITION

The School Board of Broward County, Florida prohibits any policy or procedure which results in discrimination on the basis of
age, color, disability, gender, national origin, marital status, race, religion or sexual orientation.

**INDIVIDUAL DATA:**

Social Security Number

Today's Date _9/16/98_

☒ I am immediately available.
☐ I will be available on _____

NAME: _Sears_    _Cheri_    _Denise_    _Hutchins._
      Last        First       Middle       Maiden

ADDRESS: (IF YOUR ADDRESS CHANGES PLEASE CONTACT THE INSTRUCTIONAL STAFFING DEPARTMENT)
_4730 N.W 11 st_    _Lauderhill_    _Fla_    _33313_
No. & Street              City                State    Zip

TELEPHONE: _954 797 7968._    ALTERNATE TELEPHONE: _497-3980_ #

Sex: _____ Male _X_ Female    Date of Birth: _6/23/46_

Race/Ethnic Category: _____ White-Non-Hispanic _X_ Black, Non-Hispanic _____ Hispanic
_____ Asian, Pacific _____ American Indian, Alaska Native _____ Other

Are you currently employed or have you ever been employed by Broward County Public Schools? ☒ Yes ☐ No
If yes, list your name and current position or positions _____
Year you left employment with Broward County Public Schools _Still Employed_

POSITION DESIRED: ☒ Full Time    ☐ Substitute    ☐ Part Time    ☐ Other _____

GRADE LEVEL (S): ☐ Pre-school    ☐ Kindergarten    ☒ Elementary (1-5)    ☒ Middle (6-8)
                 ☒ High (9-12)    ☐ Adult/Vocational

SUBJECT PREFERENCE: _ESE._    _DOP._    _Social Science_

COACHING/EXTRACURRICULAR ACTIVITIES: (List Activity)
_BAsketbAll_    _Volley ball_    _Track_

**CERTIFICATION**
Describe any Florida Educator's Certificate(s) you have been issued? Enclose a copy of the certificate. _2year._
_Temp_

If you have applied for a Florida Educator's Certificate, provide the following:
Date applied _9/24/98_. Subject's requested _Social Science 5-9_    0113

Include a copy of your Statement of Eligibility from the Florida Department of Education. (If you have _____
a copy to Instructional Staffing when you receive it.)

Have you participated in a Florida Professional Orientation Program? _NO_ If Yes, which District _____

**DEFENDANT'**
**EXHIBIT**
9
11/8/00

**EDUCATION** *(Provide official transcripts)*

| COLLEGE/UNIVERSITY | CITY/STATE | YEARS From | YEARS To | DATE OF GRAD | DEGREE | MAJOR | GPA * | GPA ** |
|---|---|---|---|---|---|---|---|---|
| Fla Memorial | Miami, Fla | 1985 | 1989 | Jun 1989 | B.S. | Criminal Justice | 2.8 | |
| Bethune Cookman | Daytona Bch Fla | 1984 | 1985 | | N/A | — | | |

\* Grade Point Average (Major)    \*\* Grade Point Average (Overall)

**INTERNSHIP (STUDENT TEACHING/CLINICAL PLACEMENT/GUIDANCE OR SOCIAL WORK):**
*Your internship references are* <u>*YOUR RESPONSIBILITY*</u> *to provide. You may use the reference forms provided, but college placement records and/or references on letterhead stationary are also acceptable.*

| DATE | SCHOOL NAME/LOCATION STREET, CITY, STATE, ZIP | AREA CODE & PHONE NO. | COOPERATING TEACHER FIELD PLACEMENT SUPV. | NAME OF COLLEGE SUPERVISOR | GRADE/SUBJECT TAUGHT |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |

## TEACHING EXPERIENCE

**I.    TEACHING EXPERIENCE (UNDER CONTRACT):** *Begin with the most recent and list ALL experiences in chronological order since your initial application. THIS OFFICE will mail a reference to ALL of your principals for the past FIVE years. Dates, addresses, phone numbers and names must be completed. Failure to do so will result in your update being returned. If more space is needed, attach additional sheet. Resumes may not be substituted.*

| YEARS From - To | NAME OF SCHOOL | ADDRESS STREET/CITY/STATE/ZIP | AREA CODE & PHONE NO. | NAME OF PRINCIPAL | GRADE/SUBJECT TAUGHT | REASON FOR LEAVING |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |
| | | | | | | |

_____ **Total Years of Contractual Teaching Experience** *(Full Time under Contract)*

**II.    OTHER EXPERIENCE:** *Complete the sections below with any update information since your last application. You are responsible for obtaining references for the two sections below. You must provide a reference(s) from your current and previous supervisors from the last FIVE years. Gaps in employment may require additional information. Resumes may not be substituted. If more space is needed, attach additional sheet.*

### A.    PART-TIME AND/OR SUBSTITUTE TEACHING

| YEARS FROM TO | NAME OF SCHOOL | ADDRESS Street/City/State/Zip | AREA CODE & PHONE NO. | NAME OF PRINCIPAL | GRADE/SUBJECT TAUGHT | REASON FOR LEAVING |
|---|---|---|---|---|---|---|
| 97/98 | Laud Hill Middle | 1901 N.W. 44 AVE Lauder Hill Fla | 954 4973950 | Mrs. Dahl | ESE Reading/Lang Arts | Still Employed |
| 96/97 | Laud manors | 1400 N.W. 142+ Lauderdale manor, Fla | 954 7656862 | MB Bennette | All Subjects | went to another school |

### B.    NON-TEACHING EXPERIENCE

| YEARS FROM TO | NAME OF FIRM OR BUSINESS | ADDRESS Street/City/State/Zip | AREA CODE & PHONE NO. | NAME OF SUPERVISOR | YOUR POSITION | REASON FOR LEAVING |
|---|---|---|---|---|---|---|
| 93/97 | Broward Employment & Training | 380 N. Andrew Ave. Ft Lauderdale | 765 4505 | Hugh Buchanan | YWA II | Summer Employmt |

*I certify the above entries are true, complete, and correct to the best of my knowledge and belief and are made in good faith. I understand that a knowing and willful false statement on this form may result in immediate dismissal.*

Signature: C. herl, Seen    Date: 9/16/98

instruc staff<forms<update• Revised 7/6/97

0114



DEFENDANT'S
EXHIBIT
10
RA  11/8/00

The School Board of Broward County, Florida

## Security Background Check

**THIS FORM MUST BE TURNED IN WITH YOUR APPLICATION FOR EMPLOYMENT.**

Name: Sears, Cherl, D, Hutchins    SS#: _____    Date of Birth: 06/23/66

Last    First    Middle    Maiden

Address: 4730 N.W. 115t Lauderhill Fla 33313    Phone #: 7977968

At the time of employment your fingerprints will be researched by local, state and federal law enforcement agencies. Sealed or expunged records must be revealed to the School Board of Broward County pursuant to F.S. 943.058. Your employment with the Broward County School District is temporary and probationary pending successful processing of your fingerprints. The following questions must be answered truthfully. A "Yes" answer to any of the following questions, does not automatically keep you from being hired. Your omission or falsification of any criminal history, including juvenile incidents, (misdemeanor or felony, see reverse for examples of criminal offenses) information will result in your immediate termination.

Yes ☐  No ☒  1. Have you ever been convicted of an offense (misdemeanor or felony) other than a minor traffic violation? (Driving under the Influence [DUI] and Driving while Intoxicated [DWI] convictions are not minor and must be reported.)

Yes ☐  No ☒  2. Have you ever been found guilty of a criminal offense?

Yes ☒  No ☐  3. Have you ever entered a nolo contendre or no contest plea in a criminal proceeding?

Yes ☐  No ☒  4. Have you ever had a criminal record sealed?

Yes ☐  No ☒  5. Have you ever had a criminal record expunged?

Yes ☒  No ☐  6. Have you ever participated in any type of pre-trial intervention/diversion program or had adjudication withheld in a criminal offense?

Yes ☐  No ☒  7. Are there criminal charges currently pending against you?

Yes ☐  No ☒  8. Have you ever been imprisoned or jailed in a criminal proceeding?

Yes ☐  No ☒  9. Have you ever been placed on probation in a criminal proceeding?

Yes ☐  No ☒  10. Have you ever paid a fine in a criminal proceeding?

Yes ☐  No ☒  11. Have you ever failed to appear in court or forfeited bond in a criminal proceeding?

Yes ☐  No ☒  12. Have you ever had a teaching certificate revoked or suspended? If yes, in what state and when? _____

Yes ☐  No ☒  13. Have you ever had sanctions placed on your teaching certificate for any reason?

Yes ☐  No ☒  14. Have you ever been denied a teaching certificate anywhere?

Yes ☐  No ☒  15. Is disciplinary action currently pending anywhere against your teaching certificate?

If you answered "Yes" to any question above, you must explain fully on the reverse side of the form. If you answered "Yes" to question(s) 12, 13, 14, or 15, you must give the name of the State where your teaching certificate was revoked, suspended, sanctioned, denied or where action is currently pending against you.

**NOTE:** Pursuant to Florida Statute 943.058 Criminal History Record Expunction or Sealing, persons to be employed in a position having direct contact with children must answer questions 4, 5 and 6. The School Board of Broward County will receive information on all records, including juvenile, that have been sealed, expunged, or where adjudication was withheld. To omit a response is to be untruthful in your response, regardless of any previous **information received from your attorney or the Court** will be considered falsification of your application and will result in your being terminated. If you wish to seek counsel prior to completing this section, you may take this application with you.

(over)

0139

INCIDENCE #1 (Request 2nd sheet If more than one Incidence)

If Arrested, Where?: Broward CNTY.     Date of Arrest: 6/95

Arresting Agency: $ City of Ft Lauderdale.

Offense: Poss of Cocain

Please provide detailed explanation: I let a male friend of mine Borrow my car for the day. And when my friend returned to pick me up I got into the vehicle on the passager side. At that time proceeded to the mall while on our way to the mall we were stopped by serval Police officers at that time I office asked for some idetication and then decided to search the car car for some un known reason. After searching the car Cocain was found inside the car which I had no knowledge of. At that time both of use were arrested. And After further investigating the incident. I was ordered to attend a Pre-Trail

Final Disposition: Intervention Program a the case was Dismissed. — Case was Dismissed.

---

**EXAMPLES OF CRIMINAL OFFENSES:** Assault/battery, auto theft, disorderly conduct, domestic violence, DUI/DWI, fraud (welfare/food stamps) loitering, prostitution/solicitation, robbery, shoplifting, theft (grand/petty), trespassing, worthless checks. NOTE: This is not a complete list and is intended to provide examples only. You must list all convictions including juvenile incidents and those in which adjudication was withheld and/or records were sealed/expunged.

By signing this document I certify that I have carefully read and fully understand each question and that all information contained herein is true and accurate. My signature further certifies that there is no falsification of any information, omission of any information requested or any misrepresentation of information requested. I also understand that my fingerprints will be submitted to the Federal Bureau of Investigation for a **complete** criminal history background check.

By my signature, I authorize the Broward County School Board to conduct any investigation necessary to verify all information identified on this form. My signature on this document provides for the release of any sealed or expunged records in my name by any court. Included in this grant of authority is my permission to contact any and all former employers and other persons acquainted with me or in possession of information concerning me to supply such information to the Security Clearance Office. All monies received as part of the fingerprinting process are non-refundable.

By my signature, I certify that I know, understand, and agree that any false statement or omission of information requested will result in my immediate termination.

Cheil Sears
Signature of Applicant

9/16/98
Date

Rev. 3/97; 8/97; 10/97; 2/98
Word Process Instructional Staff Forms:Security BG Check (Rev.)

0140




DEFENDANT'S EXHIBIT 11  11/8/00

The Nation's Largest Fully **Accredited School System**

# THE SCHOOL BOARD OF BROWARD COUNTY, FLORIDA

Gracie M. Diaz
Director
Instructional Staffing Department

Chairperson Dr. Donald J. Samuels
Vice Chairperson Dr. Robert D. Parks

Darla L. Carter
Dr. Abraham S. Fischler
Miriam M. Oliphant
Diana Wasserman
Lois Wexler
Student Advisor Nicole Yorke

Dr. Frank R. Petruzielo
Superintendent of Schools

October 7, 1998

Cheri Sears
4730 NW 11 Street
Lauderhill, FL 33313

**Certified**

Dear Ms. Sears:

The Security Clearance Committee met on Thursday, October 1, 1998. At this time, the decision is that you are not employable with the School Board of Broward County.

We regret that this action was necessary.

Sincerely,

Gracie M. Diaz, Director
Instructional Staffing

GMD:deh

**SENDER:**
- Complete items 1 and/or 2 for additional services.
- Complete items 3, 4a, and 4b.
- Print your name and address on the reverse of this form so that we can return this card to you.
- Attach this form to the front of the mailpiece, or on the back if space does not permit.
- Write "Return Receipt Requested" on the mailpiece below the article number.
- The Return Receipt will show to whom the article was delivered and the date delivered.

I also wish to receive the following services (for an extra fee):

1. ☐ Addressee's Address
2. ☐ Restricted Delivery

Consult postmaster for fee.

3. Article Addressed to:

Sears, Che

4a. Article Number
5934 25 368

4b. Service Type
☐ Registered        ☑ Certified
☐ Express Mail      ☐ Insured
☐ Return Receipt for Merchandise  ☐ COD

7. Date of Delivery

5. Received By: *(Print Name)*

6. Signature: *(Addressee or Agent)*
X Cheryl Sears

8. Addressee's Address *(Only if requested and fee is paid)*

PS Form **3811,** December 1994        102595-98-B-0229    Domestic Return Receipt

Is your RETURN ADDRESS completed on the reverse side?

Thank you for using Return Receipt Service.

0155

DEFENDANT'S
EXHIBIT
12
*ll*    11|9|00

October 6, 1998

Mr. Hal Blitman
Associate Superintendent of District Administration
School Board of Broward County, Florida
600 SE 3rd Avenue
Ft. Lauderdale, Florida 33301

Reference:   Additional Information, Appeal
             Cherl D. Sears,

Dear Mr. Blitman,

This letter is to inform you of key details that may better clarify the nature of the
incident I was involved in and the reason behind my electing to attend the prevention
program. I'd like to first thank you for your time in reviewing my motion for appeal.
Prior to this incident I have never been involved in any criminal proceedings nor do I
condone any criminal activity. After being arrested, I sought legal counsel to represent
me. At that time, I was working hard to support both myself and my two children. I
was also attending classes on the weekend to complete my education in order to bring
me closer to becoming a full-time teacher. My attorney advised me that since I had no
prior arrests that if I agreed to the court program, the case would be dismissed and it
would spare me the cost of going to trial. He also advised that I not contest the charge
because I was the owner of the car.   Furthermore, he explained that this would be the
best course of action and my record would remain clear. Again, I thank you for your
time and patience, and I hope that this matter can be resolved so that I may return to
back to work to continue touching the bright young minds of my students as a full-time
teacher.

Sincerely,

*Cherl D. Sears*
Cherl D. Sears



DEFENDANT'S EXHIBIT
13
22  11/8/00

*The Nation's Largest Fully*     *Accredited School System*

# THE SCHOOL BOARD OF BROWARD COUNTY, FLORIDA

Gracie M. Diaz
Director
Instructional Staffing Department

*Chairperson* Lois Wexler
*Vice Chairperson* Darla L. Carter
Carole L. Andrews
Judie S. Budnick
Paul D. Eichner, Esq.
Stephanie Arma Kraft, Esq.
Miriam M. Oliphant
Dr. Robert D. Parks
Diana Wasserman

Dr. Frank R. Petruzielo
*Superintendent of Schools*

December 10, 1998

Cheri Sears
4730 NW 11 Street
Lauderhill, FL 33313

**Certified**

Dear Ms. Sears:

The Security Clearance Committee, which met November 24, 1998,
has denied your appeal for employment with the School Board of
Broward County, FL.

We regret that this action was necessary.

Sincerely,

Gracie M. Diaz, Director
Instructional Staffing

GMD:deh

# THE SCHOOL BOARD OF BROWARD COUNTY, FLORIDA
## OFFICE OF THE SUPERINTENDENT

July 16, 1998

> **DEFENDANT'S EXHIBIT**
> 14
> RL    11/8/00

TO:       Mr. Hal Blitman, Associate Superintendent, District Administration
             Ms. Sheila Dudley, Associate Superintendent & Board Liaison
             Ms. Gracie Diaz, Director, Instructional Staffing
          *Dr. John Goonen, Director, Professional Standards
             Mr. Eddie Hardy, Chief, Special Investigative Unit
             Ms. Rebecca Jones, Director, Employee Relations
             Ms. Shirley Roberson, Director, Equal Educational Opportunities
             Mr. William Tegtman, Director, Noninstructional Staffing/Wage & Salary
             Ms. Sharon Kelley, Employee Relations Specialist, Employee Relations

FROM:    Frank R. Petruzielo
            Superintendent of Schools

SUBJECT:  **SECURITY CLEARANCE COMMITTEE MEETING SCHEDULE**
             **FOR 1998-99**

I am appointing you to serve on the Security Clearance Committee for the 1998-99 school year. The Security Clearance Committee makes determinations of eligibility for employment in the district.

You are expected to attend all scheduled committee meetings. If you are unable to attend one of the meetings, you are to submit the name of your designee to Mr. Hal Blitman for approval before the day of the meeting.

Committee meetings for the 1998-99 school year, through the month of December, are scheduled on the dates identified below:

| | | |
|---|---|---|
| Wed., July 15, 1998 | Wed., September 2, 1998 | Wed., October 28, 1998 |
| Wed., August 5, 1998 | Wed., September 16, 1998 | Tues., November 24, 1998 |
| Wed., August 19, 1998 | Wed., October 14, 1998 | Wed., December 9, 1998 |

The Chairperson of the Committee will be Ms. Gracie Diaz, Director of Instructional Staffing. All meetings will be held at 3:00 p.m. on the 3rd floor of the Kathleen C. Wright Administration Center in Ms. Diaz's office.

_____ FRP

FRP/GMD:ms

cc: Superintendent's Cabinet

0053

*Mr. Bruce Wagar has been the Director, Professional Standards since .
September 17, 1998



*The Nation's Largest Fully*                    *Accredited School System*

# THE SCHOOL BOARD OF BROWARD COUNTY, FLORIDA

Gracie M. Diaz
Director
Instructional Staffing Department

*Chairperson*  Dr. Donald J. Samuels
*Vice Chairperson*  Dr. Robert D. Parks

Daria L. Carter
Dr. Abraham S. Fischler
Miriam M. Oliphant
Diana Wasserman
Lois Wexler
*Student Advisor*  Nicole Yonke

September 29, 1998

Dr. Frank R. Petruzielo
*Superintendent of Schools*

Ms. Cheryl Sears
4730 NW 11 Street
Lauderhill, Florida 33313

Dear Ms. Sears:

In review of your applicant file for full-time Instructional employment , our records indicate we have not received verification of Florida Certification and or a Florida Statement of Eligibility.

In order to be considered for the above subject areas, **you must** provide Instructional Staffing with credential evaluation from the Department of Education. Following your submission of the evaluation your file will be adjusted to reflect the approved areas of eligibility.

At this time you are eligible for substitute teaching only.

Sincerely,

Mickey Dillard (*B.B.*)

Mickey Dillard                    Betty Glover
Personnel Administrator           Personnel Assistant
Instructional Staffing            Instruction Staffing

MAD/bg

> **DEFENDANT'S
> EXHIBIT**
> .15
> PR  11/8/00

0120

PRINTED ON RECYCLED PAPER

*Broward County Public Schools Is An Equal Opportunity Employer*

  


*The Nation's Largest Fully* **Accredited School System**

# THE SCHOOL BOARD OF BROWARD COUNTY, FLORIDA

Roger J. Beaumont, Ph.D.
Director
Instructional Staffing Department

Date: September 28, 1998

Dear: Ms Sears,

Chairperson Dr. Don Samuels
Vice Chairperson Dr. Robert D. Parks

Darla L. Carter
Dr. Abraham S. Fischler
Miriam M. Oliphant
Diana Wasserman
Lois Wexler
Student Advisor Joseph P. Chase

Dr. Frank R. Petruzielo
Superintendent of Schools

Your application for a teaching position has been received in our office. In order to complete the processing of your application, submit the items checked below. All documents should be forwarded to: Attn. Mr. Mickey Dillard, Department of Instructional Staffing, 600 S. E. 3rd Avenue, Ft.Lauderdale, Fl. 33301.

☑ Reference(s) (a minimum of 3 references are required)
  ☑ Present Supervisor _Rebecca Clahl ; Lauderhill Middle_
  ☑ Past Supervisor _Hugh Buchanan ; Broward Employment & Training_
  ☐ Directing Teacher / Cooperating Teacher _____
  ☐ College Supervisor _____
  ☐ Other_____

☐ Final Official Transcript(s) must show degree(s) and dates conferred
bachelor's____ master's degree____ doctorate____ other_____

☑ Please provide a copy of a Valid Florida Educators Certificate and or Florida Statement of Eligibility in: _Dual Science and or ESE_

☐ * Your application does not reflect your employment history for the following years _____ . Please provide employer(s) name, address, supervisor and phone number(s) for verification. (* Please note you must account for the last 5 years of employment. Periods of unemployment should be listed separately).

☐ Other_____

To obtain information regarding the status of your employment application, call (954)765-6520 between the hours of 9:00 am - 10:00 am and 3:00 pm - 4:00 pm Tuesday through Thursday. Allow two (2) to three (3) weeks for receipt of required documents and evaluation of application. Upon final evaluation you will be notified in writing your file is complete, and made available to principals.

Thank you for choosing the School Board of Broward County.

Sincerely,

Mickey Dillard
Personnel Administrator
MD:bg

PRINTED ON RECYCLED PAPER

Betty Glover
Personnel Assistant

0121

*Broward County Public Schools Is An Equal Opportunity Employer*

ADMINISTRATION OFFICES • 600 SOUTHEAST THIRD AVENUE • FORT LAUDERDALE, FLORIDA 33301 • 954 765-5000



illips University, Inc.
0 S. University Avenue
id, OK 73701-6439
80) 237-4433

DEFENDANTS
EXHIBIT
16
RB 11/8/00

PAGE: 1

DATE: 07/17/98

Sears Cherl D
4730 NW 11th
Lauderhill, FL 33313

267636148

06/23/66

| -DEPT- | ---ID--- | -------TITLE------- | GRD R | -HRS- | ATTEMPT | EARNED | POINTS | -GPA- |
|---|---|---|---|---|---|---|---|---|
| CONTIN TEACH CERT PROG 1997-98 | | | | | | | | |
| EDU | EDU-491V | LANG DEVL & LRNG DIS | B | 3.00 | 3.00 | 3.00 | 9.00 | |
| EDU | EDU-491V | SURVEY EXCEPTNL CHIL | B | 3.00 | 3.00 | 3.00 | 9.00 | |
| TERM TOTALS: | | | | | 6.00 | 6.00 | 18.00 | 3.000 |

MAJOR1: UND   UNK     COL: 1F          CUMULATIVE:   6.00    6.00  18.00 3.000
MAJOR2:            COL:
MINOR1:
MINOR2:
MINOR3:

END OF TRANSCRIPT

OFFICIAL TRANSCRIPT

This is a red ink stamp
Date JUL 17 1998
Joseph W. Evans, Jr.
Registrar

This official Phillips University transcript is provided
upon written authorization by the student and with the
understanding that the recipient may not release same for
any purpose without written authorization by the student.

ISSUED TO STUDENT
IN SEALED ENVELOPE

SECURITY PAPER                    ORIGINAL DOCUMENT HAS A GRAY BACKGROUND

| | | |
|---|---|---|
| **b** Employee's name, address, and ZIP code ☐ Corrected | **c** Employer's name, address, and ZIP code ☐ Corrected | |
| Cherl D. Sears<br>4730 N W 11 Street<br>Lauderhill FL 33313 | School Board of Broward County<br>600 SE 3rd Avenue<br>Ft. Lauderdale, FL 33301 | |

| **d** Employee's correct SSN | **e** Employer's SSA number | **f** Employer's Federal EIN | **g** Employer's state I.D. number |
|---|---|---|---|
| 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 | 69- | 59-6000530 | |

**h** Previously reported ▶  Stat. emp ☐  De-ceased ☐  Pension plan ☐  Legal rep ☐  Def'd comp ☐  IRA/SEP ☐  **i** Corrected ▶  Stat. emp ☐  De-ceased ☐  Pension plan ☐  Legal rep ☐  Def'd comp ☐  IRA/SEP ☐  **j** Employer's use

Complete k and/or l only if incorrect on the last form you filed. Show incorrect item here. ▶  **k** Employee's incorrect SSN   **l** Employee's name (as incorrectly shown on previous form)

| | Form W-2 box | (a) As previously reported | (b) Correct information | (c) Increase (decrease) |
|---|---|---|---|---|
| | 1 Wages, tips, other comp. | 8,326.16 | 8,628.88 | 302.72 |
| | 2 Federal income tax withheld | 720.94 | 720.94 | 0.00 |
| | 3 Social security wages | 0.00 | 4,036.21 | 4,036.21 |
| | 4 Social security tax withheld | 0.00 | 250.25 | 250.25 |
| **C**<br>**H**<br>**A**<br>**N**<br>**G**<br>**E**<br>**S** | 5 Medicare wages and tips | 9,001.24 | 9,001.24 | 0.00 |
| | 6 Medicare tax withheld | 130.52 | 130.52 | 0.00 |
| | 7 Social security tips | | | |
| | 8 Allocated tips | | | |
| | 403B | 675.08 | 372.36 | (302.72) |
| | | | | |
| | | | | |
| | 17 State wages, tips, etc. | | | |
| | 18 State income tax | | | |
| | 20 Local wages, tips, etc. | | | |
| | 21 Local income tax | | | |

Form **W-2c** (Rev. 10-94) **Statement of Corrected Income and Tax Amounts**

Copy C  For Employee's Records
Department of the Treasury
Internal Revenue Service

ISA

**DEFENDANT'S
EXHIBIT**
17
RR  11/8/00

STF FED7949F.4

This is a corrected **Form W-2**, Wage and Tax Statement, for the tax year shown in box a. If you have filed an income tax return for the year shown, you may have to file an amended return. Compare amounts on this form with those reported on your income tax return. If the corrected amounts change your income tax liability, file **Form 1040X,** Amended U.S. Individual Income Tax Return, with copy B of this Form W-2c to amend the return you already filed.

If you have not filed your return for the year shown in box a, attach copy B of the original Form W-2 you received from your employer and copy B of this Form W-2c to your return when you file it.

If boxes h or i have any checkboxes marked, box h will show the original information and box i will show the corrected information.

For more information, contact your nearest Internal Revenue Service office. Employees in American Samoa, Guam, Commonwealth of the Northern Mariana Islands, or the U.S. Virgin Islands should contact their local taxing authority for more information.

STF FED7949F 5

0191

# Form 1040X — Amended U.S. Individual Income Tax Return

Form **1040X**
(Rev. October 1995)

Department of the Treasury—Internal Revenue vice

**Amended U.S. Individual Income Tax Return**

▶ See separate instructions.

OMB No. 1545-0091

This return is for calendar year ▶ 19 `9 6`, OR fiscal year ended ▶     , 19 `96`.

Your first name and initial: `CHERL D.`
Last name: `SEARS`
Your social security number: `267 63 6148`

If a joint return, spouse's first name and initial / Last name
Spouse's social security number

Home address (number and street). If you have a P.O. box, see instructions.: `4730 N W 17TH Street`
Apt. no.
Telephone number (optional): `(954) 797-7968`

City, town or post office, state, and ZIP code. If you have a foreign address, see instructions.: `Lauderhill, FL 33313`

For Paperwork Reduction Act Notice, see page 1 of separate instructions.

**A** If the name or address shown above is different from that shown on the original return, check here . . . . . ▶ ☐

**B** Has original return been changed or audited by the IRS or have you been notified that it will be? . . . ☐ Yes ☒ No
If notified that it will be, identify the IRS office ▶

**C** If you are amending your return to include any item (loss, credit, deduction, other tax benefit, or income) relating to a tax shelter required to be registered, attach **Form 8271**, Investor Reporting of Tax Shelter Registration Number, and check here . . . . . . . ▶ ☒

**D** Filing status claimed. Note: *You cannot change from joint to separate returns after the due date has passed.*
On original return ▶ ☐ Single ☐ Married filing joint return ☐ Married filing separate return ☒ Head of household ☐ Qualifying widow(er)
On this return ▶ ☐ Single ☐ Married filing joint return ☐ Married filing separate return ☒ Head of household ☐ Qualifying widow(er)

## Income and Deductions (see instructions)
USE PART II ON PAGE 2 TO EXPLAIN ANY CHANGES

| | | | A. As originally reported or as previously adjusted (see instructions) | B. Net change—Increase or (Decrease)—explain on page 2 | C. Correct amount |
|---|---|---|---|---|---|
| 1 | Adjusted gross income (see instructions) . . . . . | 1 | 16,095 | 302.00 | 16,397 |
| 2 | Itemized deductions or standard deduction . . . . . | 2 | 5,900 | — | 5,900 |
| 3 | Subtract line 2 from line 1 . . . . . . . . . | 3 | 10,195 | | 10,497 |
| 4 | Exemptions. If changing, fill in Parts I and II on page 2 . . | 4 | 7,650 | | 7,650 |
| 5 | Taxable income. Subtract line 4 from line 3 . . . . . | 5 | 2,545 | | 2,847 |
| 6 | Tax (see instructions). Method used in col. C . . . . . . . . | 6 | | | |
| 7 | Credits (see instructions) . . . . . . . . . | 7 | | | |
| 8 | Subtract line 7 from line 6. Enter the result but not less than zero . | 8 | | | |
| 9 | Other taxes (see instructions) . . . . . . . . | 9 | | | |
| 10 | Total tax. Add lines 8 and 9 . . . . . . . . . | 10 | | | |
| 11 | Federal income tax withheld and excess social security, Medicare, and RRTA taxes withheld. If changing, see instructions | 11 | 1,396 | | 1,396 |
| 12 | Estimated tax payments . . . . . . . . . . | 12 | | — | |
| 13 | Earned income credit . . . . . . . . . . | 13 | 2,468 | 123 | 2,405 |
| 14 | Credits for Federal tax paid on fuels, regulated investment company, etc. | 14 | | | |
| 15 | Amount paid with Form 4868, Form 2688, or Form 2350 (applications for extension of time to file) . | 15 | | |
| 16 | Amount of tax paid with original return plus additional tax paid after it was filed . . . . . | 16 | | |
| 17 | Total payments. Add lines 11 through 16 in column C . . . . . . . . . . . . | 17 | 3801 | |

## Refund or Amount You Owe

| | | | | |
|---|---|---|---|---|
| 18 | Overpayment, if any, as shown on original return or as previously adjusted by the IRS . . . . | 18 | 3,864 |
| 19 | Subtract line 18 from line 17 (see instructions) . . . . . . . . . . . . . . | 19 | |
| 20 | **AMOUNT YOU OWE.** If line 10, column C, is more than line 19, enter the difference and see instructions . | 20 | 63 |
| 21 | If line 10, column C, is less than line 19, enter the difference . . . . . . . . . . | 21 | |
| 22 | Amount of line 21 you want **REFUNDED TO YOU** . . . . . . . . . . . . | 22 | |
| 23 | Amount of line 21 you want **APPLIED TO YOUR 19**    **ESTIMATED TAX** | 23 | |

**Sign Here**
Keep a copy of this return for your records.

Under penalties of perjury, I declare that I have filed an original return and that I have examined this amended return, including accompanying schedules and statements, and to the best of my knowledge and belief, this amended return is true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which the preparer has any knowledge.

Your signature: `Cherl D. Sears`   Date: `4-14-97`

Spouse's signature. If a joint return, BOTH must sign.   Date

**Paid Preparer's Use Only**

Preparer's signature / Date / Check if self-employed ☐ / Preparer's social security no.

Firm's name (or yours if self-employed) and address / EIN / ZIP code

Cat. No. 11360L

Form **1040X** (Rev. 10-95)

# Form 1040

Department of the Treasury—Internal Revenue Service
**U.S. Individual Income Tax Return** **1998**

For the year Jan. 1–Dec. 31, 1998, or other tax year beginning ____, 1998, ending ____, 19 ____     OMB No. 1545-0074     IRS Use Only—Do not write or staple in this space.

**Label** (See instructions on page 18.) Use the IRS label. Otherwise, please print or type.

Your first name and initial: CHERI J.
Last name: SEARS

Your social security number: 267 63 6148

Home address (number and street). If you have a P.O. box, see page 18.
4730 N W 11th St     Apt. no.

City, town or post office, state, and ZIP code. If you have a foreign address, see page 18.
LAUDERHILL, FL 33313

**IMPORTANT!** You must enter your SSN(s) above.

**Presidential Election Campaign** (See page 18.)
Do you want $3 to go to this fund?     Yes [X]  No
If a joint return, does your spouse want $3 to go to this fund?

Note: Checking "Yes" will not change your tax or reduce your refund.

## Filing Status
Check only one box.

1. [ ] Single
2. [ ] Married filing joint return (even if only one had income)
3. [ ] Married filing separate return. Enter spouse's social security no. above and full name here. ▶
4. [X] Head of household (with qualifying person). (See page 18.) If the qualifying person is a child but not your dependent, enter this child's name here. ▶
5. [ ] Qualifying widow(er) with dependent child (year spouse died ▶ 19 ). (See page 18.)

## Exemptions

6a [ ] **Yourself.** If your parent (or someone else) can claim you as a dependent on his or her tax return, do not check box 6a.

b [ ] **Spouse**

c **Dependents:**

| (1) First name  Last name | (2) Dependent's social security number | (3) Dependent's relationship to you | (4) ✓ if qualifying child for child tax credit (see page 19) |
|---|---|---|---|
| Cleophas Hall | 595 78 564 | son | [✓] |
| Tequila Sears | 590 41 6587 | Daug | [✓] |
| | | | [ ] |
| | | | [ ] |
| | | | [ ] |
| | | | [ ] |

If more than six dependents, see page 19.

No. of boxes checked on 6a and 6b: 1
No. of your children on 6c who:
• lived with you: 2
• did not live with you due to divorce or separation (see page 18): 0
Dependents on 6c not entered above: 0
Add numbers entered on lines above ▶: 3

d Total number of exemptions claimed

## Income

Attach Copy B of your Forms W-2, W-2G, and 1099-R here.

If you did not get a W-2, see page 20.

Enclose, but do not staple, any payment. Also, please use Form 1040-V.

| | | |
|---|---|---|
| 7 | Wages, salaries, tips, etc. Attach Form(s) W-2 | 7  16,260 00 |
| 8a | Taxable interest. Attach Schedule B if required | 8a  0 |
| b | Tax-exempt interest. DO NOT include on line 8a . 8b  0 | |
| 9 | Ordinary dividends. Attach Schedule B if required | 9  0 |
| 10 | Taxable refunds, credits, or offsets of state and local income taxes (see page 21) | 10  0 |
| 11 | Alimony received | 11  0 |
| 12 | Business income or (loss). Attach Schedule C or C-EZ | 12  0 |
| 13 | Capital gain or (loss). Attach Schedule D | 13  0 |
| 14 | Other gains or (losses). Attach Form 4797 | 14  0 |
| 15a | Total IRA distributions . 15a  0  b Taxable amount (see page 22) | 15b  0 |
| 16a | Total pensions and annuities  16a  0  b Taxable amount (see page 22) | 16b  0 |
| 17 | Rental real estate, royalties, partnerships, S corporations, trusts, etc. Attach Schedule E | 17  0 |
| 18 | Farm income or (loss). Attach Schedule F | 18  0 |
| 19 | Unemployment compensation | 19  1,971 00 |
| 20a | Social security benefits  20a  0  b Taxable amount (see page 24) | 20b  0 |
| 21 | Other income. List type and amount—see page 24 | 21 |
| 22 | Add the amounts in the far right column for lines 7 through 21. This is your **total income** ▶ | 22  18,231 00 |

## Adjusted Gross Income

If line 33 is under $30,095 (under $10,030 if a child did not live with you), see EIC inst. on page 36.

| | | |
|---|---|---|
| 23 | IRA deduction (see page 25) | 23  0 |
| 24 | Student loan interest deduction (see page 27) | 24  0 |
| 25 | Medical savings account deduction. Attach Form 8853 | 25  0 |
| 26 | Moving expenses. Attach Form 3903 | 26  0 |
| 27 | One-half of self-employment tax. Attach Schedule SE | 27  0 |
| 28 | Self-employed health insurance deduction (see page 28) | 28  0 |
| 29 | Keogh and self-employed SEP and SIMPLE plans | 29  0 |
| 30 | Penalty on early withdrawal of savings | 30  0 |
| 31a | Alimony paid  b Recipient's SSN ▶ | 31a  0 |
| 32 | Add lines 23 through 31a | 32  0 |
| 33 | Subtract line 32 from line 22. This is your **adjusted gross income** ▶ | 33  18,231 00 |

For Disclosure, Privacy Act, and Paperwork Reduction Act Notice, see page 51.     Cat. No. 11320B     Form **1040** (1998)

DEFENDANT'S EXHIBIT 18
RZ 11/8/00

0195

Form 1040 (1996)                                                                                     Page 2

| | | | | |
|---|---|---|---|---|
| **Tax and Credits** | 34 | Amount from line 33 (adjusted gross income) . . . . . . . . | 34 | 18,231 00 |
| | 35a | Check if: ☐ You were 65 or older, ☐ Blind; ☐ Spouse was 65 or older, ☐ Blind. Add the number of boxes checked above and enter the total here . . . . ▶ 35a | | |
| | b | If you are married filing separately and your spouse itemizes deductions or you were a dual-status alien, see page 29 and check here . . . . . . ▶ 35b ☐ | | |
| **Standard Deduction for Most People** | 36 | Enter the **larger** of your **itemized deductions** from Schedule A, line 28, **OR standard deduction** shown on the left. But see page 30 to find your standard deduction if you checked any box on line 35a or 35b or if someone can claim you as a dependent . . . | 36 | 8,295 00 |
| **Single:** $4,250 | 37 | Subtract line 36 from line 34 . . . . . . . . . . . . . | 37 | 9,936 00 |
| **Head of household:** $6,250 | 38 | If line 34 is $93,400 or less, multiply $2,700 by the total number of exemptions claimed on line 6d. If line 34 is over $93,400, see the worksheet on page 30 for the amount to enter . | 38 | 8,100 00 |
| **Married filing jointly or Qualifying widow(er):** $7,100 | 39 | **Taxable income.** Subtract line 38 from line 37. If line 38 is more than line 37, enter -0- . | 39 | 1,836 00 |
| | 40 | **Tax.** See page 30. Check if any tax from a ☐ Form(s) 8814   b ☐ Form 4972 . ▶ | 40 | 276 00 |
| **Married filing separately:** $3,550 | 41 | Credit for child and dependent care expenses. Attach Form 2441 | 41 | ∅ |
| | 42 | Credit for the elderly or the disabled. Attach Schedule R . . . | 42 | ∅ |
| | 43 | Child tax credit (see page 31) . . . . . . . . . . . | 43 | 276 00 |
| | 44 | Education credits. Attach Form 8863 . . . . . . . . | 44 | ∅ |
| | 45 | Adoption credit. Attach Form 8839 . . . . . . . . | 45 | ∅ |
| | 46 | Foreign tax credit. Attach Form 1116 if required . . . . | 46 | |
| | 47 | Other. Check if from  a ☐ Form 3800   b ☐ Form 8396 c ☐ Form 8801   d ☐ Form (specify) _____ | 47 | ∅ |
| | 48 | Add lines 41 through 47. These are your **total credits** . . . . . . . . | 48 | 276 00 |
| | 49 | Subtract line 48 from line 40. If line 48 is more than line 40, enter -0- . . . . ▶ | 49 | ∅ |
| **Other Taxes** | 50 | Self-employment tax. Attach Schedule SE . . . . . . . . . . | 50 | ∅ |
| | 51 | Alternative minimum tax. Attach Form 6251 . . . . . . . . . | 51 | ∅ |
| | 52 | Social security and Medicare tax on tip income not reported to employer. Attach Form 4137 | 52 | ∅ |
| | 53 | Tax on IRAs, other retirement plans, and MSAs. Attach Form 5329 if required . . . | 53 | ∅ |
| | 54 | Advance earned income credit payments from Form(s) W-2 . . . . . . . | 54 | ∅ |
| | 55 | Household employment taxes. Attach Schedule H . . . . . . . . | 55 | ∅ |
| | 56 | Add lines 49 through 55. This is your **total tax** . . . . . . . . . . ▶ | 56 | ∅ |
| **Payments** | 57 | Federal income tax withheld from Forms W-2 and 1099 . . | 57 | 2,169 00 |
| | 58 | 1998 estimated tax payments and amount applied from 1997 return . | 58 | ∅ |
| **Attach Forms W-2 and W-2G on the front. Also attach Form 1099-R if tax was withheld.** | 59a | **Earned income credit.** Attach Schedule EIC if you have a qualifying child b Nontaxable earned income: amount ▶ ⌊ 154 00 ⌋ and type ▶ _____ | 59a | 2,879 00 |
| | 60 | Additional child tax credit. Attach Form 8812 . . . . | 60 | ∅ |
| | 61 | Amount paid with Form 4868 (request for extension) . . | 61 | ∅ |
| | 62 | Excess social security and RRTA tax withheld (see page 43) | 62 | ∅ |
| | 63 | Other payments. Check if from  a ☐ Form 2439 b ☐ Form 4136 | 63 | |
| | 64 | Add lines 57, 58, 59a, and 60 through 63. These are your **total payments** . . . . ▶ | 64 | 5,048 00 |
| **Refund** | 65 | If line 64 is more than line 56, subtract line 56 from line 64. This is the amount you **OVERPAID** ▶ | 65 | 5,048 00 |
| **Have it directly deposited! See page 44 and fill in 65b, 65c, and 65d.** | 65a | Amount of line 65 you want **REFUNDED TO YOU.** . . . . . . . . . ▶ | 65a | 5,048 00 |
| | ▶ b | Routing number ☐☐☐☐☐☐☐☐☐ ▶ c Type: ☐ Checking ☐ Savings | | |
| | ▶ d | Account number ☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐ | | |
| | 66 | Amount of line 65 you want **APPLIED TO YOUR 1998 ESTIMATED TAX** ▶ | 66 | |
| **Amount You Owe** | 68 | If line 56 is more than line 64, subtract line 64 from line 56. This is the **AMOUNT YOU OWE.** For details on how to pay, see page 44 . . . . . . . . . . ▶ | 68 | |
| | 69 | Estimated tax penalty. Also include on line 68 . . . . . | 69 | |

| **Sign Here** | Under penalties of perjury, I declare that I have examined this return and accompanying schedules and statements, and to the best of my knowledge and belief, they are true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge. | | | |
|---|---|---|---|---|
| **Joint return?** See page 18. | Your signature | Date | Your occupation | **Daytime telephone number** (optional) |
| **Keep a copy for your records.** | Spouse's signature. If a joint return, BOTH must sign. | Date | Spouse's occupation | ( ) |

| **Paid Preparer's Use Only** | Preparer's signature ▶ | | Date | Check if self-employed ☐ | Preparer's social security no. |
|---|---|---|---|---|---|
| | Firm's name (or yours if self-employed) and address ▶ | | | EIN | |
| | | | | ZIP code | |

✱ *Printed on recycled paper*

0196

# SCHOOL BOARD OF BROWARD COUNTY
### 600 SE 3rd Avenue, Ft. Lauderdale, FL 33301

## REQUIREMENTS FOR SUBSTITUTE TEACHERS

*These requirements are subject to change without notice.*

☐ A completed application for an instructional position, application for a substitute teaching certificate, and security check.

☐ **Official** transcripts from an accredited college in the United States showing at least 60 semester hours of college credit. You must provide an evaluation or validation for degrees earned outside of the United States.

☐ References according to one of the following categories:

- **RECENT EDUCATION GRADUATE WITH STUDENT TEACHING & NO TEACHING EXPERIENCE**
  Minimum of three references. References may be from your college placement file or on our educational reference forms. References **must** include the following:
    - Cooperating/Directing Teacher/s
    - College Supervisor/s
    - If not currently employed, references from professional educators who can assess your ability as a teacher.
    - If graduated over a year ago, you must have a reference from your employer for any full-time or part-time work.

- **EXPERIENCED TEACHER**
  References may be on our educational reference forms or the locations letterhead. Minimum of three references to include
    - You must bring a reference from your last principal. If you are not presently employed as a teacher, you must also include a reference from your current supervisor.
      NOTE: Clearance is probationary, until your last principal reference has been verified by the Instructional Staffing Department.
    - Additional references may be from current and previous administrators, assistant principals, county level supervisors, department heads, community/school volunteer workers, college professors.

- **PROFESSIONAL EMPLOYMENT WITH NO TEACHING EXPERIENCE**
  Must provide a minimum of three references on company letterhead or on our professional reference forms.
    - Must include a reference from your most recent employer.
    - Self employment, experience in a family owned business, or experience at a firm no longer in business requires
      1) A letter from you explaining type of business and
      2) Must be verified by an individual knowledgeable of your employment and the trade itself.
      3) Include any applicable licenses.
    - Additional references may be from current and previous supervisors, college professors, volunteer/community organizations.

☐ $50 money order or cashier's check made payable to School Board of Broward County for fingerprinting.

☐ A copy of your valid State of Florida or Broward County Certificate. (A Statement of Eligibility is not acceptable.) If you **do not** have a valid certificate, you will need to complete a *Request for a Substitute Teaching Certificate* and bring a **seperate** $54 money order or cashier's check made payable to the School Board of Broward County.
  **If you need to pay both fees, the money orders can not be combined.**

DEFENDANT'S EXHIBIT 19  RK 11/8/00

0267

☐ A picture ID (i.e., driver's license, state ID, passport, etc.) and your social security card with current name:

## PROCEDURES FOR CLEARANCE AS A SUBSTITUTE TEACHER

Bring **all** requirements listed *in person* to the K.C. Wright Administration Center (School Board Building) to be processed. If you do not bring all the requirements you will not be processed. Substitute teachers are processed **Monday through Friday 9:00 a.m. - 12:30 and 1:30 p.m. - 3:00 p.m.**

You must attend one of the Substitute Clearance Workshops. You will be given a workshop schedule when you come to the Employment Center for processing. At the conclusion of the workshop, you will be cleared to substitute teach. (Workshops are available every other week.)

**Failure** to attend one of the clearance workshops, will result in your application and fingerprints becoming **inactive.** If your application is inactive for a school year, you will have to reapply and again submit the appropriate fees for substitute teaching.

*When you apply* to substitute teach, be sure you are available during this school year to work; if you do not substitute teach this school year, your application will be destroyed and you will have to reapply and again submit the appropriate fees.

**You cannot substitute teach if you currently hold a full-time position with the School Board of Broward County.**

\* You may apply for a **Continuing Broward Substitute Teacher Certificate:**
- if you hold an expiring Broward or State certificate **AND**
- currently on the substitute teacher list or have been inactive for less than one year

The renewal fee is **$10 dollars.** Please submit a money order or cashier's check made payable to the School Board of Broward County.

## DIRECTIONS TO THE K.C. WRIGHT ADMINISTRATION CENTER

The Employment Center is located on the first floor of the K.C. Wright Administration Building, (School Board Building) 600 SE 3rd Avenue, Ft. Lauderdale.

Directions from I-95:    Exit Broward Blvd. and go East
Go to SE 3rd Avenue, and go South.
The building is on the east side. It is a 14-story, all glass building diagonally across from the Broward County Courthouse. Parking is available for a fee south of the building and meter parking is available in the county public garage north of the building.

4/16/98tb.



**DEFENDANT'S EXHIBIT**
2D
11/8/00

IN THE CIRCUIT COURT OF THE 17th
JUDICIAL CIRCUIT, IN AND FOR
BROWARD COUNTY, FLORIDA

CASE NO. 99-3785-CACE-07

GENERAL JURISDICTION DIVISION

CHERL SEARS,
        Plaintiff,

vs.

THE SCHOOL BOARD OF
BROWARD COUNTY,
        Defendant.
                       /

## SECOND AMENDED COMPLAINT

        Plaintiff, Cherl Sears, by her undersigned counsel, hereby files this Second Amended Complaint, against the Defendant, the School Board of Broward County, and she alleges as follows:

1.     This is an action for damages in excess of $15,000, exclusive of interest and costs

        and therefore, this action is within the jurisdiction of this Court.

2.     This Court has jurisdiction to resolve constitutional questions, relating to due

        process claims, pursuant to Article I, Section 9 of the Florida Constitution and the

        Due Process Clause under the Fourteenth Amendment of the United States

        Constitution, and in addition, this Court has jurisdiction to resolve equal

        protection claims, pursuant to the Equal Protection Clause of the Fourteenth

        Amendment to the United States Constitution.

3.   The Plaintiff, Cherl Sears (hereinafter, referred to as, "Sears"), at all material
     times herein, was an employee of the Defendant, the School Board of Broward
     County, at schools administered by the Defendant, located in Broward County,
     Florida.

4.   The Defendant, the School Board of Broward County (hereinafter, referred to as,
     the "School Board," or as, the "Employer"), operates and is in existence, pursuant
     to Chapter 230 of the Florida Statutes, and it is responsible for the administration
     of the public school system, in Broward County, Florida.

5.   Sears had been employed as a substitute teacher, for the Defendant School Board,
     beginning in 1992, and her employment status remained unchanged with the
     Defendant, until October of 1996.

6.   From October of 1996, through February of 1998, Sears had been employed as a
     "pool substitute" teacher for the Defendant School Board.

7.   However, in March of 1998, and continuing until October 5, 1998, Sears was
     employed as an "interim substitute" teacher, in the exceptional student education
     program, by the Defendant School Board.

8.   The Plaintiff currently possesses a proper teaching certification, in that she holds
     a two-year temporary permit, which enables her to teach social science subjects, ·
     in the public school systems, within the State of Florida.

9.   During the beginning of the 1998-1999 school term, the Plaintiff was offered the
     opportunity, by the Defendant, to be hired as a permanent full-time teacher,

2

providing instruction in a social science curriculum, in public schools administered by the Defendant Employer, in Broward County, Florida.

10. However, the Plaintiff's application for a permanent position was rejected by the Defendant Employer; solely due to her arrest in 1995, and the arrest was based upon allegations of narcotics possession.

11. The arrest did not result in a conviction; and in fact, the charges against the Plaintiff were subsequently dismissed, due to her successful completion of a court administered pre-trial intervention program.

12. Not only was the Plaintiff's application for a permanent position rejected by the School Board, the Defendant also prohibited Sears from reassuming any substitute teacher assignments, based solely upon the 1995 arrest.

13. Immediately after the rejection of the Plaintiff's application for a full-time permanent position with the School Board, representatives and / or employees of the Defendant told Sears to reapply for a permanent full-time teacher position, for the following school year.

## COUNT I

14. The Plaintiff restates and reavers the allegations contained in paragraphs 1 through 13 of the Second Amended Complaint, as if fully set forth herein.

15. Within the context of public employment, an employee may establish entitlement to procedural due process under the Florida and United States Constitutions, by showing the existence of a property interest in his or her position.

3

16.   The concept of a property interest in public employment has been defined as a legitimate interest in continued employment.

17.   Legitimate interests or expectations of continued public employment establishing property interests, are created and defined by rules operating and found under applicable state law.

18.   Fla. Stat. Section 231.1725 (e)(2), entitled, "Employment of Substitute Teachers, Teachers of Adult Education and Non-Degreed Teachers of Career Education; Students Performing Clinical Field Experience," states as follows:

      Substitute, adult education, and non-degreed career education teachers who are employed pursuant to this section shall have the same rights and protections of laws as certified teachers.

19.   Fla. Stat. Section 231.36 (f) contains numerous procedural protections, applicable to full-time instructional staff, and upon the authority of Fla. Stat. Section 231.1725 (e)(2), such procedural protections are also applicable to the Plaintiff, as a substitute teacher, and this is the independent source of her reasonable expectation of continued employment.

20.   The Plaintiff has been denied the enjoyment of a property interest, her prior position with the School Board, because the Defendant has refused to reinstate her; and it has barred her from undertaking further employment within its organization, as an instructional staff member.

21.   The School Board has failed and or refused to provide procedural due process for the Plaintiff, prior to implementing its termination decision.

4

16.  The concept of a property interest in public employment has been defined as a legitimate interest in continued employment.

17.  Legitimate interests or expectations of continued public employment establishing property interests, are created and defined by rules operating and found under applicable state law.

18.  Fla. Stat. Section 231.1725 (e)(2), entitled, "Employment of Substitute Teachers, Teachers of Adult Education and Non-Degreed Teachers of Career Education; Students Performing Clinical Field Experience," states as follows:

     Substitute, adult education, and non-degreed career education teachers who are employed pursuant to this section shall have the same rights and protections of laws as certified teachers.

19.  Fla. Stat. Section 231.36 (f) contains numerous procedural protections, applicable to full-time instructional staff, and upon the authority of Fla. Stat. Section 231.1725 (e)(2), such procedural protections are also applicable to the Plaintiff, as a substitute teacher, and this is the independent source of her reasonable expectation of continued employment.

20.  The Plaintiff has been denied the enjoyment of a property interest, her prior position with the School Board, because the Defendant has refused to reinstate her; and it has barred her from undertaking further employment within its organization, as an instructional staff member.

21.  The School Board has failed and or refused to provide procedural due process for the Plaintiff, prior to implementing its termination decision.

4

22.    The failure and or refusal of the School Board to provide the Plaintiff with any

        process or hearing prior to her termination, constituted a denial of due process

        under Article I, Section 9 of the Florida Constitution and under the Due Process

        Clause of the Fourteenth Amendment to the United States Constitution.

23.    As a direct result of her dismissal from continued employment with the

        Defendant, the Plaintiff has suffered public embarrassment, humiliation, great

        mental pain, great monetary loss, the loss of her ability to work in her chosen

        profession and the loss of her capability to fully function as a member of her

        community.

                    WHEREFORE, the Plaintiff, Cherl Sears, requests the application
                of injunctive relief, enjoining the Defendant, the Broward County School
                Board, from continuing to violate her fundamental rights under the Due
                Process Clause of the Florida and United States Constitutions, and further,
                the Plaintiff seeks continued employment as a substitute teacher, along
                with her seniority rights and all benefits associated with that position,
                together with the opportunity to be properly considered for full-time
                teaching positions; and in addition, the Plaintiff requests the following
                relief: lost wages and benefits associated with a full time position, as well
                as reasonable attorney's fees, costs, interest and any and all further relief,
                deemed to be just and proper by this Court.

                                            COUNT II

24.    The Plaintiff restates and reavers the allegations contained in paragraphs 1

        through 13 of the Second Amended Complaint, as if fully set forth herein.

25. The Plaintiff was discharged from her employment with the School Board because criminal allegations had been made against her; however, those allegations were subsequently dismissed.

26. The School Board apparently has a *de facto* rule and / or practice, whereby employees, merely charged with criminal offenses, without convictions, can be dismissed from their employment.

27. The School Board's apparent de *facto* rule and / or practice, whereby employees, merely charged with criminal offenses, without convictions, creates two distinct classes of employees, those employees who have been merely charged with criminal offenses and those employees who have not been charged.

28. The School Board's *de facto* rule and / or practice, whereby employees, merely charged with criminal offenses, without convictions, can be dismissed from their employment, is not a rational means of advancing a legitimate state interest.

29. A rule or regulation not reasonably related to a valid government interest may not stand in the face of a due process attack.

30. A general classification of excluding employees from continued employment, is too broad, to be called "reasonable," when it leads to the automatic dismissal of numerous employees from public employment.

31. A *de facto* rule and or practice, which bars an entire class of persons from continued public employment, without any consideration of the merits of each individual case, is irrational and hence, it violates basic and fundamental due

6

process principles, as enumerated under Article I, Section 9 of the Florida

Constitution and under the Due Process Clause of the Fourteenth Amendment to

the United States Constitution.

32.    As a direct result of her dismissal from continued employment with the

Defendant, the Plaintiff has suffered public embarrassment, humiliation, great

mental pain, great monetary loss, the loss of her ability to work in her chosen

profession and the loss of her capability to fully function as a member of her

community.

> WHEREFORE, the Plaintiff, Cherl Sears, requests the application
> of injunctive relief, enjoining the Defendant, the Broward County School
> Board, from continuing to violate her fundamental rights under the Due
> Process Clauses of the Florida and United States Constitutions, and
> further, the Plaintiff seeks continued employment as a substitute teacher,
> along with her seniority rights and all benefits associated with that
> position, together with the opportunity to be properly considered for full-
> time teaching positions; and in addition, the Plaintiff requests the
> following relief: lost wages and benefits associated with a full time
> position, as well as reasonable attorney's fees, costs, interest and any and
> all further relief, deemed to be just and proper by this Court.

## COUNT III

33.    The Plaintiff restates and reavers the allegations contained in paragraphs 1

through 13 of the Second Amended Complaint, as if fully set forth herein.

34.    The Plaintiff was discharged from her employment with the School Board

because criminal allegations had been made against her; however, those

allegations were subsequently dismissed.

35.    The School Board apparently has a *de facto* rule and / or practice, whereby
       employees, merely charged with criminal offenses, without convictions, can be
       dismissed from their employment.

36.    The School Board's apparent de *facto* rule and / or practice, whereby employees,
       merely charged with criminal offenses, without convictions, creates two distinct
       classes of employees, those employees who have been merely charged with
       criminal offenses and those employees who have not been charged.

37.    The School Board's *de facto* rule and / or practice, whereby these two distinct
       classes of employees are created, violates the Equal Protection Clause of the
       Fourteenth Amendment to the United States Constitution.

38.    A rule or regulation which serves no rational purpose, or which arbitrarily divides
       citizens into different classes and treats them differently violates the Equal
       Protection Clause of the Fourteenth Amendment to the United States Constitution.

39.    A general classification of excluding employees from continued employment, is
       too broad, and thus arbitrary, when it leads to the automatic dismissal of
       numerous employees from public employment.

40.    A *de facto* rule and / or practice, which bars an entire class of persons from
       continued public employment, without any consideration of the merits of each
       individual case, is arbitrary, serves no valid governmental purpose and hence, it
       violates the Equal Protection Clause of the Fourteenth Amendment to the United
       States Constitution.

8

41.    As a direct result of her dismissal from continued employment with the

Defendant, the Plaintiff has suffered public embarrassment, humiliation, great

mental pain, great monetary loss, the loss of her ability to work in her chosen

profession and the loss of her capability to fully function as a member of her

community.

> **WHEREFORE**, the Plaintiff, Cherl Sears, requests the application
> of injunctive relief, enjoining the Defendant, the Broward County School
> Board, from continuing to violate her fundamental rights under the Equal
> Protection Clause of the Fourteenth Amendment to the United States
> Constitution, and further, the Plaintiff seeks continued employment as a
> substitute teacher, along with her seniority rights and all benefits
> associated with that position, together with the opportunity to be properly
> considered for full-time teaching positions; and in addition, the Plaintiff
> requests the following relief: lost wages and benefits associated with a full
> time position, as well as reasonable attorney's fees, costs, interest and any
> and all further relief, deemed to be just and proper by this Court.

## COUNT IV

42.    The Plaintiff restates and reavers the allegations contained in paragraphs 1

through 13 of the Second Amended Complaint, as if fully set forth herein.

43.    The Plaintiff was barred from future full-time employment with the School Board

because criminal allegations had been made against her; however, those

allegations were subsequently dismissed.

44.    The School Board apparently has a *de facto* rule and / or practice, whereby

employees, merely charged with criminal offenses, without convictions, can be

excluded from future full-time employment.

45.    The School Board's apparent de *facto* rule and / or practice, whereby employees, merely charged with criminal offenses, without convictions, creates two distinct classes of employees, those employees who have been merely charged with criminal offenses and those employees who have not been charged.

46.    The School Board's *de facto* rule and / or practice, whereby employees, merely charged with criminal offenses, without convictions, can be excluded from future full-time employment, is not a rational means of advancing a legitimate state interest.

47.    A rule or regulation not reasonably related to a valid government interest may not stand in the face of a due process attack.

48.    A general classification of excluding employees from future full-time employment, is too broad, to be called "reasonable," when it leads to the automatic exclusion of numerous employees from public employment.

49.    A *de facto* rule and or practice, which bars an entire class of persons from future full-time public employment, without any consideration of the merits of each individual case, is irrational and hence, it violates basic and fundamental due process principles, as enumerated under Article I, Section 9 of the Florida Constitution and under the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

50.    As a direct result of being barred from future full-time employment with the Defendant, the Plaintiff has suffered public embarrassment, humiliation, great

mental pain, great monetary loss, the loss of her ability to work in her chosen

profession and the loss of her capability to fully function as a member of her

community.

> **WHEREFORE**, the Plaintiff, Cherl Sears, requests the application
> of injunctive relief, enjoining the Defendant, the Broward County School
> Board, from continuing to violate her fundamental rights under the Due
> Process Clauses of the Florida and United States Constitutions, and
> further, the Plaintiff seeks the opportunity to be properly considered for
> full-time teaching positions; and in addition, the Plaintiff requests the
> following relief: lost wages and benefits associated with a full-time
> position, as well as reasonable attorney's fees, costs, interest and any and
> all further relief, deemed to be just and proper by this Court.

## COUNT V

51.   The Plaintiff restates and reavers the allegations contained in paragraphs 1

through 13 of the Complaint, as if fully set forth herein.

52.   The Plaintiff was barred from future full-time employment with the School Board

because criminal allegations had been made against her; however, those

allegations were subsequently dismissed.

53.   The School Board apparently has a *de facto* rule and / or practice, whereby

employees, merely charged with criminal offenses, without convictions, can be

excluded from future full-time employment.

54.   The School Board's apparent de *facto* rule and / or practice, whereby employees,

merely charged with criminal offenses, without convictions, creates two distinct

11

classes of employees, those employees who have been merely charged with
criminal offenses and those employees who have not been charged.

55. The School Board's *de facto* rule and / or practice, whereby these two distinct
classes of employees are created, violates the Equal Protection Clause of the
Fourteenth Amendment to the United States Constitution.

56. A rule or regulation which serves no rational purpose, or which arbitrarily divides
citizens into different classes and treats them differently, violates the Equal
Protection Clause of the Fourteenth Amendment to the United States Constitution.

57. A general classification of excluding employees from full-time employment is too
broad, and thus arbitrary, when it leads to the automatic exclusion of numerous
employees from public employment.

58. A *de facto* rule and / or practice, which bars an entire class of persons from future
full-time public employment, without any consideration of the merits of each
individual case, is arbitrary, it serves no valid governmental purpose and hence, it
violates the Equal Protection Clause of the Fourteenth Amendment to the United
States Constitution.

59. As a direct result of being barred from future full-time employment with the
Defendant, the Plaintiff has suffered public embarrassment, humiliation, great ·
mental pain, great monetary loss, the loss of her ability to work in her chosen
profession and the loss of her capability to fully function as a member of her
community.

        **WHEREFORE**, the Plaintiff, Cherl Sears, requests the application
of injunctive relief, enjoining the Defendant, the Broward County School
Board, from continuing to violate her fundamental rights under the Equal
Protection Clause of the Fourteenth Amendment to the United States
Constitution, and further, the Plaintiff seeks the opportunity to be properly
considered for full-time teaching positions; and in addition, the Plaintiff
requests the following relief: lost wages and benefits associated with a full
time position, as well as reasonable attorney's fees, costs, interest and any
and all further relief, deemed to be just and proper by this Court.

                            Respectfully submitted,

                            Mark J. Berkowitz, P.A.
                            524 S. Andrews Avenue
                            Suite 200N
                            Ft. Lauderdale, Florida 33301
                            (954) 527-0570 Telephone
                            (954) 463-5428 Telecopier
                            Fla. Bar No. 369391

                            By: Mark J. Berkowitz

## CERTIFICATE OF SERVICE

        I hereby certify that a true and correct copy of the foregoing was sent by regular
mail on this 7th day of December, 1999, to Gordon Rogers, Esq. and John Walker, Esq.,
Muller, Mintz, et al., 200 S. Biscayne Blvd., Suite 3600, Miami, Florida 33131.

                            Mark J. Berkowitz

13

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FT. LAUDERDALE DIVISION

CHERL SEARS,
        Plaintiff,        CASE NO. 00-6017-CIV-DIMITRIOULEAS

vs.

THE SCHOOL BOARD OF
BROWARD COUNTY,
FLORIDA,
        Defendant.
                  /

## PLAINTIFF'S NOTICE OF FILING OF ANSWERS TO INTERROGATORIES

Plaintiff, Cherl Sears, by her undersigned counsel and pursuant to Rule 33 of the Federal Rules of Civil Procedure, hereby files this Notice of Filing of Answers To Interrogatories.

Respectfully submitted,

Mark J. Berkowitz, P.A.
524 S. Andrews Avenue
Suite 200N
Ft. Lauderdale, Florida 33301
(954) 527-0570 Telephone
(954) 463-5428 Telecopier
E-Mail: mjb2157@aol.com.
Fla. Bar No. 369391

By: Mark J. Berkowitz

**DEFENDANT'S EXHIBIT**
RL   11/8/00

### CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was sent by facsimile on this 29ᵗʰ day of June, 2000, to Debra Lubkin, Esq., Muller, Mintz, et al., 200 S. Biscayne Blvd., Suite 3600, Miami, Florida 33131.

Mark J. Berkowitz

## Plaintiff's Answers To Defendant's First Set of Interrogatories

1.    Please provide the name, address, telephone number, place of employment
and job title of any person who has, claims to have or whom you believe may have
knowledge or information pertaining to any fact alleged in the pleadings (as defined
in Rule 7(a) of the Federal Rules of Civil Procedure) filed in this action, or any fact
underlying the subject matter of this action.

Ms. Rebecca Dahl, Principal
Lauderhill Middle School
Lauderhill, Florida

Ms. Gracie Diaz
Personnel Department
School Board of Broward County
Ft. Lauderdale, Florida

Limares Cooper, Office Staff
Lauderhill Middle School

Mr. Lockhart
Lauderhill Middle School

Ms. Cameron
Lauderhill Middle School

2.    Please state the specific nature of the knowledge that you believe the
person(s) identified in your response to Interrogatory No.1 may have.

Ms. Dahl has knowledge of the nature of the Plaintiff's work as an instructor. In
addition, Ms. Dahl encouraged the Plaintiff to apply for a full time teaching position.

Ms. Diaz has knowledge of the specific job requirements for various teaching
positions in the Broward County School District. The Plaintiff had conversations with
Ms. Diaz regarding the mandated requirements for both full-time and part-time teaching
positions.

Limares Cooper has knowledge of the duties which the Plaintiff performed at the
Lauderhill Middle School. Both Mr. Lockhart and Ms. Cameron were teachers in the
Lauderhill Middle School exceptional student program. Ms. Cameron was on the same
"teaching team," as the Plaintiff. Both Ms. Cameron and Mr. Lockhart have knowledge of
the quality of the work performed by the Plaintiff, as a teacher at the Lauderhill Middle
School.

3.    Please provide the name of each person whom you may use as an expert
witness at trial.

Defendant's Employee Handbook For Instructional Personnel, Defendant's Personnel and Work Rules, Plaintiff's Job Performance Record and State Certification Rules For Full-Time Instructional Positions.

## VERIFICATION

I, CHERL SEARS, being first duly sworn in accordance with the law, do hereby depose and state that I have read the answers to Defendant's First Set of Rule 26.1G Interrogatories and that the answers are true and correct to the best of my knowledge and information.

Cherl Sears

_____
CHERL SEARS

STATE OF FLORIDA

COUNTY OF BROWARD

The foregoing instrument was executed before me on this 27 day of May, June 2000, by Cherl Sears, who is personally known by me [or who has produced FL OR LIC as identification] and who took an oath.
5620-104-667723-0

Lisa M. Ellis
_____
Notary Public

LISA M. ELLIS
_____
Type or Print Name of Notary

My Commission Expires:   –



LISA M. ELLIS
MY COMMISSION # CC 755586
EXPIRES: June 29, 2002
Bonded Thru Notary Public Underwriters

3

## Mark J. Berkowitz, P.A.

# Fax

| **To:** | Debra Lubkin, Esq., Muller, Mintz, et al. | **From:** | Mark Berkowitz |
| --- | --- | --- | --- |
| **Fax:** | (305) 379-3802 | **Date:** | June 29, 2000 |
| **Phone:** | (305) 358-5500 | **Pages:** | 8 |
| **Re:** | Sears v. Broward School Board | **CC:** | |

| [Urgent | X For Review | [Please Comment | [Please Reply | [Please Recycle |

•**Comments:** Please see the attached discovery responses. I expect to receive the documents from Ms. Sears on 6/30/2000.

```
 1                    UNITED STATES DISTRICT COURT
                      SOUTHERN DISTRICT OF FLORIDA
 2                       FORT LAUDERDALE DIVISION
                     CASE NO. 00-6017-CIV-DIMITRIOULEAS
 3

 4
        CHERL SEARS,
 5
                        Plaintiff,
 6
        vs.                                    COPY
 7
        THE SCHOOL BOARD OF BROWARD
 8      COUNTY, FLORIDA,

 9                      Defendant.
        _ _ _ _ _ _ _ _ _ _ _ _ _ _ /
10

11                             Suite 200N
                               Law Office of Mark J. Berkowitz
12                             524 South Andrews Avenue
                               Fort Lauderdale, Florida 33301
13                             Tuesday, November 21, 2000
                               9:00 - 10:02 a.m.
14

15      -------------------------------------------------

                               DEPOSITION
16
                                  OF
17
                             GRACIE DIAZ
18      -------------------------------------------------

19

20
        APPEARANCES:
21

22           MULLER, MINTZ, ET AL.,
             GORDON ROGERS, ESQUIRE,
23           Appearing on behalf of the Plaintiff.

24
             MARK J. BERKOWITZ, P.A.
25           MARK J. BERKOWITZ, ESQUIRE,
             Appearing on behalf of the Defendant.
```

2

```
 1                          -    -    -

 2                        I  N  D  E  X

 3                          -    -    -

 4      EXHIBITS:                         PAGE
```

```
 5      Plaintiff's Exhibit 1               9
        Plaintiff's Exhibit 2              14
 6      Plaintiff's Exhibit 3              15
        Plaintiff's Exhibit 4              16
 7      Plaintiff's Exhibit 5              18
        Plaintiff's Exhibit 6              23
 8      Plaintiff's Exhibit 7              38
```

```
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                P R O C E E D I N G S
 2                      -    -    -
 3      Thereupon,
 4                     GRACIE DIAZ,
 5      being by the undersigned Notary Public first duly
 6      sworn, responded as follows:
 7                     THE WITNESS:  I do.
 8                     DIRECT EXAMINATION
 9      BY MR. BERKOWITZ:
10           Q.   Ma'am, please state your name for us
11      for the record.
12           A.   Gracie Diaz.
13           Q.   And how are you currently employed?
14           A.   I'm employed as director of
15      instructional staffing for the School Board of
16      Broward County.
17           Q.   How long have you held that position?
18           A.   Two years.
19           Q.   Ms. Diaz, my name is Mark Berkowitz.
20      I'm here on behalf of Cherl Sears, who has filed a
21      claim against Broward County in the Federal
22      District Court.  And I'm going to be asking you
23      some questions today regarding the process that
24      eventually resulted in her not being approved for
25      continued employment with the Broward County
```

```
1    School Board.  If there's any questions that you
2    don't understand, let me know.  I'll be happy to
3    repeat them.  If you want to take a break at any
4    time, just let me know.
5                What are your duties as the director of
6    instructional staffing for the school board?
7         A.    As director of instructional staffing I
8    oversee the recruitment and hiring process of all
9    new instructional staff.  I also chair the
10   security clearance committee that reviews security
11   cases for all employees or all applicants and
12   employees to the system.  Also, review the
13   security information for a certain group of
14   employees, instructional student teachers,
15   substitutes.  I am in charge of leaves, transfers,
16   teacher bonuses, substitutes.
17        Q.    How long have you been employed by the
18   school board in total?
19        A.    Since February of '87.
20        Q.    And what was the position you held
21   immediately prior to being director of
22   instructional staffing?
23        A.    Assistant director of instructional
24   staffing.
25        Q.    How long did you hold that position?
```

```
 1            A.    Two years.
 2            Q.    What kind of educational background do
 3      you have for that position?
 4            A.    It only requires a bachelor's degree.
 5      I have a bachelor's.  And I just need my practicum
 6      for my master's.
 7                  MR. ROGERS:  Why don't you spell
 8            that.
 9                  THE WITNESS:  P-r-a-c-t-i-c-u-m.
10                  MR. ROGERS:  Whenever you're saying
11            names, it would help her if you could spell
12            them so you don't have to do it at the
13            end.  Also, remember that you have to
14            answer audibly.  If you nod your head or
15            say uh-huh, she'll kick you.
16      BY MR. BERKOWITZ:
17            Q.    Where did you get your undergraduate
18      degree?
19            A.    Florida State.
20            Q.    And a major in what?
21            A.    In elementary education.  I started in
22      the system as a teacher.
23            Q.    Specifically, what is your role in the
24      security clearance committee?
25            A.    I chair the committee.  And I take any
```

1          cases that the committee should review in regards

2          to instructional employees, the substitutes, all

3          of the cases that I review.  There's a

4          noninstructional director who brings all the

5          noninstructional cases to the committee.  And,

6          basically, what we do is we share the information

7          that the applicant has provided based on the

8          offense, so the individual statement of the

9          offense, police reports, dispositions.

10              Q.    Did you review any records or documents

11         in preparation for your deposition today?

12              A.    Yes.

13              Q.    Do you recall what, specifically, you

14         reviewed?

15              A.    I reviewed all of the security

16         information that Ms. Sears provided, her statement

17         and police report disposition.  I reviewed our

18         security clearance procedures that you have in

19         front of you.  I reviewed her update application

20         that she sent in to apply to be considered as a

21         teacher applicant.  And I went through the copies

22         that you have -- what was presented to you, the

23         copies of all the documents for file..

24              Q.    How does the security clearance

25         committee make its decision with regard to a

```
 1    specific applicant before -- how does that work?
 2         A.    Each security member is given the name
 3    of the individual, the position that they are
 4    applying for, and then the offense, what was found
 5    in either the Docketrac system, the local Broward
 6    County system or what the individual admitted, and
 7    the date of the offense, the disposition of the
 8    offense.  And then, either the noninstructional
 9    director or I will share the individual's
10    statement, read the court disposition and the
11    police report to the individuals of the
12    committee.  And we discuss all of the information
13    that was shared.  And each person then votes
14    whether to approve the individual for employment
15    or deny.
16         Q.    Who are the members of the security
17    committee?
18              MR. ROGERS:  Objection.  Point in
19         time.
20    BY MR. BERKOWITZ:
21         Q.    Well, at the time that Ms. Sears was
22    denied employment, October of 1998.
23         A.    The names were provided, to tell you
24    offhand because the committee has changed a few
25    times; but they were provided in a document, in a
```

1    memo, that lists all of the individuals that were

2    on the committee at that time.

3         Q.   And their decision is made by a

4    majority vote?

5         A.   Yes.

6         Q.   Does members of the security committee,

7    are there any guidelines that they use in making

8    their determinations on specific cases?

9         A.   At the time that Ms. Sears' case was

10   reviewed, we did not have written guidelines.  The

11   committee used guidelines basically by practice,

12   past practice and comparing similar cases.  But as

13   far as written guidelines, no, at that time there

14   were not written guidelines.

15        Q.   Do you know what the practical

16   guidelines were at that point in time?

17        A.   They really do vary from case to case.

18   We certainly -- there's some general practices,

19   for example, if a felony was committed within the

20   last ten years, we would review the case.  And we

21   would look at the adjudication and look at all of

22   the mitigating factors in the case, review them on

23   an individual basis; yet, if we found that there

24   was reason to believe that the event occurred,

25   that person may not be employable.  Certainly a

1    sex offense, a drug offense, those cases --

2    everything is reviewed on a case-by-case basis.

3    But if there's reason to believe that there was

4    probable cause or that there was information that

5    substantiated that this occurred, that person may

6    be deemed nonemployable.  But we did review them

7    case by case.

8         Q.   When did the board of the security

9    committee adopt formal written guidelines?

10        A.   We formalized the guidelines, I believe

11   it was in December of 1999 based on a request from

12   our school board for BSO to come in and review our

13   security clearance process, the professional

14   standards committee process that reviews current

15   employee investigations.  And as a result of the

16   review, BSO had given us samples of other

17   district's written guidelines.  And we

18   incorporated those other district guidelines,

19   specifically Pinellas's, and created the ones that

20   you are looking at.

21             MR. BERKOWITZ:  Let me show you what

22        I would like to mark has Plaintiff's

23        Exhibit 1.

24             (Plaintiff's Exhibit 1 was marked for

25        identification.)

OFFICIAL REPORTING SERVICES, INC.
(954) 467-8204

```
 1    BY MR. BERKOWITZ:

 2         Q.   I'm showing you what we've marked as

 3    Plaintiff's Exhibit 1.  Are these the written

 4    guidelines that you referred to earlier?

 5         A.   Yes.

 6         Q.   Who at BSO assisted in the development

 7    of these guidelines; do you know?

 8         A.   I can't recall their names right now.

 9    There were three investigators that we worked

10    with.

11         Q.   Now, would it be fair to say that these

12    written guidelines codified or memorialized the

13    prior guidelines that you had before they became

14    written down?

15         A.   Yes.

16         Q.   If you look at Roman numeral number 4

17    where it says, Case By Case Review, where it says

18    DUI, is that an arrest or just a conviction, or

19    could it be both?

20         A.   It is -- if on the top it tells you

21    regardless of the adjudication, whether it was

22    guilty, no contest plea, the person entered in a

23    pretrial intervention, an adjudication withheld,

24    that's what it's referring to.  If it's a case

25    where someone is found not guilty, it's completely
```

```
 1      dismissed without the individual going through
 2      pretrial intervention or working out some kind of
 3      agreement with the courts, then that -- those
 4      cases are all -- those are the factors that we use
 5      in order to determine whether it's...
 6           Q.   Okay.  Now, in October of 1998 was
 7      there a policy by the security committee whereby
 8      applicants for instruction in the instructional
 9      staffing department would be denied employment
10      based upon a felony drug arrest?
11              MR. ROGERS:  Objection to form as to
12          the policy as a term of art.  You can go
13          ahead and answer the question.
14              THE WITNESS:  Was there a policy?
15          No.  It would be reviewed by the security
16          committee.  It wouldn't be automatic denial
17          of the employment.  The case would be
18          reviewed.  A drug offense can be many
19          different types of drugs or incidents.
20      BY MR. BERKOWITZ:
21           Q.   Well, look at number 2 where it says --
22      on Plaintiff's Exhibit Number 1, Felony Drug Use.
23      Do you see that?
24           A.   Yes.
25           Q.   And according to the written policy,
```

1    that's automatically will not hire; is that

2    correct?

3         A.    Yes.    But that was put in place as of

4    December 1999.    Prior to that, the cases were

5    taken -- every case was taken to security

6    *clearance committee and reviewed on a case-by-case*

7    *review.*

8         Q.    Now, specifically with respect to

9    Ms. Sears in October of '98 --

10        A.    Yes.

11        Q.    -- what was the process whereby she was

12   denied continued employment with the school board?

13        A.    She applied to be considered as a

14   full-time applicant.    She completed the security

15   clearance form where she indicated that she had

16   been arrested and entered into pretrial

17   intervention program.    Then the charges were

18   dismissed.    She provided the required police

19   report, disposition of the case.    All of that was

20   shared with the security committee.    And the

21   security committee, after reviewing all of the

22   documents, felt as though, based on her statement

23   which referred to a male friend, that she was in

24   the vehicle with a male friend, that she had lent

25   this friend her car, it did not coincide with the

OFFICIAL REPORTING SERVICES, INC.
(954) 467-8204

```
 1      police report that said this was more than a male
 2      friend.  This is someone she was living with.  And
 3      that she --
 4              In reviewing all of this information,
 5      the committee felt that she may have not been
 6      quite as forthcoming in her statement, that she
 7      should have been a little bit more specific as to
 8      what had occurred, and that it was a drug
 9      offense.
10          Q.   So you're saying that the committee was
11      concerned about an inconsistency regarding
12      Ms. Sears said the individual was a male friend
13      and the police report said that she was living
14      with the person?
15          A.   That was part of it, that the committee
16      was concerned she was not giving us the full
17      picture.  And also, she did not indicate the
18      amount of drugs in her statement that was found in
19      the vehicle.
20          Q.   Were there any other alleged
21      inconsistencies in the statements that the
22      committee examined or evaluated?
23          A.   Could I see the statement?
24          Q.   Sure.  Is this the same document?
25          A.   Yes, it is.
```

```
1                    MR. BERKOWITZ:  Let's mark this then
2           as Plaintiff's Exhibit 2.
3               (Plaintiff's Exhibit 2 was marked for
4           identification.)
5       BY MR. BERKOWITZ:
6               Q.   Looking at Plaintiff's Exhibit 2, which
7       is a statement signed by Ms. Sears on
8       September 16th of '98 --
9               A.   Yes.
10              Q.   -- what were the specific
11      representations that she made in her statement to
12      the board that caused the committee some concern?
13              A.   Specifically, she made it sound -- by
14      referring to this gentleman as a male friend of
15      mine, made it sound like it was a much more
16      informal type of relationship with the individual,
17      almost as though, I just lent my car to someone;
18      it's a casual friend; I had no idea what happened
19      to the car, that these drugs were in the car.
20                   The police report stated that this
21      person was a live-in boyfriend.  And we later also
22      noticed that she had the same name of the
23      individual that was identified in the police
24      report.
25                   Additionally, she -- I just lost my
```

1    train of thought.  I'm sorry.  Can I see the

2    police report?

3         Q.   Sure.  Got it?

4              MR. ROGERS:  I've got one.

5              MR. BERKOWITZ:  Okay.  Why don't we

6         mark this so the record is clear.

7           (Plaintiff's Exhibit 3 was marked for

8    identification.)

9    BY MR. BERKOWITZ:

10        Q.   Marking the police report as

11   Plaintiffs' Exhibit 3.

12        A.   The other concern I remember now when I

13   look at the police report is -- the other concern

14   is the money found in her purse and that the

15   police officer indicated that the narcotic dog

16   found the money in the purse that obviously had a

17   trace of or a scent of drugs.

18        Q.   So have we covered all the alleged

19   inconsistencies that this committee was concerned

20   about?

21        A.   Yes.

22        Q.   Now, is that the first step in the

23   process where they reviewed -- the committee

24   reviews these documents?

25        A.   Yes.

```
 1              Q.   And then are there subsequent steps in
 2      the process?
 3              A.   The individual -- after the committee
 4      makes the decision, the individual has a right to
 5      appeal the decision that the committee makes.
 6              Q.   And how did Ms. Sears or did Ms. Sears
 7      appeal that?
 8              A.   She did.  She sent a letter to the
 9      associate superintendent of district
10      administration, Mr. Blitman.
11                  MR. ROGERS:  Spell that.
12                  THE WITNESS:  B-l-i-t-m-a-n.
13                  MR. BERKOWITZ:  Let me show you what
14          I'd like to mark as Plaintiff's Exhibit 4.
15              (Plaintiff's Exhibit 4 was marked for
16      identification.)
17      BY MR. BERKOWITZ:
18              Q.   Is that the appeal that you just
19      referred to?
20              A.   Yes, it is.
21              Q.   Now, does Mr. Blitman rule on the
22      appeals himself back in October of '98, or does he
23      consult with the committee, or how does that work?
24              A.   He consulted with the committee.  The
25      process was that he would take -- we would bring
```

```
 1    the appeals back to the committee.  We would
 2    review the documents again.  There would be
 3    discussion on the merits of the case.  And
 4    Mr. Blitman would listen to each person on the
 5    committee, their opinion, if they thought that we
 6    should support the appeal or deny the appeal.  And
 7    then, ultimately, he would make the final
 8    decision.
 9            On occasion he may decide to support
10    how the committee members feel if he feels that
11    the person was unable to provide any additional
12    information that clarified the situation or that
13    showed that we misinterpreted something that she
14    had provided previous to that point.  But in this
15    case he supported the decision of the committee
16    and supported -- and denied her, rather.
17        Q.    Are there any minutes taken of these
18    security committee meetings?
19        A.    No.
20        Q.    So there's no record of them?
21        A.    No.
22        Q.    Was Ms. Sears given the opportunity to
23    personally address the members of the security
24    committee?
25        A.    No.  That is not in the procedures for
```

```
 1      the appeal.  The individual has to provide a
 2      letter and any supporting documents that he or she
 3      would like to provide.
 4           Q.    What about in the initial case review?
 5      Was there a procedure whereby Ms. Sears could have
 6      addressed the security committee?
 7           A.    No.
 8                MR. BERKOWITZ:  Let me show you what
 9           I would like to mark as Plaintiff's Exhibit
10           Number 5.
11            (Plaintiff's Exhibit 5 was marked for
12      identification.)
13      BY MR. BERKOWITZ:
14           Q.    Can you identify that document for us?
15           A.    Yes.  This is a standard letter if an
16      individual -- at that time.  We've changed it
17      since.  But the standard letter that indicates to
18      the individual that their appeal has been denied.
19           Q.    Is there any further process that's
20      allowed after this appeal is denied in terms of
21      internal school board procedures?
22           A.    Any individual has the right to appeal
23      to the superintendent, to the school board.  So
24      she certainly could have done that if she had
25      chosen to.
```

```
 1              Q.   Do you know if that happened in this
 2         case?
 3              A.   I do not know that -- I do not think
 4         that she did that, no.  I was never asked about it
 5         beyond this or saw any other documents that she
 6         did appeal higher.
 7              Q.   Now, you were aware of the fact when
 8         you initially considered Ms. Sears' case at the
 9         security committee that she pleaded nolo contendre
10         to a drug offense; is that correct?
11              A.   Yes.
12              Q.   And you were aware of the fact that she
13         entered a pretrial intervention program; is that
14         correct?
15              A.   Yes.
16              Q.   And you were aware of the fact that she
17         successfully completed the pretrial intervention
18         program; is that correct?
19              A.   Yes.
20              Q.   And how do those factors enter into the
21         committee's decision to recommend that she not be
22         employed?
23              A.   We used several -- and Florida Statute
24         I believe it's 435.04 indicates offenses, Criminal
25         offenses regardless of adjudication, these
```

```
1    offenses would be prohibitors in districts or in
2    employers hiring individuals with these offenses.
3    And it includes if someone has pled nolo
4    contendre.  We use that as one factor.
5              Additionally, we use some of the
6    standards that have been -- and they haven't given
7    it to us in writing, but in conversations with
8    professional practices in Tallahassee that reviews
9    security cases for all new teacher applicants to
10    determine whether an individual would qualify for
11    a teaching certificate, they also take into
12    account nolo pleas, pretrial interventions; and
13    even if the case is dismissed, they review all of
14    that information as well and may deem someone
15    ineligible for a teaching certificate based on
16    it.
17              And certainly, because we look at that,
18    it was a drug offense and a felony offense, and
19    the severity of that offense and the concern of
20    safety of children, we -- and after looking at all
21    of her documents, we felt that there was reason to
22    believe that she wasn't completely, again,
23    completely -- giving us a complete picture, being
24    100-percent truthful in her statement.  And
25    because of the severity of the offense, the
```

1    committee deemed that she would not be employable

2    as a substitute or any type of employee in the

3    system.

4         Q.    Well, are you saying that according to

5    State of Florida teaching certificate provisions

6    that if one is arrested, has a felony arrest, that

7    person cannot get a teaching certificate?

8         A.    Not in every case, no.  But they

9    review, they review all of that information.  They

10   may deem that an individual with a felony offense

11   would not be eligible for a teaching certificate.

12   They have in the past.  They have for misdemeanor

13   drug offenses in the past denied people

14   eligibility for a teaching certificate.  They

15   review it also on a case-by-case basis.

16        Q.    Do you know what authority you're

17   assigning for that review on a case-by-case basis?

18        A.    Yes.  Jerry Whitmore of professional --

19   oh, the law?  Are you saying the law?

20        Q.    Yes.  Who is this Jerry Whitmore?

21        A.    Jerry Whitmore works for Professional

22   Practices in Tallahassee.  He's an administrator

23   that oversees professional practices.

24        Q.    Now, if Ms. Sears had indicated to the

25   security committee initially that this male was

```
 1      not just a friend but it was a live-in boyfriend
 2      and if she had indicated that she had a fifty
 3      dollars in ones in her purse, what kind of
 4      difference would that have made in the committee's
 5      determination, if any?
 6           A.    I would be speculating in trying to
 7      speak for the entire committee.  I hate to say --
 8      I'd hate to say how they would have ruled or if
 9      they would have ruled any differently.  In my
10      opinion -- I would not have ruled differently
11      because of the nature of the offense.  And still,
12      that doesn't really change the substance of her
13      statement and what occurred.
14           Q.    Now, if the record of the felony drug
15      arrest had been expunged or stricken from the
16      records, would that have made any difference in
17      the security committee's determination?
18           A.    No.  We still review those records when
19      we receive information from FDLE, FBI, that a
20      record is sealed or expunged.  We still have
21      access to those records and ask the individual to
22      disclose that information to us.  And I believe in
23      our statement on the security form pursuant to
24      Florida Statute 943.058 that we have access to all
25      sealed and expunged records as well as juvenile
```

```
1    offenses.

2         Q.    You're referring to Plaintiff's Exhibit

3    Number 2?

4         A.    Yes.

5              MR. BERKOWITZ:  Let me show you what

6         I'd like to mark as Plaintiff's Exhibit 6.

7         (Plaintiff's Exhibit 6 was marked for

8    identification.)

9    BY MR. BERKOWITZ:

10        Q.    Can you identify Plaintiff's Exhibit

11   Number 6 for us?

12        A.    This is the security clearance

13   procedure that we use for the security clearance

14   process of all employees.  And it is from our

15   personnel division handbook.

16        Q.    When was this particular procedure in

17   effect; do you know?

18        A.    It was -- if you look on the second

19   page, it was first prepared July 1st, '96; revised

20   November 20th, '98.  And this was the final one we

21   have reviewed.  And I believe there's been changes

22   since.  But this is the one that we changed when

23   we reviewed all of our security procedures and

24   established the written hiring guidelines that we

25   discussed earlier.
```

```
 1            Q.   So Plaintiff's Exhibit Number 6 was not
 2     in effect in October of 1996; is that correct?
 3            A.   It was.  Not this version, but it was
 4     in effect.  It's been in effect since July of '96.
 5            Q.   Well, how does this version,
 6     Plaintiff's Exhibit 6, differ from what was in
 7     effect in October of '96, if you know?
 8            A.   I do not know.
 9            Q.   Now, if you look at section C-1 of
10     Plaintiff's Exhibit Number 6 where it indicates:
11            "If an individual provides documentation
12            of a criminal incident, regardless of
13            whether adjudication was withheld, such
14            individual shall not be employed."
15            Was that guideline in effect in
16     October of 1998?
17            A.   No, because it's underlined, that was
18     new verbiage that was added based on the review,
19     the BSO review.
20            Q.   So is it fair to say that in October of
21     '98 everything that was not underlined in
22     Plaintiff's Exhibit 6 was in effect in October of
23     1996?
24            A.   Could you restate that, please?
25            Q.   Is it fair to say that all of the
```

```
 1        language that is not underlined was in effect at

 2        the time of Ms. Sears' application in October of

 3        1996?

 4              A.    October of 1998?

 5              Q.    '98.  I'm sorry.

 6              A.    Okay.

 7                    MR. ROGERS:  Objection to form.

 8              Calls for speculation.

 9                    MR. BERKOWITZ:  If you know.

10                    MR. ROGERS:  If you know.  Go ahead

11              and answer.

12                    THE WITNESS:  No.  I can't say with

13              certainty, no.

14        BY MR. BERKOWITZ:

15              Q.    Who would know that at the school

16        board?  Do you know?

17                    MR. ROGERS:  For the record, the

18              document should exist.

19        BY MR. BERKOWITZ:

20              Q.    Well, do you know who would know that

21        at the school board?

22              A.    I'm looking at the dates to see because

23        we did keep track of when it was revised.

24        October 1998.

25              Q.    Well, the document lists you as a
```

```
1     contact person; is that correct?
2          A.    Right.  I just want to make sure that,
3     because I'm looking at the changes -- we made
4     changes in November 20th, '98.  So I'm not sure --
5     I believe in October of '98 the section --
6     everything was here other than the sections that
7     are underlined.  And now looking at the section on
8     the second page that is stricken through, and that
9     was really the only change was in November the
10    change was that we changed the title of the person
11    that they would appeal to, the individual would
12    appeal to.  So other than that, then this would
13    have been the document in October of '98.  So all
14    the parts stricken through and underlined were not
15    there.
16         Q.    You mentioned that there was also a
17    security procedure for noninstructional staff; is
18    that correct?
19         A.    Yes.
20         Q.    And are you involved in the
21    noninstructional staff review?
22         A.    The noninstructional staffing director
23    reviews those and then brings them to the
24    committee where the same committee that reviews
25    instructional reviews and noninstructional cases.
```

```
 1              Q.    In October of '98 were the guidelines
 2       for noninstructional staff for the security
 3       committee any different than for the instructional
 4       staff?
 5              A.    No.
 6              Q.    They were the same?
 7              A.    The same.
 8              Q.    And by noninstructional staff, what
 9       kind of staff are we talking about?
10              A.    Teacher aides, assistants, clerical,
11       food service, bus drivers.
12              Q.    Any other kinds of employees?
13              A.    Yes.  Custodians.  I'm sure I'm
14       omitting some, but general group.
15              Q.    So the custodian position in October of
16       '98 would be subject to the same guidelines, if
17       you will, noted in Plaintiff's Exhibit Number 6?
18              A.    Yes.
19              Q.    What is the difference between a
20       substitute, a pool substitute and an interim
21       substitute?
22              A.    A substitute is a daily substitute that
23       may be at a school just for one day two days a
24       week.
25                    A pool sub is a position that is
```

```
 1      allocated to a school.  That substitute reports to
 2      that school every day and substitutes every day at
 3      that school.  That person does not have to work at
 4      different schools.
 5              The interim sub position is a
 6      substitute that's filling in for an individual
 7      that is out for 20 days or more.  Could be due to
 8      a leave of absence, disability leave.  And also,
 9      March 1st of every year we stop hiring full-time
10      teachers.  And any new positions, teacher
11      positions from March 1st on, would have to be
12      filled by an interim sub.  And an interim
13      substitute must have a bachelor's degree in order
14      to qualify.
15          Q.    Now, Ms. Sears was denied employment
16      both as a permanent hire and as a substitute, is
17      that correct, in October of '98?
18          A.    Yes.
19          Q.    So the security committee's concerns
20      were the same for a substitute teacher or for
21      full-time instructional staff; is that correct?
22          A.    Yes.
23          Q.    Do you know what the procedures were?
24      After Mr. Blitman denied the appeal, what would
25      have been the procedure after that specifically;
```

 1     do you know?

 2          A.    It would be up to Ms. Sears, if she

 3     would choose to write a letter or to appeal to the

 4     superintendent or to the school board.  She could

 5     also apply back to the school board a year after

 6     the initial review of her security clearance and

 7     ask that the security committee review the

 8     documents again and provide any additional

 9     information or work experience information that

10     she's had within that year.

11          Q.    Do you know what procedures are

12     specifically used or guidelines are specifically

13     used in the appeal process to the superintendent,

14     how he would evaluate an application after

15     Mr. Blitman denies the appeal?

16          A.    We have various -- we've had various

17     superintendents.  And they handle them

18     differently.  But generally, they individually

19     calls them or writes them a letter.  And the

20     superintendent will review all the same

21     documents.  And the ones that I've been involved

22     with, he normally would ask the associate

23     superintendent over human resources, myself and

24     the director of noninstructional, since we both

25     basically chair the committee.  And he would ask

```
 1      to go over all of the -- all the conversation, the
 2      issues that were discussed, look at her paperwork,
 3      look at her file and her references and
 4      qualifications.  And sometimes they would -- the
 5      superintendent would make a decision based on
 6      that.  Other times the superintendent may still,
 7      in addition, want to call the person in or discuss
 8      the case with the individual.
 9           Q.   What about if an appeal was further
10      made to the school board, what would be the
11      process then?
12           A.   The person would ask to speak before
13      the school board going through the
14      superintendent's liaison and schedule a time at a
15      board meeting to bring up his or her issue.  And
16      then at that point, the school board may or may
17      not decide to ask the superintendent to review the
18      matter again or look into the matter further.
19           Q.   Now, these procedures that you're
20      describing as of October of '98, after
21      Mr. Blitman's level, were they written down any
22      place or is this just a practice?
23           A.   It's a practice.
24           Q.   At any point did they become written
25      down?
```

```
1              A.    No.

2              Q.    Now, you mentioned that Ms. Sears could

3       have reapplied after a year; is that correct?

4              A.    Yes.

5              Q.    If she had reapplied in, let's say

6       December of 1999, would she have been

7       automatically excluded from further employment?

8              A.    No.  Her case -- she would go through

9       the same process and her case would be reviewed

10      again.  And any additional information would be

11      shared with the committee because remember,

12      sometimes the committee changes from year to

13      year.  So it would be as though she started again

14      as new.  All the documents would be reviewed and

15      discussed.

16             Q.    Okay.  Maybe I misunderstood you,

17      then.  It was my understanding that -- I mean,

18      according to Plaintiff's Exhibit 6, as of December

19      of '99, the rules of the game changed in that

20      there were automatic exclusions; is that correct

21      or not?

22             A.    An individual still can apply each

23      year.  And if they provide -- this does not mean

24      automatic.  If a person can still provide

25      information, documents that might change the
```

```
1     decision of the committee or through the appeal
2     process change the decision of our associate
3     superintendent, then they may be approved.
4     Initially, if they meet --
5             If it is, let's say, a felony drug
6     offense and it's a no contest plea or a guilty
7     plea or adjudication withheld, initially that
8     person may be denied; but the person has a right
9     to appeal and provide any additional information
10    that may change the decision of our committee or
11    the associate superintendent.  And these
12    individuals can apply each year to have their case
13    reviewed and can provide any additional
14    information that might change the committee's
15    decision.
16         Q.   So you're saying that even under the
17    new procedure, there was no hard and fast rule
18    that someone with a felony arrest would not be
19    automatically excluded?
20         A.   Right.  There's still an option for
21    someone to appeal and provide additional
22    information to help change the committee's
23    decision.
24         Q.   Post December 1999 were there any
25    formal written guidelines as to what either the
```

```
1     superintendent or the school board can review in

2     terms of the application at that point?

3          A.    I don't understand your question.

4          Q.    Well, December of 1999, let's suppose

5     that an applicant wants to go beyond the

6     Hal Blitman appeal.  Are there formal guidelines

7     at that point in terms of what the superintendent

8     would look at?

9          A.    No.

10         Q.    Would the superintendent automatically

11    exclude somebody for a felony arrest at that

12    point?

13         A.    No.  He would review all of the

14    documents.

15         Q.    And you don't see a conflict there in

16    what your testimony is with C-1 on Plaintiff's

17    Exhibit 6?

18         A.    No, because on initial review an

19    individual may be denied based on these offenses.

20    And these guidelines --

21              MR. ROGERS:  Which document are you

22         referring to?

23              THE WITNESS:  The personnel hiring

24         guidelines.

25              MR. ROGERS:  What's the number on
```

```
 1        it?
 2                  MR. BERKOWITZ:  What was this?  1?
 3                  MR. ROGERS:  1, I believe.
 4                  MR. BERKOWITZ:  I think it was 1.
 5                  THE WITNESS:  On initial review this
 6        person may be denied.  And it was put in
 7        place so we would handle these cases
 8        consistently.  Then, this person does have
 9        the right to appeal and have further
10        discussion and provide a letter and any
11        further documentation, as I stated, that
12        would possibly change the decision by the
13        committee and/or by the associate
14        superintendent and certainly could, again,
15        appeal to the superintendent or the school
16        board.  So it's not -- initially, it might
17        be a denial based on what's on the
18        guidelines.  But that person does have a
19        right to provide additional information.
20        BY MR. BERKOWITZ:
21           Q.   So you're saying initially, before the
22        security committee, it may or may not be a rule of
23        exclusion; is that correct?
24           A.   Right.
25           Q.   But regardless of whether or not it's a
```

```
 1    rule of exclusion, initially, the person can still
 2    appeal that; is that correct?
 3         A.   Yes.
 4         Q.   But we're uncertain as to what
 5    standards or procedures would apply in that
 6    subsequent appeal process; is that correct?
 7         A.   Beyond the associate superintendent.
 8         Q.   Right.
 9         A.   Because it would be up to the
10    superintendent what information he would want to
11    review.
12         Q.   So at that level it's kind of a
13    case-by-case or an all-circumstances review?
14         A.   Well, it's a case by case when they
15    appeal as well by the associate superintendent.
16         Q.   Have there been any cases where someone
17    with a felony drug arrest, since 1998, has been
18    employed by the school board?
19         A.   Since 1998, I could not give you that
20    answer.
21         Q.   You don't know?
22         A.   No.
23         Q.   Can you recall anyone coming before
24    your committee being approved if they had a felony
25    drug arrest?
```

```
1            A.    Yes.

2            Q.    But you don't know the name of the

3     person?

4            A.    Offhand, no.  But we have been --

5     because certainly the passage of time, when that

6     offense occurred, plays into a big part of it.

7     And what the person has done since that time and

8     if the person has had a clean record since that

9     time, all of those factors are considered.

10           Q.    Well, are there any specific standards

11    regarding passage of time?  If it's a drug arrest

12    that's less than ten years old, the procedure says

13    the person will not be hired; is that correct?

14           A.    A felony drug offense less than ten

15    years, yes.  On initial review that individual may

16    be denied if they had a guilty plea, adjudication

17    withheld, no contest or pretrial intervention.

18    But again, that individual could apply for the

19    appeal and ask the associate superintendent to

20    review any information this person may have

21    taught -- this might have happened eight years

22    ago; and since, the person has gone through drug

23    rehabilitation, has taught in another state

24    successfully, was able to get a teaching

25    certificate, has wonderful references.  All of
```

```
1    that would be taken into consideration.
2         Q.   What specific written instructions are
3    provided to an applicant regarding the appeal
4    procedure?  Let's say in October of '98.  Were
5    there any written instructions provided?
6         A.   No.  In Ms. Sears' case, she contacted
7    our office and she was told to appeal to
8    Mr. Blitman by sending a letter.  But there is
9    nothing in writing that we hand them and say,
10   Okay, this is what you need do as far as this is
11   all of the information that you can supply.  We
12   ask that the individual provide any information
13   that would strengthen their case.
14        Q.   Did you inform Ms. Sears that she was
15   to provide any additional information that was to
16   strengthen her case in October of '98?
17        A.   I did not speak to her personally.  And
18   I am unsure of who she spoke to or what that
19   individual told her.
20        Q.   But there was nothing in writing at
21   that time as to what an applicant could provide in
22   an appeal procedure; is that correct?
23        A.   No.  Yes, it is correct.  There is
24   nothing.
25             MR. BERKOWITZ:  Let me show you what
```

```
 1              I'd like to mark as Plaintiff's Exhibit 7.
 2              (Plaintiff's Exhibit 7 was marked for
 3         identification.)
 4         BY MR. BERKOWITZ:
 5              Q.   Let me ask you this question before we
 6         go to this document.  Did Ms. Sears have the
 7         proper credentials to continue to teach in
 8         October of '98?
 9                   MR. ROGERS:  Objection to form.
10              Teach as what?
11                   MR. BERKOWITZ:  Well, teach as a
12              permanent teacher in social science.
13                   THE WITNESS:  Well, when you say
14              continue, she never was hired as a
15              teacher.  She would not and did not at the
16              time have the credentials to qualify for a
17              teaching certificate that would enable her
18              to be hired as a full-time teacher.
19         BY MR. BERKOWITZ:
20              Q.   What authority do you have that
21         supports that conclusion?
22              A.   This document.  If you take a look at
23         the second paragraph, the statement of eligibility
24         from the Department of Education.
25                   MR. ROGERS:  This is Plaintiff's 7?
```

```
 1              MR. BERKOWITZ:  Yes.
 2              THE WITNESS:  Second sentence, Based
 3         upon current requirements, you will be
 4         eligible for a two-year nonrenewable
 5         temporary certificate valid for two
 6         consecutive school fiscal years covering
 7         middle grades social science when you
 8         complete the following subject area
 9         requirements:  The three hours in history
10         and three hours in geography.
11              In order for a teacher to be eligible
12         to teach in the State of Florida, a teacher
13         has to be eligible for a temporary
14         certificate.  She was -- Ms. Sears was
15         still lacking six hours in order to be
16         eligible for a teaching certificate.
17              From all of the paperwork that we
18         had, she did not provide any transcripts or
19         course work that showed that she had
20         completed these six hours; therefore, she
21         would not qualify for a temporary
22         certificate and could not be recommended
23         for a full-time teaching certificate.  Her
24         degree in criminal justice does not qualify
25         her for a teaching certificate.
```

1    BY MR. BERKOWITZ:

2        Q.    Well, how was it that she qualified for

3    a substitute teaching position?

4        A.    You can be a substitute teacher with 60

5    semester hours of college credit.

6        Q.    Did she have any particular period of

7    time in which to complete the six hours of

8    additional study?

9        A.    In order to qualify for a temporary

10    certificate, no.  You cannot hold the temporary

11    certificate and take these hours.  They will not

12    issue the temporary certificate until she met

13    those requirements.

14            What this document does is it showed

15    that Cherl applied to have her transcripts

16    evaluated for middle grade social science.  The

17    validity of this document is for two years.  In

18    essence, it says, Cherl, we will state that you

19    can -- if we increase the requirement for middle

20    grade social studies, let's say we go from 18

21    hours to now requiring 24 hours to middle grade

22    science, you fall under the old rules.  We're

23    protecting you for the two years, the validity of

24    this statement.  And you only need six hours to

25    qualify for a temporary certificate.  But in order

```
1    for that certificate to be issued, she had to
2    complete the six hours because you cannot teach
3    without qualifying at least for the temporary
4    certificate.
5         Q.   So it's your position that in October
6    of '98 she did not have the appropriate
7    requirements completed for the issuance of a
8    permanent certificate?
9         A.   Yes.
10        Q.   Were there any documents that she was
11   given in October of '98 that indicated that?
12        A.   She was sent a letter asking her to
13   provide the statement of eligibility so that we
14   could make a determination whether she was
15   eligible or not.  And, obviously, she applied.
16   And it's showing that she, indeed, was not
17   eligible yet because she still lacked six hours.
18             MR. BERKOWITZ:  I don't have any
19        other questions, then.  Thank you.
20
21        (The witness was excused.)
22
23   (At 10:02 a.m. the deposition was concluded.)
24
25
```

1    STATE OF FLORIDA

2    COUNTY OF PALM BEACH

3

4

5

6              I, Mary R. Desiderio, the undersigned

7    Notary Public, in and for the State of Florida,

8    hereby certify that GRACIE DIAZ personally

9    appeared before me and was duly sworn.

10

11

12

13              WITNESS my hand and official seal this

14    6th day of December, 2000.

15

16

17

18

19

20    _____

21

22    MARY R. DESIDERIO
       MY COMMISSION # CC 885990
       EXPIRES: November 4, 2003
       Bonded Thru Notary Public Underwriters

23

24

25

OFFICIAL REPORTING SERVICES, INC.
(954) 467-8204

```
 1               C E R T I F I C A T E

 2

 3      STATE OF FLORIDA

 4      COUNTY OF PALM BEACH

 5

 6         I, Mary R. Desiderio, Registered Professional

 7      Reporter, do hereby certify that I was authorized

 8      to and did stenographically report the foregoing

 9      deposition; and that the transcript is a true and

10      correct transcription of the testimony given by

11      the witness.

12

13         I further certify that I am not a relative,

14      employee, attorney or counsel of any of the

15      parties, nor am I a relative or employee of any of

16      the parties' attorney or counsel connected with

17      the action, nor am I financially interested in the

18      action.

19

20         Dated this 6th day of December, 2000.

21

22

23         _____

24         Mary R. Desiderio,

25         Registered Professional Reporter
```

## Personnel Hiring Guidelines
Criminal Records Including Guilty Pleas (Regardless of Adjudication),
No Contest Pleas, Pre-trial Intervention/Diversion
This is not intended to be a complete list of all disqualifying criminal offenses.

### I. Will Not Hire

- Extreme Violence (Aggravated Assault/Aggravated Battery, Murder, Attempted Murder)
- Sexual Offense (Lewd & Lascivious-Sexual Battery, Rape, Sex With A Minor)
- Kidnapping
- False Imprisonment
- Child Abuse
- Arson
- Pornography
- Extortion
- Manslaughter (Including Vehicular Homicide/Involuntary)
- Indecent Exposure If Sexual In Nature
- Currently on probation or has a case pending

### II. Will Not Hire - If Offense Less Than 10 Years Old.    Will Consider And Carefully Review If Older Than 10 years.

- Felony Drug Use
- Grand Theft / Robbery
- Burglary
- Felony Battery/Assault
- Felony Possession of a Concealed Weapon
- Welfare/Unemployment Fraud
- Forgery
- Prostitution or Solicitation of Prostitution
- Grand Larceny
- Other Felonies Not Mentioned in Section I

### III. Will Not Hire - If Offense Is Less Than 5 Years Old.    Will Consider And Carefully Review If Older Than 5 Years.

- Multiple DUI's
- Misdemeanor Drug and/or Paraphernalia
- Possession of Concealed Weapon - Misdemeanor
- Battery/Assault
- Resisting Arrest With Violence
- Domestic Violence

### IV. Judgment - Case By Case Review

- DUI - One Incident Only
- Sale of Alcohol to Minor
- Worthless Checks
- Disorderly Conduct
- Multiple Criminal Offenses
- Petty Theft (Theft to Deprive/Retail Theft/Shoplifting)
- Loitering
- Trespassing
- Arrest With Out Violence
- Larceny
- Other criminal offenses



12/10/99

0055

The School Board of Broward County, Florida

## Security Background Check

**THIS FORM MUST BE TURNED IN WITH YOUR APPLICATION FOR EMPLOYMENT.**

Name: Sears, Cheri, D. Hutchins SS# :
　　　　Last　　First　　Middle　　Maiden

Date of Birth: 06/23/66

Address 4730 N.W 11St LauderHill Fla 33313    Phone #: 797-7968

At the time of employment your fingerprints will be researched by local, state and federal law enforcement agencies. Sealed or expunged records must be revealed to the School Board of Broward County pursuant to F.S. 943.058. Your employment with the Broward County School District is temporary and probationary pending successful processing of your fingerprints. The following questions must be answered truthfully. A "Yes" answer to any of the following questions, does not automatically keep you from being hired. Your omission or falsification of any criminal history, including juvenile incidents. (misdemeanor or felony, see reverse for examples of criminal offenses) information will result in your immediate termination.

Yes ☐　No ☒　1. Have you ever been convicted of an offense (misdemeanor or felony) other than a minor traffic violation? (Driving under the Influence [DUI] and Driving while Intoxicated [DWI] convictions are not minor and must be reported.)

Yes ☐　No ☒　2. Have you ever been found guilty of a criminal offense?

Yes ☒　No ☐　3. Have you ever entered a nolo contendre or no contest plea in a criminal proceeding?

Yes ☐　No ☒　4. Have you ever had a criminal record sealed?

Yes ☐　No ☒　5. Have you ever had a criminal record expunged?

Yes ☒　No ☐　6. Have you ever participated in any type of pre-trial intervention/diversion program or had adjudication withheld in a criminal offense?

Yes ☐　No ☒　7. Are there criminal charges currently pending against you?

Yes ☐　No ☒　8. Have you ever been imprisoned or jailed in a criminal proceeding?

Yes ☐　No ☒　9. Have you ever been placed on probation in a criminal proceeding?

Yes ☐　No ☒　10. Have you ever paid a fine in a criminal proceeding?

Yes ☐　No ☒　11. Have you ever failed to appear in court or forfeited bond in a criminal proceeding?

Yes ☐　No ☒　12. Have you ever had a teaching certificate revoked or suspended? If yes, in what state and when? _____

Yes ☐　No ☒　13. Have you ever had sanctions placed on your teaching certificate for any reason?

Yes ☐　No ☒　14. Have you ever been denied a teaching certificate anywhere?

Yes ☐　No ☒　15. Is disciplinary action currently pending anywhere against your teaching certificate?

**EXHIBIT**
Plaintiffs
7
11-21-00 MD

you answered "Yes" to any question above, you must explain fully on the reverse side of the form. If you answered es" to question(s) 12, 13, 14, or 15, you must give the name of the State where your teaching certificate was voked, suspended, sanctioned, denied or where action is currently pending against you

TE: Pursuant to Florida Statute 943.058 Criminal History Record Expunction or Sealing, persons to be employed a position having direct contact with children must answer questions 4, 5 and 6. The School Board of Broward unty will receive information on all records, including juvenile, that have been sealed, expunged, or where idication was withheld. To omit a response or to be untruthful in your response, regardless of your application rmation received from your attorney or the Court will be considered falsification of your application will result in your being terminated. If you wish to seek counsel prior to completing this section, you may take application with you.

(over)

0139

Name:
    Last      First     Middle     Maiden

INCIDENCE #1 (Request 2nd sheet if more than one Incidence)

If Arrested, Where?: Broward CNTY.        Date of Arrest: 6/95

Arresting Agency: # City of Ft Lauderdale.

Offense: Poss of Cocain

Please provide detailed explanation: I let a male friend of mine Borrow my car for the day. And when my friend returned to pick me up I got into the vehicle on the passager side. At that time proceeded to the mall white on our way to the mall we were stopped by serval Police officers at that time 1 office asked for some identication and then decided to search the case car for some unknown reason. After Searching the car Cocain was found inside the car Which I had no knowledge of. At that time both of use were arrested. And After further investigating the incident. I was ordered to attend a Pre-Trail Program a the case was Dismissed. Final Disposition: Intervention — Case was Dismissed.

EXAMPLES OF CRIMINAL OFFENSES: Assault/battery, auto theft, disorderly conduct, domestic violence, DUI/DWI, fraud (welfare/food stamps) loitering, prostitution/solicitation, robbery, shoplifting, theft (grand/petty), trespassing, worthless checks. NOTE: This is not a complete list and is intended to provide examples only. You must list all convictions including juvenile incidents and those in which adjudication was withheld and/or records were sealed/expunged.

By signing this document I certify that I have carefully read and fully understand each question and that all information contained herein is true and accurate. My signature further certifies that there is no falsification of any information, omission of any information requested or any misrepresentation of information requested. I also understand that my fingerprints will be submitted to the Federal Bureau of Investigation for a complete criminal history background check.

By my signature, I authorize the Broward County School Board to conduct any investigation necessary to verify all information identified on this form. My signature on this document provides for the release of any sealed or expunged records in my name by any court. Included in this grant of authority is my permission to contact any and all former employers and other persons acquainted with me or in possession of information concerning me to supply such information to the Security Clearance Office. All monies received as part of the fingerprinting process are non-refundable.

By my signature, I certify that I know, understand, and agree that any false statement or omission of information requested will result in my immediate termination.

_____
Signature of Applicant

9/16/98
Date

Rev. 3/97; 8/97; 10/97; 2/98
Word Process Instructonal Staff.Forms Secunty BG Check (Rev.)

0140

BROWARD COUNTY 553 11128

☐ ARREST

FILING AGENT: BJO

OFFENSE REPORT: 95-5-16697

DEFENDANT'S LAST NAME: Sears  FIRST: David  MIDDLE:  SUF:  ALIAS/STREET NAME:  CITIZENS: USA

| RC | SEX | HGT. | EYES | HAIR | WGT. | COMP. | AGE | D.O.B. |
|---|---|---|---|---|---|---|---|---|
| B | M | 5'4" | Br | Blk | 120 | DK | 28 | 3-1-67 |

BIRTHPLACE: Nassau Bahamas  SCARS, MARKS, TT: Rt Arm

PERMANENT ADDRESS: 4730 NW 11 St. Lauderhill, Fl

LOCAL ADDRESS: 4730 NW 11 St Lauderhill

RESIDENCE TYPE: (1) CITY  (2) COUNTY  (3) FLORIDA  (4) OUT-OF-STATE

PLACE OF EMPLOYMENT: Laster Lawn Service  LENGTH:

HOW LONG DEFENDANT IN BROWARD COUNTY:  BREATHALYZER BY/CCN:  READING:  PLACE OF ARREST: 2201 W Broward  DATE/TIME ARRESTED: 6-1-95  ARRESTING OFFICER(S) CCN: Pane 1256

OFFICER INJURED: Y ☐ N ☒  UNIT:  ZONE:  BEAT:  SHIFT:  UNIT TRANSPORTING PRISONER:  TRANSPORTING OFFICER/CCN:  PICK-UP TIME-:  TIME ARRIVED AT BSO:  DRUG TYP:

NAME OF VICTIM (IF CORPORATION, EXACT LEGAL NAME AND STATE OF INCORP.): Vincent Small  ADDRESS: 1909 NW 46 Ave Lauderhill, Fl.  PHONE #:

| COUNT NO. | OFFENSES CHARGED | CITATION #, IF APPLICABLE | F.S. # OR CAPIAS/WARRANT # |
|---|---|---|---|
| 1 | Murder | | 782.04 |
| | | | |
| | | | |
| | | | |

Before me this date personally appeared Robert H. Pane who being first duly, sw... deposes and says that on 29 day of May 19 95 at 4701 NW 14 St Lauderhill, Fl (crime location) t... above named defendant committed the above offenses charged and the facts showing probable cause to believe same are as follows:

City of Lauderhill Police officer responded to the Stop and Shop store at the above location where the victim was shot and collapsed across the street at a private home. The victim died at Broward General Hospital later that evening.

Witness Warren Samsels observed the defendant arrive at the scene in a bl...

I swear the above statement is correct and true to the best of my knowledge and belief.

OFFICER/AFFIANT'S SIGNATURE  OFFICER'S NAME/CCN: RH Pane 1256  OFFICER'S D...

EXHIBIT
Plaintiff's
3
11-21-00 MD

STATE OF  COUNTY OF

The foregoing instrument was acknowledged before me this 15 day of June 19 95 who is personally known to me or who has produced (ID Type) as identification and who ___ (DID OR DID NOT) take an oath.

DEPUTY CLERK OF THE COURT, NOTARY PUBLIC, OR ASSISTANT STATE ATTORNEY  TITLE OR RANK/CCN: Police Sol

(SEAL OR STAMP)

0104

SEVENTEENTH JUDICIAL CIRCUIT
BROWARD COUNTY
STATE OF FLORIDA

FIRST APPEARANCE / ARREST FORM

SHOULD ADDITIONAL SPACE BE NEEDED, USE PROBABLE CAUSE AFFIDAVIT CONTINUATION

Ong - Court
2nd - State Atty
3rd - Filing Agency

-060 WPD: Document 34 Entered on FLSD Docket 12/22/2000 Pag

**COMPLAINT AFFIDAVIT**
**PROBABLE CAUSE AFFIDAVIT CONT'D**

BROWARD COUNTY

| DEFENDANT'S LAST NAME | FIRST | MIDDLE | SUF. | HGT. | WGT. | RC. | SEX | D.O.B. | OFFENSE REPORT | ARRESTING OFFICER (S)/CCN |
|---|---|---|---|---|---|---|---|---|---|---|
| Sears | Davis | | | 5'4" | 130 | B | M | 3/16/67 | 95-5-16697 | R.H. Pate #125 |

| NAME OF VICTIM (IF CORPORATION, EXACT LEGAL NAME AND STATE OF INCORP.) | ADDRESS | PHONE # |
|---|---|---|
| Vincent Stall | 1909 NW 4th Ave Lauderhill, FL | |

| COUNT NO. | OFFENSES CHARGED | CITATION #, IF APPLICABLE | F.S. # OR CAPIAS/WARRAN |
|---|---|---|---|
| 1 | Murder | | 782.04 |
| | | | |
| | | | |
| | | | |

Before me this date personally appeared ___Robert H Pate___ who being first duly s deposes and says that on __29__ day __May__, 19 _95_ at _4701 NW 14 St Lauderhill._ (crime location above named defendant committed the above offenses charged and the facts showing probable cause to believe same are as follows:

Cadillac with blue fabric roof and also turning onto the East side of the premises. Samuels observes the defendant approach the victim and begin to argue with him. The defendant was described as wearing a white tee-shirt. The defendant was described as having a short Afro haircut, and the handgun which the defendant carries was concealed in his waistband. Samuels describes the shooter as 22-3x. Samuels observes the shooter to pull out the pistol described as an automatic, then begin to strike the victim with the pistol on the head and face. After entering the Stop and Shop store Samuels hears a gun shot, observes the victim bleeding, observes the victim cross the street then collapse onto a lawn.

Witness Samuels identifies the defendant from a photo line up and signed a photo line up affidavit. Samuels states that the vehicle left the scene southbound.

I swear the above statement is correct and true to the best of my knowledge and belief.

_____    R H Pate 1256.    _____
OFFICER/AFFIANT'S SIGNATURE    OFFICER'S NAME/CCN    OFFICER'S DIVISION

STATE OF _____    COUNTY OF _____

The foregoing instrument is acknowledged before me this _5_ day of _June_, 19 _85_ who is personally known to me or who has produced (ID Type) _____ as identification and who _____ (DID OR DID NOT) take an oath.    (SEAL OR STAMP)

_____    _Ellics Cob_
DEPUTY CLERK OF THE COURT, NOTARY PUBLIC, OR ASSISTANT STATE ATTORNEY    TITLE OR RANK/CCN

FIRST APPEARANCE/ARREST FORM

SEVENTEENTH JUDICIAL CIRCUIT
BROWARD COUNTY

Org - Court
2nd - State Atty
3rd - Filing Agenc
4th - Arresting Ag

0105

COMPLAINT AFFIDAVIT
PROBABLE CAUSE AFFIDAVIT

BROWARD COUNTY
ARREST NO.

| DEFENDANT'S LAST NAME | FIRST | MIDDLE | SUF. | HGT. | WGT. | RC | SEX | D.O.B. | OFFENSE REPORT | ARRESTING OFFICER (S)/CCN |
|---|---|---|---|---|---|---|---|---|---|---|
| Sears, | David | | | 5'4" | 130 | B | M | 3-11-67 | 95-5-1669 | R.H. Porr # |

| NAME OF VICTIM (IF CORPORATION, EXACT LEGAL NAME AND STATE OF INCORP.) | ADDRESS | PHONE |
|---|---|---|
| Vincent Small (Deceased | 1909 NW 46 Ave, Lauderhill | |

| COUNT NO. | OFFENSES CHARGED | CITATION #, IF APPLICABLE | F.S. # OR CAPIAS/WARR. |
|---|---|---|---|
| 1 | Murder | | 782.04 |

Before me this date personally appeared **Robert H. Parr**

deposes and says that on **27** day **May** , 19 **95** at **4701 NW14 ST Lauderhill** who being first the above named defendant committed the above offenses charged and the facts showing probable cause to believe same are as follows:

Witness Aisha Eubanks and Jermaine Prince were both Se in an automobile next to the crime scene. Both describe the automobile driven by the shooter as white. Prince recall that the shooter pulled a handgun from his waistband and began beating the victim in the face and head with the g while the victim pleaded with him to stop. The shooter fired one time striking the victim who was now on the ground. The witness saw the victim walk across the roa and finally collapsed on a lawn. Ft Lauderdale Police stopped the defendant who was driving a white Cadillac with a blue fabric roof. Gold tri ornaments with light window tint. The defendant was arrested for a traffic offense and possession of crack Cocaine, at which time your Affiant was called & advise Witness Eubanks and Prince reported that the shoot looked Similar to the person who committed the crime

I swear the above statement is correct and true to the best of my knowledge and belief.

OFFICER/AFFIANT'S SIGNATURE

OFFICER'S NAME/CCN     R.H. Parr     1256

OFFICER'S DIVISION

STATE OF _____  COUNTY OF _____

The foregoing instrument was acknowledged before me this **15** day of **June** , 19 **95** who is personally known to me or who has produced (ID Type) _____ as identification and who _____ take an oath.
(DID OR DID NOT)

DEPUTY CLERK OF THE COURT, NOTARY PUBLIC, OR ASSISTANT STATE ATTORNEY

TITLE OR RANK/CCN     Police     256

SEVENTEENTH JUDICAL CIRCUIT
BROWARD COUNTY

FIRST APPEARANCE/ARREST FORM

(SEAL OR STAMP)

Orig - Court
2nd - State Atty
3rd - Filing Age
4th - Arresting

0105

BROWARD COUNTY
AREA NO. WPD

☐ ARREST F...

## COMPLAINT AFFIDAVIT
PROBABLE CAUSE AFFIDAVIT CONTINUAL

| DEFENDANT'S LAST NAME | FIRST | MIDDLE | SUF. | HGT. | WGT. | RC | SEX | D.O.B. | OFFENSE REPORT | ARRESTING OFFICER (S)/CCN |
|---|---|---|---|---|---|---|---|---|---|---|
| Sear, | David | | | 5'4" | 130 | B | M | 3-11-67 | 95-5-1687 | R.H. Parr |

| NAME OF VICTIM (IF CORPORATION, EXACT LEGAL NAME AND STATE OF INCORP.) | ADDRESS | PHONE # |
|---|---|---|
| Vincent Small | 1909 NW 46 Ave, Lauderhi... | |

| COUNT NO. | OFFENSES CHARGED | CITATION #, IF APPLICABLE | F.S. # OR CAPIAS/WARRANT |
|---|---|---|---|
| 1 | Murder | | 782.04 |
| | | | |
| | | | |
| | | | |

Before me this date personally appeared **Robert H. Parr** who being first duly sw
deposes and says that on **29** day **May**, 19 **95** at **4701 NW 14 St Lauderhill** (crime location)
above named defendant committed the above offenses charged and the facts showing probable cause to believe same are as follows:

(supporting witness Samuels positive Identification.)
The defendant additionally made a comment to the
transporting Ft Lauderdale Officer asking if we
wishing to question him about a "Robbery or a Killin
No one mentioned either crime to him.
Broward Associate Medical Examiner Dr. Price advised
that the victim died by a gunshot wound and the
manner of death was ruled to be a Homicide.
Witness Samuels was shown a photo lineup of the
defendant's vehicle + stated it looked like the
car she observed at the crime scene.
Defendant voluntarily submitted/demanded to a polygra
examination. Upon conclusion, the results indicated the
defendant was deceptive on key questions surrounding the
shooting. Defendant denied all allegations regarding
the shooting incident.

I swear the above statement is correct and true to the best of my knowledge and belief.

| OFFICER/AFFIANT'S SIGNATURE | OFFICER'S NAME/CCN | OFFICER'S DIVISION |
|---|---|---|
| | R.H. Parr  12% | |

STATE OF                COUNTY OF

The foregoing instrument was acknowledged before me this **15** day of **JUNE**, 19 **95** who is personally
known to me or who has produced (ID Type) _____ as identification and who _____ take an oath.
(DID OR DID NOT)

| DEPUTY CLERK OF THE COURT, NOTARY PUBLIC, OR ASSISTANT STATE ATTORNEY | TITLE OR RANK/CCN |
|---|---|
| | Police  2.6 |

FIRST APPEARANCE/ARREST FORM

SEVENTEENTH JUDICIAL CIRCUIT
BROWARD COUNTY

(SEAL OR STAMP)

Orig. - Court
2nd - State Atty
3rd - Filing Agency
4th - Arresting Ag...

0107

□ ARRE-

ARREST NO. (R) 91130

Ft. LAUD. PD. 95-95287

| DEFENDANT'S LAST NAME | FIRST | MIDDLE | SUF | ALIAS/STREET NAME | CITIZ |
|---|---|---|---|---|---|
| SEARS | DAVID | NMN | | DAVE | R.G. |

| RC. | SEX | HGT. | EYES | HAIR | WGT. | COMP. | AGE | D.O.B. | BIRTHPLACE | SCARS, MARKS, T |
|---|---|---|---|---|---|---|---|---|---|---|
| B | M | 5'4 | BRN | BLU | 135 | LT. | 28 | 3-11-67 | NASSAU, BAH. | REAL BAD |

PERMANENT ADDRESS
4730 N.W. 11 ST. LAUDERHILL, F.
33313

LOCAL ADDRESS 4730 N.W. 11 ST. L. HILL

PLACE OF EMPLOYMENT LASTER LAWN SER    LENGTH 1½

| RESIDENCE TYPE: | (1) CITY | (2) COUNTY | (3) FLORIDA | (4) OUT-OF-STATE |

| HOW LONG DEFENDANT IN BROWARD COUNTY | BREATHALYZER BY/CCN | READING | PLACE OF ARREST | DATE/TIME ARRESTED ARRESTING OFFICER CCN |
| 28 YRS. | | | 1500 E. SUNRISE | 6-14-95 | R.P. MART... |

| OFFICER INJURED | UNIT | ZONE | BEAT | SHIFT | UNIT TRANSPORTING PRISONER | TRANSPORTING OFFICER/CCN | PICK-UP TIME- | DRUG T |
| Y □ N ☒ | m-14/02 PTR. 2 | | | | | | TIME ARRIVED AT BSO | |

| TYPE | B-BARBITURATE | H-HALLUCINOGEN | P-PARAPHERNALIA | U-UNKNOWN | ACTIVITY | ACTIVITY | S-SELL | A-SMUGGLE | M-MANUFACTURE/ | K-CONSPIRACY | Z-OTHER | INDICATION OF | T | N | U |
| H-N/A | C-COCAINE | M-MARIJUANA | EQUIPMENT | Z-OTHER | | N-N/A | B-BUY | D-DELIVER | PRODUCE/ | DISTRIBUTE | | ALCOHOL INFLUENCE | □ | □ | □ |
| A-AMPHETAMINE | E-HEROIN | O-OPIUM | S-SYNTHETIC | | | P-POSSESS | T-TRAFFIC | E-USE | CULTIVATE | | | DRUG INFLUENCE | □ | □ | □ |

DEFENDANT'S VEHICLE MAKE

VEHICLE TOWED TO R.P.D.

NAME OF VICTIM (IF CORPORATION, EXACT LEGAL NAME AND STATE OF INCORP.)    ADDRESS    PHONE #

| COUNT NO. | OFFENSES CHARGED | CITATION #, IF APPLICABLE | F.S. # OR CAPIAS/WARRANT |
|---|---|---|---|
| 1 | OPERATING VEH. AGAINST RESTRICTIONS (BUSINESS PURPOSES ONLY) | 281816-K | 322.16 |
| 2 | POSESSION OF COCAINE | | |

Before me this date personally appeared RICHARD P. MARTIN who, being first duly s
deposes and says that on 14 day JUNE 19 95 1500 E. SUNRISE BLVD FT. LAUD COUN
above named defendant committed the above offenses charged and the facts showing probable cause to believe same are as follows: BROWARD COUN

THE UNDERSIGNED OFFICER + OFF. D. PORIO INITIALLY OBSERVED THE
ARRESTED VEHICLE IN THE 2300 BLK OF N.W. 19 ST. AS IT W
EASTBOUND. THE VEHICLE FIT THE DESCRIPTION OF A VEHICLE TH
WAS A SUSPECT VEHICLE IN A HOMICIDE WHICH BSO WAS HAN
LINE. DET PARR OF BSO HAD GIVEN THESE OFFICERS CONTINUE

I swear the above statement is correct and true to the best of my knowledge and belief.

OFFICER/AFFIANT'S SIGNATURE    R.P. MARTIN 514    PATROL
OFFICER'S NAME/CCN    OFFICER'S DIVISION

STATE OF    COUNTY OF

The foregoing instrument was acknowledged before me this 15 day of JUNE, 19 95 who is personally
known to me or who has produced (ID Type) _____ as identification and who _____ take an oath. (DID OR DID NOT)

(SEAL OR STAMP)

DEPUTY CLERK OF THE COURT, NOTARY PUBLIC, OR ASSISTANT STATE ATTORNEY    TITLE OR RANK/CCN

0108

SEVENTEENTH JUDICIAL CIRCUIT
BROWARD COUNTY
STATE OF FLORIDA

FIRST APPEARANCE / ARREST FORM
SHOULD ADDITIONAL SPACE BE NEEDED, USE PROBABLE CAUSE AFFIDAVIT CONTINUATION.

Org - Court
2nd - State Atty.
3rd - Filing Agency

COMPLAINT/AFFIDAVIT
PROBABLE CAUSE AFFIDAVIT

ARREST NO. _____

☐ ARREST

DEFENDANT'S LAST NAME: SEARS, DAVID  MIDDLE _____ HGT. _____ WGT. 5'4 135 RC _____ SEX M D.O.B. 3-11-67 OFFENSE REPORT 95-95287 ARRESTING OFFICER (S) CCN R.P. MAR

NAME OF VICTIM (IF CORPORATION, EXACT LEGAL NAME AND STATE OF INCORP.) _____ ADDRESS _____ PHONE #

| COUNT NO. | OFFENSES CHARGED | CITATION #, IF APPLICABLE | F.S. # OR CAPIAS/WARRA. |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

Before me this date personally appeared RICHARD P. MARTIN
deposes and says that on 14 day JUNE, 19 95 at 1500 E. SUNRISE BLVD. who being first duly
above named defendant committed the above offenses charged and the facts showing probable cause to believe same are as follows: BROWARD COUNTY

A DESCRIPTION OF THE SUSPECT VEHICLE AS WELL AS A COMPO.
ITE OF THE POSSIBLE CULPRIT, ON MON. 6-13-95.
ON THIS DATE OFF. MARTIN ATTEMPTED TO CATCH THE VEHICLE
AS IT PROCEEDED EAST ON N.W. 19TH ST. BUT THE VEHICLE
TURNED OFF OF NW 19 ST. IN THE AREA OF N.W. 20 AVE. TO 1
15 AVE. OFF. MARTIN PUT OUT A DESCRIPTION OF THE VEHICLE,
AS WELL AS A BRIEF DESCRIPTION OF THE POSSIBLE SUSPE
+ DIRECTED FLPD OFFICERS TO THE AREA OF W. SUNRISE +
15 AVE. A POMPANO P.D. DETECTIVE (DET. LACY A. CREW)
THEN OBSERVED THE VEHICLE EASTBOUND ON W. SUNRISE BL
NEAR N.W. 9TH AVE. + DIRECTED FLPD MARKED UNITS TO TH
AREA. WHEN SUFFICIANT UNITS WERE IN THE AREA A TRAFF
STOP WAS MADE AT E. SUNRISE + N.E. 15 AVE. (FLPD OFFI(
S. LEDEGANG, CASTRO, PINTO-GONZALEZ, + M. MUNIZ). OFFICER
MARTIN + PORIO RESPONDED TO E. SUNRISE + NE 15 AVE. AN(
CHECKED THE DRIVER FOR A DRIVERS LICENSE, WHICH

I swear the above statement is correct and true to the best of my knowledge and belief.
CONTINUE(

OFFICER/AFFIANT'S SIGNATURE
OFFICER'S NAME/CCN R.P. MARTIN 514
OFFICER'S DIVISION PATROL

STATE OF _____ COUNTY OF _____

The foregoing instrument was acknowledged before me this 5 day of JUNE, 19 9 , who is personally
known to me or who has produced (ID Type) _____ as identification and who (DID OR DID NOT) _____ take an oath.

DEPUTY CLERK OF THE COURT, NOTARY PUBLIC, OR ASSISTANT STATE ATTORNEY

SEVENTEENTH JUDICAL CIRCUIT
BROWARD COUNTY
FIRST APPEARANCE/ARREST FORM

TITLE OR RANK/CCN BLEE 206

0109

(SEAL OR STAMP)

Orig - Court
2nd - State Atty
3rd - Filing Agenc
4th - Arresting A(

**COMPLAINT AFFIDAVIT**
**PROBABLE CAUSE AFFIDAVIT CONTINUA**

| DEFENDANT'S LAST NAME | FIRST | MIDDLE | SUF. | HGT. | WGT. | RC | SEX | D.O.B. | OFFENSE REPORT | ARRESTING OFFICER (S)/CCN |
|---|---|---|---|---|---|---|---|---|---|---|
| SEARS, DAVID | | | | 5'4 | 135 | B | M | 3-11-67 | 95-95287 | R.P. MART, D. PORRO |

| NAME OF VICTIM (IF CORPORATION, EXACT LEGAL NAME AND STATE OF INCORP.) | ADDRESS | PHONE # |
|---|---|---|
| | | |

| COUNT NO. | OFFENSES CHARGED | CITATION #, IF APPLICABLE | F.S. # OR CAPIAS/WARRAN |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |

Before me this date personally appeared __RICHARD P. MARTIN__ who being first duly s
deposes and says that on __14__ day __JUNE__, 19 95 at 1500 E. SUNRISE BLVD. (crime location)
above named defendant committed the above offenses charged and the facts showing probable cause to believe same are as follows: BROWARD COUNT

THE ARRESTED SEARS HAD, BUT IT HAD A RESTRICTION FOR

WORK PURPOSES ONLY, AND THE ARRESTED HAD RELATED TO

OFF. MARTIN THAT HE WAS NOT WORKING, RATHER HE + HI.

GIRLFRIEND (PASS. IN VEHICLE) CHERYL DENISE HALL WER

GOING SHOPPING.

AT THIS POINT SEARS WAS PLACED UNDER ARREST FOR VIO.

OF RESTRICTIONS ON D.L. + A TOW TRUCK WAS CALLED TO

THE SCENE. IT SHOULD ALSO BE NOTED THAT SEARS HAD A

LARGE AMMOUNT OF CASH IN HIS POSSESSION + HE ALSO

HAS A PAST ARREST RECORD FOR NARCOTICS VIOLATIONS. OF:

MONIZ WAS ON THE SCENE WITH HIS DRUG DOE KONAN, WHO

WAS THEN UTILIZED TO CONDUCT A SEARCH OF THE VEHICLE.

THE DRUG DOG LOCATED 14 GMS OF COCAINE UNDER THE

DASH OF THE VEHICLE. THE DRUG DOG ALSO "HIT" ON THE

CASH THAT SEARS + HALL HAD IN THEIR POSSESSION. THE

VEHICLE WAS THEN TOWED TO F.L.P.D. CONFISCATION.

CONTINUED.

I swear the above statement is correct and true to the best of my knowledge and belief.

| OFFICER/AFFIANT'S SIGNATURE | OFFICER'S NAME/CCN | OFFICER'S DIVISION |
|---|---|---|
| | K.P. MARTIN 511 | PATROL |

STATE OF _____    COUNTY OF _____

0110

The foregoing instrument was acknowledged before me this __2__ day of __JUNE__, 19 95, who is personally
known to me or who has produced (ID Type) _____ as identification and who _____ (DID OR DID NOT) take an oath.

Blas Zak

DEPUTY CLERK OF THE COURT, NOTARY PUBLIC, OR ASSISTANT STATE ATTORNEY    TITLE OR RANK/CCN

(SEAL OR STAMP)

FIRST APPEARANCE/ARREST FORM

SEVENTEENTH JUDICAL CIRCUIT
BROWARD COUNTY

Orig    Coun
2nd    State Atty
3rd    Filing Agency
4th    Arresting Ag.

## COMPLAINT AFFIDAVIT

☐ ARREST FC

APPROBABLE CAUSE AFFIDAVIT CONTINUATION

☐ ARREST FC

| DEFENDANT'S LAST NAME | FIRST | MIDDLE | SUF. | HGT. | WGT. | RC | SEX | D.O.B. | OFFENSE REPORT | ARRESTING OFFICER (S)/CCN |
|---|---|---|---|---|---|---|---|---|---|---|
| SEARS, | DAVID | | | 5'4" | 135 | B | m | 3-11-67 | 95-95287 | R.P. MARTIN |

| NAME OF VICTIM (IF CORPORATION, EXACT LEGAL NAME AND STATE OF INCORP.) | ADDRESS | PHONE # |
|---|---|---|
| | | |

| COUNT NO. | OFFENSES CHARGED | CITATION #, IF APPLICABLE | F.S. # OR CAPIAS/WARRANT .. |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

Before me this date personally appeared __RICHARD P. MARTIN__ who being first duly swo
deposes and says that on __19__ day __JUNE__ 19 __95__, __1500 E. SUNRISE BLVD.__ (crime location) t
above named defendant committed the above offenses charged and the facts showing probable cause to believe same are as follows: __BROWARD COUNTY__

THE NARCOTICS WAS VALTOX TESTED BY OFF. MONIZ + SHOWED
POSITIVE FOR COCAINE. THE NARCOTICS + CASH WAS PLACED
INTO EVIDENCE BY OFF. MONIZ.
DET. PARR + DET. O'NEAL ALSO RESPONDED TO E. SUNRISE +
15 AVE. + REQUESTED THAT BOTH SEARS + MALL BE BROUGH
TO BSO HEADQUARTERS SO THEY COULD FURTHER THEIR IN-
VESTIGATION OF THEIR HOMICIDE.
AT THIS POINT SEARS HAD BEEN CHARGED WITH VIO. OF RES
ON HIS D.L. + ALSO POSS. OF COCAINE, AND MALL WAS CHARG-
ED WITH POSS. OF COCAINE, WHICH OFF. MONIZ WAS INITIA-
TING.

I swear the above statement is correct and true to the best of my knowledge and belief.

| OFFICER/AFFIANT'S SIGNATURE | R.P. MARTIN 511 | PATROL |
|---|---|---|
| OFFICER/AFFIANT'S SIGNATURE | OFFICER'S NAME/CCN | OFFICER'S DIVISION |

STATE OF _____ COUNTY OF _____

The foregoing instrument was acknowledged before me this __15__ day of __JUNE__, 19 __95__, who is personally
known to me or who has produced (ID Type) _____ as identification and who __(DID OR DID NOT)__ take an oath.

POLICE Sol.

DEPUTY CLERK OF THE COURT, NOTARY PUBLIC, OR ASSISTANT STATE ATTORNEY
TITLE OR RANK/CCN

FIRST APPEARANCE/ARREST FORM

SEVENTEENTH JUDICIAL CIRCUIT
BROWARD COUNTY

0111

(SEAL OR STAMP)

Orig - Court
2nd - State Atty
3rd - Filing Agency
4th - Arresting Agency

| [ ] 17th Judicial Circuit in and for Broward County<br>[ ] In the County Court in and for Broward County | | CLOCK IN |
|---|---|---|
| **DIVISION:**<br>[ ] CRIMINAL<br>[ ] TRAFFIC<br>[ ] OTHER | **ORDER** | |
| THE STATE OF FLORIDA VS. *DAVID SEARS* | | **CASE NUMBER**<br>*GRAND JUR* |
| **PLAINTIFF** | **DEFENDANT** | |

CHARGE *MURDER IN THE FIRST DEGREE*

*THE GRAND JURY HAVING THIS DATE - JULY 5, 1995, SPRING TERM GRAND JURY, RETURNED A NO TRUE BILL AS TO THE DEFENDANT, IT IS HEREBY ORDERED THAT THE DEFENDANT SHALL BE RELEASED FROM CUSTODY AS TO THIS CASE, ONLY.*

DONE AND ORDERED THIS _20_ DAY OF ___JULY___ 19_95_, IN BROWARD COUNTY, FLORIDA *NUNC PRO TUNC, JULY 5, 1995*

95 JUL 21 PM 4: 21

_____
JUDGE
*BRESCHER*

COPIES: BSO - SAO

FORM #CC-252
REVISED 10/90

0112

October 6, 1998

Mr. Hal Blitman
Associate Superintendent of District Administration
School Board of Broward County, Florida
600 SE 3rd Avenue
Ft. Lauderdale, Florida 33301

Reference:   Additional Information, Appeal
             Cherl D. Sears,

Dear Mr. Blitman,

This letter is to inform you of key details that may better clarify the nature of the
incident I was involved in and the reason behind my electing to attend the prevention
program. I'd like to first thank you for your time in reviewing my motion for appeal.
Prior to this incident I have never been involved in any criminal proceedings nor do I
condone any criminal activity. After being arrested, I sought legal counsel to represent
me. At that time, I was working hard to support both myself and my two children. I
was also attending classes on the weekend to complete my education in order to bring
me closer to becoming a full-time teacher. My attorney advised me that since I had no
prior arrests that if I agreed to the court program, the case would be dismissed and it
would spare me the cost of going to trial. He also advised that I not contest the charge
because I was the owner of the car. Furthermore, he explained that this would be the
best course of action and my record would remain clear. Again, I thank you for your
time and patience, and I hope that this matter can be resolved so that I may return to
back to work to continue touching the bright young minds of my students as a full-time
teacher.

Sincerely,

*Cherl D. Sears.*

Cherl D. Sears



0145



*The Nation's Largest Fully* *Accredited School System*

# THE SCHOOL BOARD OF BROWARD COUNTY, FLORIDA

Gracie M. Diaz
Director
Instructional Staffing Department

Chairperson  Lois Wexler
Vice Chairperson  Darla L. Carter
Carole L. Andrews
Judie S. Budnick
Paul D. Eichner, Esq.
Stephanie Arma Kraft, Esq.
Miriam M. Oliphant
Dr. Robert D. Parks
Diana Wasserman

Dr. Frank R. Petruzielo
*Superintendent of Schools*

December 10, 1998

Cheri Sears
4730 NW 11 Street
Lauderhill, FL 33313

Certified

Dear Ms. Sears:

The Security Clearance Committee, which met November 24, 1998, has denied your appeal for employment with the School Board of Broward County, FL.

We regret that this action was necessary.

Sincerely,

Gracie M. Diaz, Director
Instructional Staffing

GMD:deh



0156

# PERSONNEL DIVISION HANDBOOK



---
### SECURITY CLEARANCE PROCEDURE
---

I   Purpose: To ensure that a security background check is done on all individuals (see III below). ~~who will be in direct contact with the children of The Broward County School System.~~

II  Check for Sexual Predator, Deadbeat Parent, and State Termination:
The Broward Security Clearance Office shall check latest list of sexual predators, deadbeat parents, EPC/PPS records, and the list of persons on the Florida list of terminated employees before giving security clearance.

III  All applicants for employment, all employees of outside vendors, all mentors who come in direct contact with children, all education students prior to their field experience and student teaching, and all employees who become inactive for ninety (90) or more days in TAPS must be fingerprinted and pay a $50.00 fee.

IV  Procedure:

   A.   When individuals in the above categories appear for processing at the Employment Center, they must complete a Security Background Information Form and allow their fingerprints to be taken.

   B.   A local check is done through the Broward Sheriff's Department Docketrac computer system. If no record surfaces, the individual is cleared and the fingerprints are then sent to FDLE. If a record is found at the state level, the record is returned to security clearance office for appropriate action. If no state record is disclosed, the fingerprints are forwarded to FBI. If no record is discovered by the FBI, original fingerprint card is returned to Broward and kept on file. If a record is found, the individual's file is given to the appropriate administrator: Director of Non-Instructional Staffing or Director of Instructional Staffing.

   C.   Individuals with records: The case is reviewed by the appropriate staffing director: if other than a minor traffic offense, the individual is asked to provide explanation, police records and court documents verifying disposition <u>regardless of whether adjudication was withheld, sealed or expunged.</u>

      1.  <u>If an individual provides documentation of a criminal incident (identified in #I Personnel Hiring Guidelines) regardless of whether adjudication was withheld, such individual shall not be employeed.</u>

V.        Appeals Process:

Applicants who have been denied employment because of criminal
incident(s) may appeal the decision of the Security Clearance
Committee ~~may be appealed in~~ by writing to the ~~Associate
Superintendent for District Administration~~ Director, Personnel &
Benefits. Such written appeal shall be considered only if the
applicant provides new information that was not previously
available to the Security Clearance Committee.

Document Preparation Date: July 1, 1996
Revision date: ~~November 20, 1998~~ December XX, 1999
Contact Persons: Gracie M. Díaz, Bill Tegtman
Appendix: Security Background Check Form, Personnel Hiring Guidelines
Authority: Fl Statute 231-02, 435.04
          Board Policy #4002-A, B



# FLORIDA DEPARTMENT OF EDUCATION
### FRANK T. BROGAN
Commissioner of Education

TO: CHERL D SEARS
    4730 NW 11 ST
    LAUDER HILL, FL  33313

FEBRUARY 24, 1998

IN REPLY PLEASE REFER TO:
SSAN# 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

FROM:   BUREAU OF TEACHER CERTIFICATION

SUBJECT: STATEMENT OF ELIGIBILITY

**THIS IS YOUR STATEMENT OF ACADEMIC ELIGIBILITY FOR MIDDLE
GRADES SOCIAL SCIENCE (5-9) VALID UNTIL FEBRUARY 24, 2000.**

The State of Florida issues two types of certificates for
full-time teaching:  a nonrenewable Temporary Certificate
valid for two years and a Professional Certificate valid
for five years.  The attached Form CF-106a, FLORIDA TEACHER
CERTIFICATION REQUIREMENTS, outlines the criteria for the
issuance of these certificates.  The Temporary Certificate
is issued to allow time to complete requirements for the
Professional Certificate.

Your application for teacher certification has been
received and evaluated.  Based upon current requirements,
you will be eligible for a two-year nonrenewable Temporary
Certificate valid for two consecutive school fiscal years
covering MIDDLE GRADES SOCIAL SCIENCE (5-9) when:

    You complete the following subject area specialization
    (subject content) requirements:

    Three (3) semester hours in western civilization; or,
    European, Asian, African, Latin American, or Middle
    Eastern history

    Three (3) semester hours in geography

    You must complete the requirements specified above and
    maintain a 2.5 GPA in the subject area.  Courses
    utilized in this evaluation reflect an acceptable GPA.

    Note:  The specialization requirements listed above
    must be completed prior to the issuance of the
    Temporary Certificate and no later than June 30th of
    the first year of the two-year validity period of the
    certificate.

    You obtain employment with a Florida public, state
    supported, or nonpublic school which has an approved
    system for documenting the demonstration of required
    professional education competence.  Your employer must



# FLORIDA DEPARTMENT OF EDUCATION
## FRANK T. BROGAN
Commissioner of Education

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                                           FEBRUARY 24, 1998
                                                      PAGE  2

request issuance of your certificate.

Your employer submits a fingerprint card which has been
processed by the Florida Department of Law Enforcement
and the Federal Bureau of Investigation.  If your
fingerprint report reflects an arrest record, your file
will be referred to Professional Practices Services for
further review. Issuance of your certificate will be
contingent upon the results of this review.

Please note that if you do not complete specialization
requirements, obtain employment, and issuance of your
certificate is not requested by FEBRUARY 24, 2000, your
Statement of Eligibility will expire.  Another application
and fee may be submitted within one year from the
expiration date of this Statement of Eligibility to
re-establish your eligibility based on these same
requirements.  However, if this Statement of Eligibility
has expired for more than one year when you submit another
application, your eligibility for certification will be
based on requirements which are in effect at the time the
next application is received.

To qualify for a five-year Professional Certificate,
requirements must be completed in the following three
categories: General Requirements, Professional Education
Requirements, and Specific Subject Requirements.

YOU MUST COMPLETE THE FOLLOWING REQUIREMENTS FOR THE
ISSUANCE OF YOUR PROFESSIONAL CERTIFICATE:

GENERAL REQUIREMENTS -

    Submit official documentation of a passing score on the
    Professional Education Subtest of the Florida Teacher
    Certification Examination.

    Submit official documentation of a passing score on the
    College Level Academic Skills Test (CLAST).

    Submit from a Florida district superintendent or the
    chief administrative officer of a Florida state
    supported or nonpublic school, official verification of
    demonstration of required professional education
    competence.



## FLORIDA DEPARTMENT OF EDUCATION
### FRANK T. BROGAN
Commissioner of Education

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                                    FEBRUARY 24, 1998
                                               PAGE   3

Complete the recency-of-credit requirement either by
earning six (6) semester hours of college credit from
an accredited institution in an area in which you are
seeking certification, or by earning 120 inservice
points which are part of an approved Florida district
Master Inservice Plan or a combination of college
credit and inservice points. Sixty inservice points
equate to three (3) semester hours.

Submit Application Form CG-10 and the appropriate fee
as indicated on the application form.

### PROFESSIONAL EDUCATION REQUIREMENTS -

20 semester hours in education courses which must
include:

6 semester hours covering the sociological and
psychological foundations of education

6 semester hours in general methods, curriculum,
school administration, or school supervision

a course in special methods of teaching the subject
in which you are seeking certification as indicated
in the SPECIFIC SUBJECT REQUIREMENTS outlined
below.

The practical teaching experience requirement as
explained in the enclosed attachment.

### SPECIFIC SUBJECT REQUIREMENTS FOR MIDDLE GRADES SOCIAL SCIENCE (5-9)

Complete the subject area specialization (content
courses) specified for issuance of the two-year-
nonrenewable Temporary Certificate.

Submit official documentation of a passing score on the
MIDDLE GRADES SOCIAL SCIENCE (5-9) subject area test

Complete the special methods requirement as follows:

2 semester hours in special methods of teaching social
science in the middle grades



# FLORIDA DEPARTMENT OF EDUCATION
### FRANK T. BROGAN
Commissioner of Education

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

FEBRUARY 24, 1998
PAGE 4

NOTE:  The college credit earned to complete the special
methods requirement will also be applicable toward the
total hours specified in PROFESSIONAL EDUCATION
REQUIREMENTS listed above.

PLEASE NOTE:  BASED ON CURRENT STATUTES, YOU MAY RECEIVE
ONLY ONE TEMPORARY CERTIFICATE, VALID FOR TWO YEARS, PRIOR
TO ISSUANCE OF THE PROFESSIONAL CERTIFICATE.  IF YOU HAVE
REQUESTED CERTIFICATION IN MORE THAN ONE SUBJECT, IT IS NOT
NECESSARY FOR YOU TO COMPLETE REQUIREMENTS SPECIFIED FOR
ALL SUBJECTS PRIOR TO ISSUANCE OF YOUR PROFESSIONAL
CERTIFICATE.  HOWEVER, IT IS ESSENTIAL THAT YOU COMPLETE
REQUIREMENTS SPECIFIED IN YOUR STATEMENT OF ELIGIBILITY FOR
GENERAL REQUIREMENTS, PROFESSIONAL EDUCATION REQUIREMENTS,
AND SPECIFIC SUBJECT REQUIREMENTS FOR THE PROFESSIONAL
CERTIFICATE IN AT LEAST ONE SUBJECT TO INSURE YOUR
ELIGIBILITY FOR ANOTHER CERTIFICATE FOR THE SCHOOL YEAR
IMMEDIATELY FOLLOWING THE EXPIRATION OF YOUR TEMPORARY
CERTIFICATE.

The Bureau of Teacher Certification will be pleased to
answer any questions that you may have after you have
carefully reviewed your Statement of Eligibility.  You may
direct written correspondence to: The Bureau of Teacher
Certification, Florida Department of Education, 325 West
Gaines Street, Tallahassee, FL, 32399-0400.  If you live in
Florida, you may call the Bureau of Teacher Certification
at 1-800-445-6739.  (You CANNOT reach the Bureau by
substituting the area code "850" for the "800" toll-free
extension).  If you live outside the State, you may reach
the Bureau at 850-488-2317.

ENCLOSURE(S)
 PTER

STAFF: JCT

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 00-6017-CIV-DIMITROULEAS/SELTZER

CHERL SEARS,                          )
                                      )
                Plaintiff.            )
                                      )
v.                                    )
                                      )
THE SCHOOL BOARD OF BROWARD           )
COUNTY, FLORIDA,                      )
                                      )
                Defendant.            )
_____)

## AFFIDAVIT OF GRACIE DIAZ

STATE OF FLORIDA        )
                        )SS
COUNTY OF BROWARD       )

I, GRACIE DIAZ, being first duly sworn, depose and state that I am over eighteen (18) years of age. that I am sui juris and that this Affidavit is made voluntarily and of my own free will without threats or promises of benefit by or from any person, and is based on my personal knowledge.

1.    I am presently employed as the Director of Instructional Staffing by the School Board of Broward County, Florida (hereinafter, "School Board"). I have been employed by the School Board since 1987 and have held my current position as Director for the past two years. Prior to becoming Director. I held the position of Assistant Director of Instructional Staffing. In my current position, I am responsible for the recruitment and hiring of all new instructional employees. I am also in charge of substitute teachers, as well as all leaves, transfers, and bonuses for the instructional staff. In addition, I serve as the Chairperson of the School Board's Security Clearance Committee,

which reviews employee and applicant background checks when security concerns arise. As Chairperson, I was present at the Security Clearance Committee meetings regarding the Plaintiff, Ms. Cherl Sears.

2.    The School Board employs three types of substitute teachers: Regular Substitutes, Interim Substitutes, and Pool Substitutes. Regular Substitutes are called in to a school on an ad hoc basis to substitute for an absent teacher that day. A Regular Substitute is not required to have a college degree but must have at least 60 semester hours of college credit. Regular Substitutes are paid at a daily rate of approximately seventy to eighty dollars per day, and receive no fringe benefits.

3.    Pool Substitutes report each school day to a particular school to be available to fill in for absent teachers as the need arises. Each person hired as a Pool Substitute agrees in writing to accept the position for one school year only (specifically, 180 days), at a specified daily rate of pay of approximately ninety dollars per day. Pool Substitutes also receive state retirement, FICA, and worker's compensation benefits. Like a Regular Substitute, a Pool Substitute is not required to have a college degree but must have at least sixty semester hours of college credit.

4.    Interim Substitutes are hired to teach a class for at least twenty consecutive days or more. Interim Substitutes must have a bachelor's degree and are paid the daily rate of a beginning teacher (approximately $28,500/year). Interim Substitutes cannot be put into a vacant teaching position; they can only be used to substitute for a teacher on an extended leave of absence (i.e., sickness or injury, pregnancy, or workers' compensation).

5.    All substitutes must attend and complete the Substitute Teaching Training Workshop, must qualify for a Broward County Substitute Teaching Certificate, and must undergo a criminal

background check which includes fingerprinting. All substitutes also sign a memorandum of understanding which specifies that regular work during the school year is not guaranteed.

      6.     Substitute teachers are expressly excluded from coverage under the collective bargaining agreement between the School Board and the Broward Teachers Union.

      7.     Plaintiff, Cherl Sears, was first employed by the School Board as a Regular Substitute teacher in February, 1992. She worked on an as needed basis as a Regular Substitute teacher until October 1, 1996. Official School Board records establish that Ms. Sears thereafter worked as a substitute teacher in the following capacities:

| School Period | Substitute Position |
|---|---|
| 10/02/96 - 06/13/97 | Pool |
| 07/01/97 - 09/30/97 | Regular |
| 10/01/97 - 03/01/98 | Pool |
| 03/02/98 - 06/12/98 | Interim |
| 08/25/98 - 10/05/98 | Regular |

At the time she was initially authorized to work as a substitute teacher, Ms. Sears signed a Memorandum of Understanding which stated that she "understood that there are currently over 3,300 substitutes available for employment and that regular employment should not be expected nor guaranteed."

      8.     Pursuant to Florida law, criminal background checks have been required for new School Board instructional employees since, at least, the mid 1980s.   In 1989, non-instructional employees who have direct contact with students were added to the group for which the School Board was required to conduct fingerprint checks. The background check requirements apply to regular as well as substitute employees and normally involve requiring the employee to submit a complete set of fingerprints, which are then sent to the Federal Bureau of Investigation and the

-3-

Florida Department of Law Enforcement for review. Official School Board records reflect that Ms. Sears was fingerprinted upon being employed as a Substitute Teacher in 1992 and again in 1994. She had no reported criminal history at that time and passed both those background/fingerprint checks.

9.     In order to implement the requirements of Florida law regarding fingerprinting and criminal background checks for employees, the School Board established a Security Clearance Committee. Pursuant to School Board procedures put in place in July, 1996, applicants for full-time instructional positions were required to complete a security background check form and be fingerprinted. If an applicant disclosed past criminal activity on the form, or the fingerprint check revealed such criminal activity, the School Board obtained the relevant police report(s) and records for review by the Security Clearance Committee.

10.    The responsibility of the Security Clearance Committee was, and currently is, to make determinations of eligibility for employment with the School District. At the time of the determination regarding Ms. Sears, the Security Clearance Committee's policy was to look at the type of crime involved, when it was committed, and how it was adjudicated. The Security Clearance Committee would also take into consideration any mitigating factors, such as whether a long period of time had passed since the offense and what the person had done since that time, i.e., whether he or she had a clean record.

11.    Further, in making its determinations regarding eligibility for employment with the School Board, the Security Clearance Committee generally followed Section 435.04, Florida Statutes (1997), which provides that persons with a record of having committed certain criminal offenses, regardless of adjudication, should not be hired. Specifically, Section 435.04 requires security

-4-

background investigations for all employees in positions designated by law as positions of trust or responsibility to ensure that such persons have not pled nolo contendere to specific criminal activities, including but not limited to violation of Chapter 893, Florida Statutes, relating to drug abuse prevention and control. Each employer must sign an affidavit, under penalty of perjury, to that effect. Termination of employment of any personnel found to be in noncompliance is required unless an exemption is requested and granted.

12.     The Security Clearance Committee also considered the standards adopted by the Professional Practices Division of the Florida Department of Education for the issuance of teaching certificates, which provide that an applicant may be deemed ineligible for certification even if the criminal offense with which he or she was charged resulted in a plea of nolo contendre, withholding of adjudication, or pretrial intervention.

13.     After reviewing the merits of a case, if the Security Clearance Committee found reason to believe that a disqualifying offense occurred and insufficient mitigating factors were present, the Committee served as the initial step in the screening process to determine the person to be non-employable. However, prior to policy changes implemented in 1999 as discussed below, no applicant was ever automatically denied employment. In fact, instructional personnel have been hired or retained despite past felony arrests.

14.     On or about September 16, 1998, Ms. Sears applied for a full-time teaching position with the School Board. Prior to that time, Ms. Sears had only worked for the School Board as a substitute teacher. As part of the full-time teacher application process, Ms. Sears was required to complete a new security background check form. On that form, Ms. Sears disclosed that she had been arrested and charged in 1995 with possession of cocaine. Ms. Sears also disclosed that she had

-5-

pled "no contest" in the criminal proceeding and that she had participated in a pre-trial intervention program after which the charge was dismissed. On the back of the form, she stated that she allowed a "male friend" to borrow her car for a day; that the friend then returned to pick her up at which time Ms. Sears entered the passenger side of her car; and that the "male friend" drove them to a mall where she and the "male friend" were confronted by the police. The police searched Ms. Sears' car and found cocaine. Ms. Sears alleged that she had no knowledge that the cocaine was in her car. Ms. Sears and her "male friend" were subsequently arrested. Ms. Sears stated that she was "ordered" to attend pre-trial intervention. After she completed the pre-trial intervention program, the felony criminal case against her was dismissed.

15.    Contrary to the explicit requirements of Section 230.335(1)(a), Florida Statutes (1994 Supp.), the fact that Ms. Sears had been arrested for felony cocaine possession was not reported to the School Board's Superintendent of Schools within 48 hours by the law enforcement agency which made the arrest.

16.    Upon receipt and review of the police report on Ms. Sears' arrest, the Security Clearance Committee learned that Ms. Sears (formerly known as "Cherl Hall") had been arrested on June 14, 1995, and that the criminal proceedings against her continued into the period during which she was working as a substitute teacher for the School Board. The police report also stated that Ms. Sears' "male friend" was David Sears, her live-in boyfriend at the time of arrest. The report further noted that the police found 14 grams of crack cocaine in the passenger-side compartment of the car. The arresting Officer stated in the report that a trained narcotics dog specifically alerted on Ms. Sears' purse, where the Officer found a rolled bundle of fifty one-dollar bills. According to the

-6-

police report, Ms. Sears was charged with violation of Section 893.13, Florida Statutes, which makes it a felony to possess crack cocaine.

17.    On October 1, 1998, based on its assessment of the facts presented before it, the Security Clearance Committee determined that Ms. Sears was not employable with the School Board at that time. This determination was based on the felony arrest for possession of 14 grams of crack cocaine; the fact that Ms. Sears pled "no contest" to that felony narcotics charge and entered a pre-trial intervention program; and the incomplete and otherwise misleading manner in which Ms. Sears described her arrest on the security background check form. Specifically, Ms. Sears' statement on the back of the security background check form gave the impression that she was merely "in the wrong place at the wrong time" and, therefore, had nothing to do with the illegal drugs found in her car, which, upon further review by the Security Clearance Committee, did not appear to be forthright or truthful. For instance, the "male friend" referred to was actually Ms. Sears' husband at the time she disclosed the arrest to the School Board.

18.    The Security Clearance Committee's determination in this regard also complied with Section 435.03(2), Florida Statutes (1997). Ms. Sears' application for a full-time teaching position was denied and she was removed from the substitute teacher availability list.

19.    Official School Board records establish that on October 6, 1998, Ms. Sears sent a letter to Mr. Hal Blitman, (former) Assistant Superintendent of District Administration, appealing the Security Clearance Committee's decision to deny her clearance for employment.

20.    On November 10, 1998, I received a letter from Mark J. Berkowitz, Esquire, on behalf of Ms. Sears, demanding that Ms. Sears be reinstated as a substitute teacher and that her application for a full-time teaching position be given "appropriate and full consideration by the

-7-

School Board." Mr. Berkowitz stated that, if the School Board did not respond to the demand by November 23, 1998, Ms. Sears was "prepared to take formal legal measures."

21.     The Security Clearance Committee reconvened on November 24, 1998, to consider Ms. Sears' appeal of its previous decision to reject her for full-time employment as a teacher and remove her from the substitute teaching availability list. After reviewing the correspondence and documents sent by, and on behalf of, Ms. Sears, the Security Clearance Committee denied Ms. Sears' appeal.

22.     At no time during her employment with the School Board did Ms. Sears hold any type of Florida Teaching certificate that would have allowed her to be hired as a regular full-time teacher under Florida law. Thus, even if Ms. Sears had been cleared by the Security Clearance Committee, the School Board still could not have employed her as a regular full-time teacher at that time.

23.     In December 1999, following an audit of the Security Clearance Committee's procedures by the Broward County Sheriff's Office, the Security Clearance Committee developed formal, written guidelines. The new guidelines delineate when the Security Clearance Committee should automatically deny employment (such as, for egregious offenses like sexual assault, child abuse, kidnaping and extreme violence) and when applicants should be considered on a case-by-case basis. The guidelines apply to guilty pleas (regardless of adjudication), no contest pleas, and pre-trial intervention/diversion.

24.     In all cases (both pre-December 1999 and post-December 1999), each applicant has had the right to appeal the Security Clearance Committee's determination. Appeal is first made directly to the Security Clearance Committee via a designated Associate Superintendent of Schools.

-8-

The Security Clearance Committee then reconvenes, with the Associate Superintendent present, and reviews the merits of the case again. The Associate Superintendent makes the final administrative determination regarding eligibility for employment. Each applicant also has the option of appealing an adverse determination to the Superintendent of Schools or the elected members of the Broward County School Board.

25.   Ms. Sears could have appealed the Security Clearance Committee's decision to the Superintendent of Schools or the elected members of the Broward County School Board.

26.   After the Security Clearance Committee's denial of Ms. Sears' appeal, Ms. Sears never reapplied for employment with the School Board. The School Board does not have any policy that would absolutely and permanently bar Ms. Sears from employment with the School Board.

27.   Under Florida law, in order to be hired for a full-time instructional position, an applicant must have a valid Florida Professional Teaching Certificate or be eligible for one (i.e., possess a Temporary Teaching Certificate). The Florida Department of Education ("DOE") determines eligibility. Specifically, the DOE, upon review of an application for certification, will issue a "Statement of Eligibility" indicating what the applicant must do in order for a Temporary certificate to be issued. If the Statement of Eligibility indicates that "specialization requirements" are required, the applicant will not be eligible for a Temporary Certificate until the noted courses are completed. Thus, a Statement of Eligibility is not the same as a Temporary Teaching Certificate. Once a Temporary Certificate is issued, the certificate holder has two years to complete any additional requirements to obtain a Professional Certificate. In any event, prior to issuance of a Certificate (Temporary or Professional), the DOE requires a fingerprint card which has been processed by the Florida Department of Law Enforcement and the Federal Bureau of Investigation.

-9-

If the background check on the applicant reflects an arrest record, the file is sent to DOE's Professional Practices Services for a further review, and the issuance of any type of teaching certificate is contingent upon the results of that review.

28.    At the time Ms. Sears applied for the full-time teaching position, she had not completed the six semester hours of college courses which the DOE informed her were required as "specialization requirements" on her Statement of Eligibility prior to obtaining authorization to receive a temporary teaching certificate. Although Ms. Sears had taken six semester hours in Language Development & Learning Disabilities and Survey of Exceptional Children, those courses did not fulfill the requirements to obtain her temporary Florida teaching certificate because neither of the two courses were in the required fields of study (i.e., Geography and Western Civilization). Again, absent an actual Temporary (or Professional) Teaching Certificate, Ms. Sears was not employable as a regular full-time teacher.

29.    At no time during her employment as a substitute teacher by the School Board was Ms. Sears ever granted a regular employment contract as a teacher under Section 231.36, Florida Statutes.

-10-

I, GRACIE DIAZ, state that I have read the foregoing Affidavit consisting of 29 numbered paragraphs and swear or affirm that it is true and correct to the best of my knowledge.

_____
GRACIE DIAZ

The foregoing instrument was executed before me this 21 day of December, 2000, by GRACIE DIAZ, who is personally known by me [or who has produced *FL. Drivers Lic.* as identification] and who took an oath.

_____
Notary Public
State of Florida at Large

*Oscar L. Gonzalez*
Type or Print Name of Notary

My Commission Expires:

OFFICIAL NOTARY SEAL
OSCAR L GONZALEZ
NOTARY PUBLIC STATE OF FLORIDA
COMMISSION NO. CC846060
MY COMMISSION EXP. JUNE 13,2003

Suite 3600
First Union Financial Center
200 South Biscayne Boulevard
Miami, Florida 33131-2338
(305) 358-5500 (Miami-Dade)
(954) 522-0393 (Broward)
(305) 379-3802 (Fax)

MULLER, MINTZ, KORNREICH, CALDWELL,
CASEY, CROSLAND & BRAMNICK, P.A.

By_____
Gordon D. Rogers, Esquire
Florida Bar No. 240168
grogers@mullermintz.com

By_____
Debra M. Lubkin
Florida Bar No. 0992161
dlubkin@mullermintz.com
Counsel for Defendant

-11-

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of this document has been furnished to Mark J. Berkowitz,

Esquire, Mark J. Berkowitz, P.A., Counsel for Plaintiff, Suite 200N, 524 South Andrews Avenue,

Fort Lauderdale, Florida 33301, by mail, this 21st day of December, 2000.

for Debra M. Lubkin